Case No. 23-1618

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Robert Arias

v.

U.S. Government, et al.

Appeal from United States District Court
for the District of New Hampshire

---

**APPENDIX TO BRIEF OF
APPELLANT, ROBERT ARIAS**

---

Jeremy D. Eggleton, Esq.
NH Bar #18170
Orr & Reno, P.A.
45 S. Main Street, Suite 400
P.O. Box 3550
Concord, NH  03302-3550
Phone:  (603) 224-2381
Fax:  (603) 224-2318
jeggleton@orr-reno.com

To be argued by:
Jeremy D. Eggleton, Esq.

# APPENDIX
# TABLE OF CONTENTS

Order on Second Motion for Summary Judgment,
dated June 27, 2023 ......................................................................................... 4

Defendants' Motion for Summary Judgment,
dated November 15, 2022 ................................................................................ 20

Memorandum in Support of Defendants' Motion for Summary
Judgment with Declaration of Gary Owen, dated
November 15, 2022 .......................................................................................... 21

Declaration of Gary Owen (Supplement, Doc. #67), filed
November 21, 2022 .......................................................................................... 40

Plaintiff's Objection to Defendants' Second Motion for Summary
Judgment, dated December 14, 2022 ................................................................ 43

Plaintiff's Memorandum of Law in Support of Objection to Defendants'
Motion for Summary Judgment, dated December 14, 2022 .............................. 45

Defendants' Reply to Objection to Defendants' Moton for Summary
Judgment, dated December 21, 2022 ................................................................ 51

Order on Defendants' Renewed Motion for Summary Judgment,
dated January 19, 2021 .................................................................................... 57

Defendants' Renewed Moton for Summary Judgment, dated
May 14, 2020 ................................................................................................... 70

Memorandum in Support of Defendants' Motion for Summary
Judgment With Exhibits, dated May 14, 2020 .................................................. 72

Plaintiff's Objection to Motion for Summary Judgment, dated
September 29, 2020 .......................................................................................... 155

Memorandum in Support of Plaintiff's Objection to Moton for
Summary Judgment With Affidavits of Arias & Jose, dated
September 29, 2020 .......................................................................................... 159

Defendants' Reply to Objection to Defendants' Motion for
Summary Judgment With Exhibits, dated October 20, 2020 ........................... 178

Plaintiff's Surreply to Reply to Objection to Defendants'
Motion for Summary Judgment, dated November 13, 2020 ........................... 216

Verified Complaint, dated October 19, 2017 ................................................... 221

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Brief of the Appellant and Appendix to the Brief of the Appellant have been forwarded, this day, to counsel of record via the First Circuit Court of Appeals electronic filing File and Serve system.

/s/ Jeremy D. Eggleton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Robert Arias

    v.                                            Civil No. 17-cv-516-LM
                                                    Opinion No. 2023 DNH 076 P
Noah A. Herzon, et al.


**O R D E R**

Plaintiff Robert Arias alleges that several Drug Enforcement Administration ("DEA") agents used excessive force on him (or failed to intervene against other agents' use of excessive force) when they arrested him in September 2016. Arias's claims arise under the Fourth Amendment. He seeks damages from the defendants under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

Defendants move for summary judgment (doc. no. 66). They rely on recent Supreme Court precedent, Egbert v. Boule, --- U.S. ---, 142 S. Ct. 1793 (2022), that strictly limits the applicability of Bivens outside of its original "context." Defendants contend that Arias's excessive force and failure-to-intervene claims seek to apply Bivens to a new context. Arias disagrees and contends that both claims survive summary judgment because they "fall within the ambit of Bivens."

For the reasons that follow, the court agrees with defendants and grants their motion for summary judgment.

4

## STANDARD OF REVIEW

Summary judgment is proper only if the moving party can demonstrate that there is no evidence in the record to support a judgment for the nonmoving party. Borges v. Serrano-Isern, 605 F.3d 1, 5, 8 (1st Cir. 2010); see also Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the courts must view the evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence. Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

## BACKGROUND

The following facts are drawn from the court's (McAuliffe, J.) first summary judgment order (doc. no. 56). They are uncontested for purposes of the issue before the court.

Law enforcement officers investigating drug trafficking made several controlled purchases of fentanyl-laced heroin from Arias. On September 8, 2016, the 6 named defendants[1] and 12 other federal law enforcement officers arrested Arias. Arias's arrest was authorized by an arrest warrant. All of the defendants are either DEA agents or local police officers assigned to a DEA task force.

The arrest occurred at the parking lot of the Rockingham Park Mall in Salem, New Hampshire. Arias arrived at the mall in a car driven by his pregnant

---

[1] The court previously granted summary judgment in favor of two of the six defendants, so only four officers remain in this case. See doc. no. 56

2

**5**

wife, Carmen Jose. Arias sat in the front passenger seat. Carmen Jose pulled the car into a parking spot. Several police cars pulled in, blocking Arias's car into the spot. Seeing that she had nowhere to move the car, Carmen Jose put the car into park. The officers, many in plain clothes, approached the car with their weapons drawn.

The officers tried to remove Arias from the car, but he was wearing a seatbelt. An officer cut Arias's seatbelt and dragged him from the car, took him to the ground, and handcuffed him. Both Arias and Carmen Jose complied with all of the officers' commands. The officers stated in affidavits that the arrest was quick and nonviolent. They say that Arias suffered no injuries of significance.

By contrast, Arias stated in an affidavit that the officers dragged him from the car by his neck. Once the officers had Arias on the ground, they handcuffed him, stepped on his legs, and hit his head against the ground. Arias involuntarily urinated in his pants because of the fear the officers caused him. At some point, Arias lost consciousness. Carmen Jose recounted a similar version of events in her affidavit.

Arias brought this suit in 2017. He alleges that the arresting officers used excessive force against him in violation of the Fourth Amendment. He alleges that the officers who watched his violent arrest but failed to protect him also violated the Fourth Amendment.

Arias seeks money damages for the alleged physical and emotional injuries that he suffered. In January 2021, this court (McAuliffe, J.) denied defendants'

Case 1:17-cv-00516-LM   Document 71   Filed 06/12/23   Page 4 of 16

motion for summary judgment on the ground of qualified immunity. Defendants filed this second motion for summary judgment after the Supreme Court's decision in Egbert v. Boule.

## DISCUSSION

Relying on Egbert, defendants argue that the court must dismiss Arias's claims for excessive force and failure to intervene in the use of excessive force because this case applies Bivens in a "new context." Arias responds that the circumstances of his claims are, in all material respects, like those of Bivens. After reviewing the applicable law, the court addresses Arias's excessive-force claims first and his failure-to-intervene claims second.

The Fourth Amendment prohibits federal officers from using excessive force on arrestees. E.g., Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 70-71 (1st Cir. 2016). While 42 U.S.C. § 1983 permits plaintiffs to bring damages suits against state officials for constitutional violations, there is no analogous statutory cause of action for such suits against federal officials. See Ziglar v. Abbasi, 582 U.S. 120, 130-31 (2017). Notwithstanding that absence of statutory authorization, the Supreme Court held in Bivens that an arrestee could bring a suit under the Fourth Amendment for damages from the federal officers who searched his home and arrested him, allegedly using excessive force in the process. 403 U.S. at 397. Subsequently, the Supreme Court recognized a similar "implied cause of action" under the constitution in two other suits seeking damages for alleged constitutional violations. First, in Davis v. Passman, 442 U.S 228 (1979), the Court held that a

4

**7**

former congressional staffer could bring a suit for damages against a United States Congressman for sex discrimination in violation of the Fifth Amendment. Then, in Carlson v. Green, 446 U.S. 14 (1980), the Court held that a deceased federal inmate's estate could bring a suit for damages against prison officials for their failure to provide the inmate adequate medical treatment in violation of the Eighth Amendment.

But since deciding Carlson, the Supreme Court has "consistently refused" to extend Bivens despite numerous opportunities to do so. See Abbasi, 582 U.S. at 135; see also Drewniak v. U.S. CBP, 554 F. Supp. 3d 348, 355 (D.N.H. 2021) (collecting Supreme Court cases). More recently, the Supreme Court "has scaled back Bivens significantly, delivering a trilogy of opinions expressing opposition toward any expansion of Bivens actions." See Bulger v. Hurwitz, 62 F.4th 127, 136 (4th Cir. 2023) (citing Egbert, 142 S. Ct. at 1803, Hernandez v. Mesa, 589 U.S. ---, 140 S. Ct. 735, 741 (2020), and Abbasi, 582 U.S. at 135). This approach derives from the Court's separation-of-powers concerns, as the Supreme Court has expressed its view that Congress—not the courts—should determine whether a private right of action for damages should exist for constitutional violations. See Abbasi, 582 U.S. at 133-34 ("[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation.").

5

**8**

At the same time, the Supreme Court has not overruled <u>Bivens</u>. <u>Egbert</u>, 142 S. Ct. at 1803 ("[R]ather than dispense with <u>Bivens</u> altogether, we have emphasized that recognizing a cause of action under <u>Bivens</u> is 'a disfavored judicial activity.'"). Instead, the Supreme Court has imposed "a highly restrictive two-step analysis," which limits when claims for damages against federal officers may proceed. <u>Bulger</u>, 62 F.4th at 136-37.

Under the first step, the court must determine whether the claim seeks to apply <u>Bivens</u> in a "new context" or involves a "new category of defendant." <u>Id.</u> at 137 (quoting <u>Hernandez</u>, 140 S. Ct. at 743). A case presents "a new <u>Bivens</u> context" if it is "meaningfully" different from all three cases in which the Supreme Court has authorized damages claims against federal officers for constitutional violations. <u>Egbert</u>, 142 S. Ct. at 1803; <u>Bulger</u>, 62 F.4th at 137. Meaningful differences may include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the function of other branches; <u>or the presence of potential special factors that previous Bivens cases did not consider.</u>

<u>Abbasi</u>, 582 U.S. at 140 (emphasis added). Thus, a meaningful difference from <u>Bivens</u> exists where a claim presents "special factors" which the Supreme Court did not consider in <u>Bivens</u>. <u>Id.</u> In <u>Egbert</u>, the Supreme Court made clear that an alternative remedial structure, created by either the Executive or by Congress, is

one such "special factor" that courts must consider in making this determination. See 142 S. Ct. at 1806-07. This followed from the Supreme Court's earlier holdings that legislatively created comprehensive alternative remedies can make the "situation altogether different from Bivens." See Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 73 (2001); Bush v. Lucas, 462 U.S. 367, 378, 385-86 (1983); see also Gonzalez v. Velez, 864 F.3d 45, 52-54 (1st Cir. 2017) (holding, in the alternative, that the existence of an "alternative process that Congress may have viewed as an equally effective surrogate for an action brought directly under the Constitution" forecloses relief under Bivens).

The court proceeds to the second step in the analysis if it determines that a meaningful difference exists. At the second step, the court must dismiss the claim if there is "any rational reason (even one)" to think that either Congress or the Executive branch "is better suited" to determine whether a cause of action exists than the courts. Egbert, 142 S. Ct. at 1803. In Egbert, the Supreme Court acknowledged that the two-step analysis "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." Id. And Egbert further clarified that the presence of an alternative remedial structure is a "special factor" counseling in favor of dismissal. See id. at 1806-07.

Thus, after Egbert, once a court determines that there is an alternative remedial structure that Bivens did not consider, the two-step framework collapses into one question: Is there any reason to think that the Judiciary is better equipped

**10**

Case 1:17-cv-00516-LM   Document 73   Filed 03/31/21   Page 8 of 16

than Congress or the Executive branches to augment that remedy? <u>Egbert</u>, 142 S. Ct. at 1805. The answer requires deference to the other branches and will likely always be answered in the negative. As explained in <u>Egbert</u>: "[T]he question of whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a Bivens remedy." <u>Id.</u> at 1807.

The parties agree that, of the three cases in which the Supreme Court has authorized damages causes of action against federal officers (<u>Bivens</u>, <u>Carlson</u>, and <u>Davis</u>), only <u>Bivens</u> itself is relevant here. In <u>Bivens</u>, officers from the Federal Bureau of Narcotics[2] entered Bivens's apartment and arrested him for alleged narcotics crimes. 403 U.S. at 389. Bivens alleged that the agents handcuffed him "in front of his wife and children, and threatened to arrest the entire family." <u>Id.</u> The officers searched the apartment, and they took Bivens to a federal courthouse, where he was interrogated, booked, and "subjected to a visual strip search." <u>Id.</u>

---

[2] The Supreme Court in <u>Abbasi</u>, 582 U.S. at 140, described <u>Bivens</u> as involving "a claim against FBI agents," although <u>Bivens</u> involved agents from the Federal Bureau of Narcotics. <u>Bivens</u>, 403 U.S. at 389 ("Petitioner's complaint alleged that . . . agents of the Federal Bureau of Narcotics acting under claim of federal authority . . . ."); <u>Bivens</u>, 276 F. Supp. 12, 13 (E.D.N.Y. 1967) (quoting Bivens's complaint as bringing claims against "six (6) Agents of the U.S. Narcotic Bureau"); <u>Bivens</u>, 456 F.2d 1339, 1341 (2d Cir. 1972) (stating, on remand from Supreme Court, that "we must now decide the important and highly controversial question whether the acts of these Federal Bureau of Narcotics Agents are clothed with immunity . . . ."). It is unclear why the Supreme Court in <u>Abbasi</u> described the defendants in <u>Bivens</u> as FBI agents.

8

**11**

Bivens later brought suit against the arresting officers. Id. He alleged that the officers arrested him and searched his apartment without a warrant and without probable cause. Id. Additionally and separately, he alleged that the officers used unreasonable force when arresting him. Id. The Supreme Court held that Bivens could seek money damages against the officers for all those alleged violations of the Fourth Amendment, even though Congress had not expressly created a damages remedy by statute. Id. at 397 ("[W]e hold that petitioner is entitled to recovery money damages for any injuries he has suffered as a result of the agents' violation of the Amendment.").

Despite its refusal to extend Bivens, the Court recognizes that Bivens is still good law. Abbasi, 582 U.S. at 134. In Abbasi, the Court explained that the "settled law of Bivens in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." Id.

Relying on Bivens, Arias brings two Fourth Amendment excessive force claims against the DEA agents who arrested him. The first claim is brought against the officers who inflicted the excessive force, and the second is brought against the officers who failed to intervene to stop the excessive force. Until Egbert, Arias's first Bivens claim may have survived. After Egbert, neither of his claims is viable.

I.   Excessive Force

Defendants argue that Arias's excessive-force claims are materially different from Bivens because (1) Arias was arrested pursuant to warrant in a parking lot while Bivens's arrest occurred without a warrant in his home, and (2) the DEA has, like Border Patrol, an alternative remedial structure, a factor which was not considered in Bivens and was dispositive in Egbert. Defendants' second argument is persuasive.

Bivens and Arias's claims share many of the same background facts: an arrest made by federal narcotics agents investigating a violation of federal drug laws that would have been routine but for the alleged constitutional violations. Whether the officers had a warrant for Arias's arrest is not a meaningful difference from Bivens. See Bueno Diaz v. Mercurio, 442 F. Supp. 3d 701, 708 (S.D.N.Y. 2020) (finding that plaintiff's arrest pursuant to a warrant did not create a meaningful difference from Bivens when plaintiff alleged excessive force claims). As discussed, Bivens involved two allegedly unlawful actions: a warrantless search and seizure and an arrest executed with excessive force, and it recognized the availability of damages for both violations. See 403 U.S. at 389 ("[H]is complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest . . . ."). The arresting officers' possession of a warrant in this case is a difference from Bivens, but not one with meaning. Likewise, the court does not find persuasive defendants' argument that this case is meaningfully different from Bivens because Bivens involved an arrest in the

10

**13**

plaintiff's home while this case involves an arrest in a parking lot. These differences are illusory rather than meaningful. See Abbasi, 582 U.S. at 149 (acknowledging that some differences "will be so trivial that they will not suffice to create a new Bivens context"). Furthermore, the category of defendants is effectively the same here as in Bivens. In 1973, the functions of the Federal Bureau of Narcotics (the agency at issue in Bivens) were transferred to the DEA — the agency defendants work for in this case.[3]

Here, however, the defendants also point to the DEA's alternative remedial structures under the Inspector General Act of 1978, 5 U.S.C. chapter 4,[4] and the Office of Professional Responsibility, 28 C.F.R. § 0.29c(c). These processes allow individuals like Arias to file misconduct reports against DEA agents, which may then be investigated and remedied by the appropriate office. Defendants contend that the Border Patrol's similar administrative process was critical to the Supreme Court's holding in Egbert that Bivens did not extend to a claim against a border patrol agent. The court agrees that the existence of these alternative remedial

---

[3] Specifically, in 1968, the Bureau of Narcotics (which had been part of the Department of the Treasury) was abolished and its functions transferred to the newly established Bureau of Narcotics and Dangerous Drugs, part of the Department of Justice. See Reorganization Plan No. 1 of 1968, 38 F.R. 15932, 1968-2 C.B. 907; United States v. Feola, 420 U.S. 671, 684 n.18 (1975). Then, in 1973, the Bureau of Narcotics and Dangerous Drugs was abolished and its functions were transferred to the DEA. See Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091.

[4] The Inspector General Act was initially codified in an appendix to the U.S. code, 5 U.S.C.App. §§ 1 et seq. Effective December 2022, Congress moved those provisions to 5 U.S.C. chapter 4. Pub. L. 117-286, 136 Stat. 4196.

structures is sufficient both to place Arias's case in a new context and to preclude expansion of <u>Bivens</u> to that new context.

In <u>Abbasi</u>, the Supreme Court stated that one reason to find a new context is the "presence of potential special factors that previous <u>Bivens</u> cases did not consider." 582 U.S. at 140. Then, in <u>Egbert</u>, the Supreme Court made clear that an alternative remedial structure is a "special factor" which courts must give heightened consideration. <u>See</u> 142 S. Ct. at 1806-07. In other words, the court—at either the first or second step of the <u>Abbasi</u> framework—cannot ignore the presence of special factors which were not considered in <u>Bivens</u>. <u>McGee v. Bureau of Prisons</u>, No. CV 23-00190 LEK-KJM, 2023 WL 3467116, at *5 (D. Haw. May 15, 2023) (holding that BOP's administrative remedial structure was not considered in <u>Carlson</u> and therefore presents a new context for this <u>Bivens</u> claim).

The alternative remedial structure identified by the government applies to alleged misconduct by DEA agents and was created in 1978 – several years after the Supreme Court decided <u>Bivens</u>. Therefore, it is a "special factor" which the Supreme Court did not consider in <u>Bivens</u>. And the existence of a special factor like an alternative remedial structure is sufficient to place a case in a new context.[5] <u>See</u> <u>Abbasi</u>, 582 U.S. at 140; <u>Egbert</u>, 142 S. Ct. at 1803.

---

[5] The court need not analyze all of the features of the DEA's alternative remedial structure. In <u>Egbert</u>, the Supreme Court held that so long as Congress or the Executive created an alternative remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot apply <u>Bivens</u> to federal agents covered by that process. <u>See</u> 142 S. Ct. at 1806. Arias has supplied no reason to distinguish the alternative remedial structures at issue here from the process at issue in <u>Egbert</u>, which the Supreme Court found to be sufficient to preclude application of

In light of Egbert, the court is not persuaded to apply the approach to the two-step framework used in Aaron v. City of Lowell, --- F. Supp. 3d ---, No. 20-cv-11604-ADB, 2023 WL 2743337, at *16 (D. Mass. Mar. 31, 2023), and Kennedy v. Massachusetts, No. 22-cv-11152, --- F. Supp. 3d ---, ---, 2022 WL 17343849, at *4 (D. Mass. Nov. 30, 2022). Both cases hold that a court need not consider an alternative remedial structure unless it reaches the second step of the Abbasi framework. However, Abbasi states that courts must consider special factors which the Supreme Court did not consider in Bivens. 582 U.S. at 140. And even though the Court's analysis in Egbert was made in the second step of the framework, the Supreme Court observed that the two-step Abbasi analysis "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." 142 S. Ct. at 1803. Egbert stresses that the existence of a remedial scheme is sufficient by itself to carry the day: "If there are alternative remedial structures in place, 'that alone', like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new Bivens cause of action.'" Id. at 1804; see also id. at 1806 (holding that existence of "alternative remedies . . . independently foreclose a Bivens action"). That is the case here: the existence of the alternative remedial scheme is enough to both place the case into a new context at the first step and to prohibit expanding Bivens at the second step.

---

Bivens. Additionally, because these alternative remedial structures are sufficient to require dismissal, the court does not reach whether the Federal Tort Claims Act, 28 U.S.C. § 2675, might also foreclose Arias's Bivens claims.

Case 1:17-cv-00516-LM    Document 71    Filed 05/24/23    Page 14 of 16

At bottom, this case is like <u>Egbert</u>: it presents with facts virtually indistinguishable from <u>Bivens</u>. But the two-step framework boils down to one question: whether the presence of a special factor which was not considered in <u>Bivens</u> precludes its application. The court answers that question in the affirmative. The alternative remedial scheme authorized by the Inspector General Act and implemented by the Executive branch is a reason to believe that Congress is better positioned to create a damages remedy than the court. <u>See</u> <u>Egbert</u>, 142 S. Ct. at 1803, 1806-07. For that reason, Arias's first set of excessive force claims are dismissed.

II.    <u>Failure to Intervene</u>

Defendants also move for summary judgment as to Arias's failure-to-intervene claims, arguing that <u>Bivens</u> did not involve claims for failure to intervene in the use of excessive force. Few courts have directly confronted the question,[6] and there is minimal authority expressly recognizing a remedy under <u>Bivens</u> for failure to intervene in the use of excessive force. <u>Accord</u> <u>Robinson v. Sauls</u>, 2019 WL

---

[6] Most opinions involving Fourth Amendment claims brought under <u>Bivens</u> address arguments that the allegations are insufficient or are blocked by the difficult hurdle of qualified immunity. There are many decisions that address failure-to-intervene claims brought under <u>Bivens</u>, but none that the court can find which persuasively explain (considering <u>Abbasi</u>, <u>Hernandez</u>, or <u>Egbert</u>) why such a claim arises in the same context as that in <u>Bivens</u>. And, prior to <u>Abbasi</u>, the First Circuit "construed <u>Bivens</u> claims with some generality." <u>Ortega v. U.S. Customs & Border Protection</u>, --- F. Supp. 3d ---, 2023 WL 2187896, at *5 n.2 (D. Mass. 2023) (noting that—considering <u>Abbasi</u> and <u>Egbert</u>—it is "highly doubtful" that the First Circuit's pre-<u>Abbasi</u> decisions which apply <u>Bivens</u> in this way "remain[] good law in all respects").

14

**17**

Case 1:17-cv-00516-LM    Document 71    Filed 06/27/23    Page 15 of 16

13270432, at *10-*11 (N.D. Ga. Mar. 13, 2019) ("Ms. Robinson has not provided any authority indicating that a Bivens remedy exists for failure to intervene. The Court has conducted its own search and similarly finds no such authority."). Arias identifies one case, Campbell v. City of Yonkers, which held that a failure-to-intervene claim does not state a separate constitutional violation but is instead an alternate theory of liability for the alleged use of excessive force. 2020 WL 5548784, at *10 (S.D.N.Y. Sept. 16, 2020). On that basis, the court rejected an argument that the plaintiff's failure-to-intervene claims presented Bivens in a new context. Id.[7]

Regardless of whether a failure-to-intervene claim is an alternative theory of liability or separate constitutional violation, Bivens did not involve any theory that the defendant officers' failure to intervene should subject them to bystander liability under Bivens. And, in light of the Supreme Court's recent Bivens jurisprudence, this seems like a meaningful difference. "[E]ven a modest extension is still an extension." Abbasi, 582 U.S. at 147; see also Hernandez, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision" as Bivens). Most importantly, however, (and for the reasons discussed above), the existence of an alternative remedial scheme is sufficient to place the case in a new context and foreclose this Bivens claim.

---

[7] The other case cited by Arias on this topic, Damiani v. Duffy, does not provide any analysis of this issue and is therefore unhelpful. See 277 F. Supp. 3d 692, 706 (D. Del. 2017) (granting summary judgment in defendants' favor on failure to intervene claims because the plaintiff had not shown excessive force as opposed to analyzing whether the case presented Bivens in a new context).

15

**18**

For these reasons, Arias's failure-to-intervene claims apply <u>Bivens</u> to a new context and the existence of an alternative remedial structure requires the same analysis that the court used to dismiss Arias's first set of excessive-force claims. The court therefore grants defendants' motion for summary judgment on Arias's "failure to intervene" excessive-force claims.

## CONCLUSION

Arias's claims would extend <u>Bivens</u> to a new context and special factors counsel against expanding <u>Bivens</u> to that new context. Arias's claims are therefore dismissed. Defendants' motion for summary judgment (doc. no. 66) is granted. The clerk of court is directed to close the case.

SO ORDERED.

Landya McCafferty
United States District Judge

June 27, 2023

cc: Counsel of Record

16

**19**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS, | |
| Plaintiff, | |
| v. | Civil No. 1:17-cv-516-SM |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(6) and 56(c) of the Federal Rules of Civil Procedure, Defendants move this Court to enter summary judgment on their behalf.  On the undisputed material facts, Defendants are entitled to judgment as a matter of law.  In support of this motion, Defendants refer the Court to the Memorandum of Law in Support of its Motion for Summary Judgment and to the record of this litigation.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated:  November 15, 2022

By: /s/ Terry L. Ollila
Terry L. Ollila
Assistant U.S. Attorney
MA Bar 560603
U.S. Attorney's Office
53 Pleasant Street, 4th Floor
Concord, NH  03301-3904
(603) 225-1552
Terry.Ollila@usdoj.gov

**20**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,

     Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

     Defendants.

Civil No. 1:17-cv-516-SM

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Robert Arias ("Arias") filed a *pro se* complaint in October 2017 alleging the use of excessive force by six[1] Drug Enforcement Administration ("DEA") agents during his September 2016 arrest, which was pursuant to a valid arrest warrant, and seeking $3 million in damages. Document Number ("DN") 1 at 16. The Court construed the Complaint as asserting a *Bivens*[2] cause of action under the Fourth Amendment against the arresting agents for the purported use of excessive force, and against the remaining agents for the alleged failure to intervene. DN 8 at 3.

On June 8, 2022, the United States Supreme Court decided *Egbert v. Boule*, ___ U.S. ___, 142 S. Ct. 1793 (2022), the latest in a series of Supreme Court opinions declining to create a judicially implied remedy against federal officials for alleged constitutional violations. In *Egbert*, the Court held that *Bivens* did not extend to a Fourth Amendment excessive force claim against a Border Patrol agent because "the Government [had] provided alternative

---

[1] The Court (McAuliffe, J.) granted summary judgment to two of the six DEA agents. DN 56 at 2.

[2] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

remedies" to safeguard the plaintiff's rights. *Id.* at 1796-97. A *Bivens* remedy should not be implied, the Supreme Court determined, "[s]o long as *Congress* or the *Executive* has created a remedial process that *it* finds sufficient to secure an adequate level of deterrence." *Id.* at 1807 (emphasis added). Specifically, the Court held that the existence of regulations enacted by the United States Border Patrol for the investigation of grievances for alleged constitutional violations was "reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Id.* at 1804, 1807 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)).

Like the United States Border Patrol in *Egbert*, the DEA has implemented regulations that allow aggrieved individuals to pursue remedies for alleged unconstitutional conduct by its employees. "[T]hat alone" is enough to prohibit the courts from creating a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1804 (quoting *Abbasi*, 137 S. Ct. at 1858). Accordingly, because the establishment of a *Bivens* cause of action "is a legislative determination that must be left to Congress [or the Executive], not the federal courts," summary judgment must be granted, as Arias' claims have been foreclosed by the Supreme Court's holding in *Egbert*. *Id.*, 142 S. Ct. at 1803 ("So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy."); *Abbasi*, 137 S. Ct. at 1858 ("It is not [ ] a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others.").

## II. ARGUMENT

Summary judgment should be granted whenever there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex*

2

**22**

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Insurance Co. of Pennsylvania v. Great Northern Ins. Co.*, 787 F.3d 632 (1st Cir. 2015). The burden on the party moving for summary judgment is to demonstrate that the record does not disclose a genuine issue of material fact. *Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Technologies GmbH*, 781 F.3d 510, 516 (1st Cir. 2015). Once a moving party has established a lack of material facts in dispute, the nonmoving party "must present definite, competent evidence to rebut the motion." *Mendez-Laboy v. Abbott Labs., Inc.*, 424 F.3d 35, 37 (1st Cir. 2005). That is, it is incumbent upon the nonmoving party to produce "specific facts in suitable evidentiary form, sufficient to limn a trial worthy issue [as] [f]ailure to do so allows the summary judgment engine to operate at full throttle." *Lawton v. State Mut. Life Assur. Co. of Am.*, 101 F.3d 218, 223 (1st Cir. 1996); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) ("[Rule 56 is] meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court.").

### A.  Summary Judgment Must Be Granted Because the DEA and DOJ Established Safeguards to Address Constitutional Violations

The Supreme Court recognized an implied cause of action for damages in *Bivens* to compensate for injuries caused by federal agents who violated an individual's Fourth Amendment right against an unreasonable search or seizure. *Bivens*, 403 U.S. at 397. In the 51 years following *Bivens*, the Supreme Court has countenanced an implied cause of action in only two additional matters, *Davis v. Passman*, 442 U.S. 228 (1979), involving a Fifth Amendment sex discrimination claim by a former congressional staffer, and *Carlson v. Green*, 446 U.S. 14 (1980), involving an Eighth Amendment claim for inadequate medical treatment of a federal prisoner.

Not only has the Supreme Court hesitated to recognize any additional implied causes of action, it also specifically denounced doing so in the context of alleged constitutional violations,

3

**23**

stating "we have abandoned th[e] power to invent 'implications' in the statutory field. There is even greater reason to abandon it in the constitutional field, since an 'implication' imagined in the Constitution can presumably not even be repudiated by Congress." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (citations omitted). Chief among the reasons against the recognition of an implied cause of action is the fact that such actions consist of a "significant step under separation-of-powers principles for a court to [ ] create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Abbasi*, 137 S. Ct. at 1856.

When an individual attempts to assert an implied cause of action based on a constitutional violation, "separation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts." *Abbasi*, 137 S. Ct. at 1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 390 (1983)). The answer to who should decide will "most often be Congress," so "[w]hen an issue 'involves a host of considerations that must be weighted and appraised,' it should be committed to 'those who write the laws' rather than 'those who interpret them.'" *Id.* (quoting *United States v. Gilman*, 347 U.S. 507, 512-13 (1954)).

In *Abbasi*, the Supreme Court provided a two-step analysis to determine whether a claim under *Bivens* may lie: (1) "[a]court asks first whether the case presents 'a new *Bivens* context'- *i.e.,* is it 'meaningfully different from the three cases in which the Court has implied a damages action[;]' and [(2)] if so, do 'special factors' indicate that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1797-98 (quoting *Abbasi*, 137 S. Ct. at 1858). In *Egbert*, the Supreme Court winnowed the two-step *Abbasi* analysis to a single question: "whether there is any

4

**24**

reason to think that Congress might be better equipped to create a damages remedy." 142 S. Ct. at 1803. If the answer is yes, "as it will be in most every case[,] no *Bivens* action may lie." *Id.*

### 1. Arias' Claims Present a New Context

The Supreme Court's determination of whether a claim arises in a new context is broad and encompasses any claim that is "different in a meaningful way from previous *Bivens* cases." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). "[T]he new-context inquiry is easily satisfied." *Abbasi*, 137 S. Ct. at 1865. "[E]ven a modest extension" from the *Bivens* claims previously recognized by the Supreme Court "is still an extension." *Id.* at 1864. In *Egbert*, for example, the Supreme Court determined that plaintiff's claims arose in a new context even though the case involved "similar allegations of excessive force" and "almost parallel circumstances" as those alleged in *Bivens*. *Egbert*, 142 S. Ct. at 1804-05; *Hernandez*, 140 S. Ct. at 743 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").

In *Bivens*, the Petitioner claimed that agents of the Federal Bureau of Narcotics[3] conducted a warrantless entry and search of his apartment. *Bivens*, 430 U.S. at 388. The Petitioner also claimed that the agents violated the Fourth Amendment when they "strip search[ed]" him, handcuffed him in front of his wife and child, arrested him through the use of unreasonable and excessive force and without probable cause or a warrant, and threatened to arrest his entire family. *Id.* at 388-89. Although the facts in *Bivens* have some similarities with those underlying Arias' claim - both involve an alleged Fourth Amendment violation in the context of an arrest - they are different in several meaningful ways.

---

[3]In *Abbasi*, the Supreme Court described the Federal Bureau of Narcotics agents as "a claim against *FBI agents* for handcuffing a man in his own home without a warrant." *Abbasi*, 137 S. Ct. at 1860) (emphasis added).

5

**25**

First, *Bivens* involved a warrantless arrest, but Arias was arrested pursuant to a valid warrant issued by the United States District Court, District of New Hampshire. *See United States v. FNU LNU, a/k/a EL MATATAN*, 1:16-MJ-125-01-AJ (DN 6); *United States v. Carmen A. Jose*, 1:16-MJ-126-01-AJ (DN 1). The mere "presence of a warrant is a crucial difference in the *Bivens* new context." *Cienciva v. Brozowski*, 2022 WL 2791752, at *11 (M.D. Penn. July 15, 2022) ("We conclude that [Plaintiff's] claim presents a new context because of at least one key factual difference: *Bivens* involved narcotics agents who arrested the plaintiff and searched the residence sans warrant; the defendants here acted pursuant to a valid arrest warrant . . ."). Thus, the agents who arrested Arias were acting under a different "legal mandate" than the arresting officers in *Bivens*, and courts have recognized that claims based on seizures by law enforcement pursuant to a warrant are different from the claims recognized in *Bivens*. *Abbasi*, 137 S. Ct. at 1860; *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021) (noting that, unlike *Bivens*, "this case . . . involves [ ] a seizure conducted *with* a warrant"); *Quinones-Pimentel v. Cannon*, No. 3:20-cv-01443-JAW, 2022 WL 826344, at *21 (D.P.R. Mar. 17, 2022) ("Given the Supreme Court's differentiation between searches with and without warrants and the development of the "good faith" exception for searches *with* warrants, the Court concludes that a search with a warrant—regardless of whether it was properly acquired with probable cause—is meaningfully different from the warrantless search in *Bivens*.") (quoting *United States v. Leon*, 468 U.S. 897, 913-14 (1984)).

This case is also fundamentally different from *Bivens* because *Bivens* involved a search and seizure within the home, but Arias was apprehended in a public parking facility. DN 1 at 2 ("On Sept. 8th 2016 while enroute to the mall with my girlfriend I or rather we entered the entrance to the mall when we were surrounded by DEA agents. These agents then approached the

6

**26**

car very quickly opened the door and attempted to pull me out of the vehicle."). The distinction is important because courts have recognized that claims for excessive force "in making a lawful street arrest" arise in a new context. *See, e.g., Evans v. U.S. Border Patrol Agents*, Civ. No. 7:19-cv-00358, 2020 WL 9066054 at *8 (S.D. Texas July 20, 2020) ("[P]laintiff's excessive force *Bivens* claim arose in a new context because 'the actions at issue in *Bivens* were predicated on allegations of a warrantless search and seizure occurring at a residence, unlike the vehicle stop initiated' in the present case."); *Rivera v. Samilo*, 370 F. Supp. 3d 362, 369 (E.D. N.Y. 2019) ("Plaintiff's claim is not for a violation of his privacy rights, or for a warrantless invasion of his home and the unreasonable search and seizure of his property. Instead, Plaintiff's claim arises from the force allegedly applied in making a lawful street arrest.").

Moreover, *Bivens* involved the search of a private residence, which is "markedly different" from the search of a private vehicle on a public street. *See, e.g., Robinson v. Pilgram*, No. 20-CV-2965 (GMH), 2021 WL 5987016, at *12 (D.D.C. Dec. 17, 2021) ("[C]ourts have found that Fourth Amendment claims involving vehicle searches bring *Bivens* into a new context."), *aff'd*, No. 22-5001, 2022 WL 3009621 (D.C. Cir. July 28, 2022); *Rivera*, 370 F. Supp. 3d 369 (holding that plaintiff's excessive force claim that "arose from a lawful vehicle search" placed *Bivens* in new context); *Young v. City of Council Bluffs*, 569 F. Supp. 3d 885, 893-94 (S.D. Iowa 2021); *Xiaoxing Xi v. Haugen*, No. CV 17-2132, 2021 WL 1224164, at *17 (E.D. Pa. Apr. 1, 2021).

Finally, unlike in *Bivens*, Arias asserts a claim based on the agents' failure to intervene in the alleged use of excessive force. DN 1 at 8 ("Agent[s] had the opportunity to prevent [ ] other agents' use of excessive force. There is evidence that the agency does not allow this type of behavior."); DN 8 at 3. The Supreme Court case has never held that a federal officer who fails to

7

**27**

intervene to prevent another officer from using force is liable under *Bivens,* and district courts have held that such claims represent a new context. *See, e.g., Cannenier v. Skipper-Scott*, 18 Civ. 2383 (LGS), 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019); *Martinez v. D'Agata*, 16 CV 44 (VB), 2019 WL 6895436, at 7 (S.D. N.Y. Dec. 16, 2019).

### 2.    The Presence of Alternative Remedial Processes Preclude Application of *Bivens*

The Supreme Court's long-time hesitancy to expand upon implied causes of action turned from reluctance to near refusal in June 2022 when it decided *Egbert. Egbert,* 142 S. Ct. at 1809 In fact, in *Egbert*, the Supreme Court "indicated that if [it] were called to decide *Bivens* today, *[it] would decline to discover any implied causes of action in the Constitution.*" *Id.* (emphasis added). Thus, not surprisingly, the Supreme Court's decision prohibits courts from implying a *Bivens* cause of action "if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Id.; Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) ("'[A]ny alternative, existing process for protecting the [injured party's] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'").

If an alternative remedial structure is in place, "'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Egbert,* 142 S. Ct. at 1808-09. "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.; Wilkie,* 551 U.S. at 550; *Malesko,* 534 U.S. at 69 ("[I]t is irrelevant to a special factors analysis whether the laws currently on the books affords [plaintiff] an adequate federal remedy for his injuries . . . [as] long as the plaintiff had an

8

**28**

avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.").

In *Egbert*, Robert Boule ("Boule"), the owner of "Smuggler's Inn," a bed and breakfast located along the Canadian border and known as a location for the cross-border smuggling of individuals and drugs, engaged in an altercation with a Border Patrol agent, Erik Egbert ("Egbert"), who was at the Smuggler's Inn to check on a guest's immigration status. *Egbert*, 142 S. Ct. at 1801. During the altercation, according to Boule, Agent Egbert "lifted him off the ground . . . threw him against a [vehicle] . . . [and then] threw him to the ground." *Id.* Agent Egbert then checked the guest's immigration paperwork, concluded that everything was in order, and left. After Agent Egbert left, the guest unlawfully entered Canada from the Smuggler's Inn location. *Id.*

Boule filed a grievance against Agent Egbert with his supervisors, claiming Agent Egbert used excessive force and caused physical injury. *Egbert*, 142 S. Ct. at 1801. Boule also filed an administrative claim under the Federal Tort Claims Act ("FTCA") (28 U.S.C. § 2675(a)) with the Border Patrol. Following denial of his grievance, Boule filed a complaint in Federal District Court, asserting a *Bivens* claim against Agent Egbert based on a purported violation of the Fourth Amendment through use of excessive force. *Egbert*, 142 S. Ct. at 1802. The district court declined to extend a *Bivens* remedy to Boule's claim and granted summary judgment to Agent Egbert, but the Ninth Circuit Court of Appeals reversed, concluding "there was no reason to hesitate before recognizing a [*Bivens*] cause of action." *Id.*

The Supreme Court determined that the Border Patrol's administrative grievance process, through which the Border Patrol is required by federal regulations to "investigate '[a]lleged violations of the standards for enforcement activities' and accept grievances from '[a]ny persons

9

**29**

wishing to lodge a complaint,'" was an alternative available process that foreclosed a *Bivens* cause of action. *Egbert*, 142 S. Ct. at 1806-07. In its holding, the Supreme Court instructed that "*Bivens* does not invite federal courts to independently assess the costs and benefits of implying a cause of action." *Id.* at 1805. Instead, "[a] court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858)) (emphasis in original). "If so, *or even if there is the 'potential' for such consequences*, a court cannot afford a plaintiff a *Bivens* remedy." *Id.* at 1805-06 (emphasis added).

The adequacy of relief through the administrative process is immaterial to the availability of a *Bivens* cause of action. *Egbert*, 142 S. Ct. at 1806. Likewise, it does not matter whether an aggrieved individual is allowed to participate in the grievance process or whether he has a right to a review of an adverse determination. *Id.* ("[W]e have never held that a *Bivens* alternative must afford rights to participation or appeal."). This is so because *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers," and "the focus is whether the Government has put in place safeguards to 'preven[t]' constitutional violations 'from recurring.'" *Id.* (quoting *Malesko*, 534 U.S. at 71, 74)). Thus, even if an alternative remedy is not as effective as an individual damages remedy, the mere existence of a remedy precludes the creation of a *Bivens* cause action so long as there are safeguards put in place to prevent constitutional violations from recurring. *Id.* at 1806.

The Judiciary Act ("the Act") of 1789 created the federal court system, identified in Article III of the Constitution, but left Congress with the authority to create federal courts. *See* Judiciary Act of 1789, 1 Stat. 73, 92-93 (1789). In addition to the creation of the federal court system, the Act also created the Office of the Attorney General. *Id.* In 1870, Congress

10

**30**

passed the Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870), which created

the Department of Justice ("DOJ") as an "executive department of the government of the United

States government" and named the Attorney General as the leader of the executive department.

*Id.* The Act provided the DOJ and Attorney General control over federal law enforcement,

establishing the Attorney General as the chief law enforcement officer of the Federal

Government. *Id.*

The DEA is a federal law enforcement agency within DOJ, created through

Reorganization Plan No. 2 of 1973. *See* Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87

Stat. 1091 (1973). *See also* 28 C.F.R. § 0.100. Five years after creating Reorganization Plan No.

2, Congress passed the Inspector General Act of 1978. 5a U.S.C. §§ 1-11 (Suppl. 2 1982).

Through the Inspector General Act of 1978, as amended, Congress instructed the Attorney

General to ensure that "any component" of the DOJ that receives a "nonfrivolous allegation of

criminal wrongdoing or administrative misconduct by an employee of the Department of Justice

. . . shall report that information to the Inspector General." 5 U.S.C. App. 3 § 8E(d). Congress

also authorized the DOJ's Inspector General to "investigate allegations of criminal wrongdoing or

administrative misconduct by an employee of the Department of Justice," "refer such allegations

to the Office of Professional Responsibility," or refer them to "the internal affairs office of the

appropriate component" of DOJ. *Id.* § 8E(b)(2).

Congress placed no limitations on who may report allegations of wrongdoing. Thus, any

person, including Arias, could report alleged misconduct. Indeed, DOJ's Office of the Inspector

General ("OIG") provides a link on its public website to report allegations of wrongdoing.

*See oig.justice.gov/hotline.* Upon receipt of an allegation of misconduct, OIG either opens its

own investigation or, as appropriate, refers the allegations to the Office of Professional

11

**31**

Responsibility or the internal affairs office of the relevant DOJ component. Any findings by OIG involving allegations of misconduct are then provided to the appropriate component for remedial or disciplinary steps.

The Inspector General Act also requires that Inspectors General, including that of the DOJ, prepare semiannual reports that are transmitted to Congress and describe "significant problems, abuses, and deficiencies" related to the administration of DOJ's "programs and operations." 5 U.S.C. App. 3 § 5(a)(1); *id.* § 5(b). The Act requires that the reports contain "matters referred to prosecutive authorities and the prosecutions and convictions which have resulted." *Id.* § 5(a)(4). Through such provisions, Congress has taken steps to be notified regarding substantiated misconduct at DOJ, enabling it to conduct its own inquiries and enact laws or provide remedies it deems fit to address misconduct by DOJ employees.

Moreover, a component of the DEA is the Office of Professional Responsibility ("OPR"), which is responsible for policies and procedures to investigate allegations of misconduct by DEA agents. *See* Declaration of Gary Owen, Deputy Chief Inspector, Drug Enforcement Office of Professional Responsibility ("OPR") ("Owen Dec.") at 1, ¶¶ 2, 3; 28 C.F.R. § 0.29c(c). Evidence and non-frivolous allegations of serious misconduct by DEA agents must be reported to OPR or the Deputy Attorney General. *Id.* at 1-2, ¶¶ 2-3, 6 ("OPR investigations serve to gather and document facts, interview subjects and witnesses, and provide a thorough and complete source of materials on which DEA's Board of Professional Conduct can make disciplinary recommendations."); 28 C.F.R. § 0.29c(c). Among the matters that must be reported to DEA's OPR are "participation in unauthorized or illegal searches of property . . . or use of excessive force." *Id.* at 2, ¶ 5 (quoting DEA Planning and Inspection Manual, Section 8307.1(E)).

12

When DEA's OPR begins an investigation into allegations of misconduct, it gathers and documents facts, interviews subjects and witnesses, and provides documentation upon which DEA's Board of Professional Conduct can make disciplinary recommendations.   Owen Dec. at 2, ¶ 6.   The disciplinary recommendations range from reprimand to removal.   *Id.*   If information develops during an OPR investigation that suggests criminal liability, OPR has the authority to request that the matter be presented for criminal prosecution.   *Id.* at 2, ¶ 7.

The foregoing remedial avenues were available to Arias.   Although Arias did not pursue his claims through the DEA or DOJ, on November 9, 2018, DEA's Office of Chief Counsel notified OPR of Arias' complaint and referred the matter for appropriate action.   Owen Dec. at 3, ¶ 9.   The investigation into Arias' allegations remains pending.   *Id.*   The existence of a congressionally authorized investigatory process, as implemented by the Executive Branch, is an alternative process counseling against this Court implying a damages remedy to Arias.   *Egbert*, 142 S. Ct. at 1807 ("[If] Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy"); *Abbasi*, 137 S. Ct. at 1862 (acknowledging that DOJ OIG investigation into the area at issue counseled against *Bivens* remedy).   And, the threat of an investigation, and potential for DEA agents to be subject to reprimand, removal, and possible criminal liability, serves as a deterrent to misconduct by DEA agents.   *Egbert*, 142 S. Ct. at 1806 ("[*Bivens*] 'is concerned solely with deterring the unconstitutional acts of individual officers' – *i.e.*, the focus is whether the Government has put in place safeguards to 'preven[t]' constitutional violations 'from recurring.'").

13

**33**

The question of whether a particular remedy is adequate[4] is "a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the *Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a Bivens remedy.*" *Egbert*, 142 S. Ct. at 1806 (emphasis added). Such is the case here. The Executive created a remedial structure to address purported wrongdoing of its agents, who were executing a lawful arrest warrant issued by the Court.[5]  Thus, much like the plaintiff in *Egbert*, Arias was afforded an avenue to vindicate the purported violation of his constitutional rights.  *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclose [ ] judicial imposition of a new substantive liability."); *Davila v. Lang*, No. 1:18-cv-6164, 2018 WL 5282896, at *9 (S.D.N.Y. Oct. 23, 2018) ("[T]here is an alternative remedial structure in place . . . This alone counsels hesitation in extending a *Bivens* remedy here.").

It does not matter that DEA OPR, not Arias, initiated the investigation. Nor does the outcome of the investigation matter. *Gibson v. Alvarez*, EP-21-cv-00110-DCG, 2022 WL 3274164, at *10 (W.D. Texas August 11, 2022) ("[W]hat matters is not whether the plaintiff will ultimately *succeed* in obtaining redress, but rather whether the alternative remedy structure is *available*.") (emphasis in original); *Cienciva*, 2022 WL 2791752, at *10 ("That our own

---

[4]While it may certainly be true that the denial of a *Bivens* cause of action could result in a lack of redress for Arias, the Supreme Court understood the possible consequence and nevertheless recognized in *Egbert* that Congress and the Executive, not the courts, should be the appropriate arbiters. *Abbasi*, 137 S. Ct. at 1863. The fundamental precept is not to deny that "Government employees sometimes overreach, for of course they do[.] The point is the reasonable fear that a general *Bivens* cure would be worse than the disease." *Wilkie*, 551 U.S. at 561.

[5]*Cienciva*, 2022 WL 2791752 at *11 ("Implying a damages remedy for excessive force [ ] is potentially harmful to the duty of the Marshals Service to make judgment calls about the use of force needed to execute a judicially authorized arrest warrant.").

14

**34**

independent consideration of the adequacy of such an investigation or process may question its deterrent effects is of no moment; the *Egbert* decision admonishes us not to graft a judicial remedy onto an existing grievance process . . .").  Thus, because an alternative remedy exists to vindicate Arias' rights, his complaint, which represents a "'congressionally uninvited intrusion' [that is ] 'inappropriate' action for the Judiciary to take," *Egbert*, 142 S. Ct. at 1806; *Abbasi*, 137 S. Ct. at 1862, cannot survive.  *Silva v. United States*, 45 F.4th 1134, 1136 (10th Cir. 2022) ("The Supreme Court's message could not be clearer—lower courts expand *Bivens* claims at their own peril.").

Finally, not only has Congress, through DOJ, created a remedial process that it finds sufficient to secure an adequate level of deterrence, *Egbert*, 142 S. Ct. at 1806, Arias also had the ability to file a cause of action under the Federal Tort Claims Act ("FTCA") (28 U.S.C. § 2675). *See, e.g., Davis v. Greer,* Case No. 21 C 0995, 2022 WL 2460782, at *2 (N.D. Ill. July 6, 2022) ("Congress created another remedial process: Plaintiff could bring a claim under the Federal Tort Claims Act to redress the correctional officer's conduct.  These remedial processes demonstrate that Congress and the Executive are better equipped to create a damages remedy, and thus no *Bivens* action can be judicially created.").  Much like the remedial avenue afforded by the DEA OPR investigation, a FTCA claim could serve to award Arias monetary relief for his purported injuries.

The presence of the foregoing remedial processes serves to underscore the Supreme Court's holding in *Egbert* – that Congress and the Executive established a framework that they believe is sufficient to secure an adequate level of deterrence in the context of claims of alleged unconstitutional conduct by DEA employees.  *Gilson v. Alvarez*, 2022 WL 3274164, at *4 (W.D. Texas Aug. 11, 2022) ("[A] court may not fashion a *Bivens* remedy if Congress already has

15

provided, or has authorized the Executive to provide, 'an alternative remedial structure.'")

(quoting *Egbert*, 142 S. Ct. at 1804). Accordingly, because *Egbert* prohibits courts from second

guessing the remedies established by Congress and the Executive, Arias' complaint cannot

survive because this Court cannot superimpose a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1805-06.

## III.   CONCLUSION

Based upon the foregoing reasons, Defendants respectfully request that the Court grant

summary judgment and dismiss Arias' complaint.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

November 15, 2022

By: /s/ Terry L. Ollila
Terry L. Ollila
MA Bar 560603
Assistant U.S. Attorney
U.S. Attorney's Office
53 Pleasant Street, 4th Floor
Concord, NH 03301-3904
(603) 225-1552
Terry.Ollila@usdoj.gov

16

**36**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.,*<br><br>*Defendants.* | Civil Action No. 17-cv-516-SM |

## DECLARATION OF GARY OWEN

I, Gary Owen, do hereby declare and state as follows:

1.    I make this declaration based on my personal knowledge and on information available to me as part of my official duties as an employee of the U.S. Department of Justice ("DOJ"), Drug Enforcement Administration ("DEA"). If called as a witness, I could and would testify competently thereto.

2.    I am the Deputy Chief Inspector in DEA's Office of Professional Responsibility ("OPR") located at DEA Headquarters in Arlington, Virginia.

3.    As such, I have direct knowledge of DEA's policies and procedures related to OPR's mission to investigate allegations of misconduct levied against DEA personnel reported by other DEA employees or by sources outside of DEA.

4.    The DOJ Office of Inspector General ("OIG") has the right of first refusal on all DEA OPR investigations, therefore, OPR forwards all allegations received to

1

OIG for review and consideration. Furthermore, evidence and non-frivolous allegations of serious misconduct by DEA employees must be reported by OIG to DEA's OPR. 28 C.F.R. § 0.29c(c).

5.     Misconduct is generally defined as any violation of federal, state, and local law and/or violation of DEA' s Standards of Conduct. Among the matters that must be reported to OPR is "participat[ion] in unauthorized or illegal searches of property [,] automobiles [,] or persons, arrests, electronic intercepts, or use of excessive force." DEA Planning and Inspection Manual, Section 8307.1(E).

6.     OPR investigations serve to gather and document facts, interview subjects and witnesses, and provide a thorough and complete source of materials on which DEA's Board of Professional Conduct can make disciplinary recommendations. Discipline can range from a reprimand to removal.

7.     If information developed during an OPR investigation suggests criminal culpability on the part of a DEA employee, OPR can present the matter to a relevant authority for potential criminal prosecution.

8.     I have become aware of Plaintiff Robert Arias' civil lawsuit, in which he purports to assert Fourth Amendment excessive force claims against current and/or former DEA agents and task force officers in their individual capacity.

2

**38**

9.     On November 9, 2018, DEA's Office of Chief Counsel notified OPR of Mr. Arias' federal lawsuit alleging excessive force, referring the matter to OPR for appropriate action. The investigation into this matter is still pending.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed this __ day of November
2022, in Arlington, Virginia

_____
Gary Owen
Deputy Chief Inspector
Office of Professional Responsibility

3

**39**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS,<br><br>    *Plaintiff,*<br><br>  v.<br><br>UNITED STATES OF AMERICA, *et al.,*<br><br>    *Defendants.* | Civil Action No. 17-cv-516-SM |

## DECLARATION OF GARY OWEN

I, Gary Owen, do hereby declare and state as follows:

1.    I make this declaration based on my personal knowledge and on information available to me as part of my official duties as an employee of the U.S. Department of Justice ("DOJ"), Drug Enforcement Administration ("DEA"). If called as a witness, I could and would testify competently thereto.

2.    I am the Deputy Chief Inspector in DEA's Office of Professional Responsibility ("OPR") located at DEA Headquarters in Arlington, Virginia.

3.    As such, I have direct knowledge of DEA's policies and procedures related to OPR's mission to investigate allegations of misconduct levied against DEA personnel reported by other DEA employees or by sources outside of DEA.

4.    The DOJ Office of Inspector General ("OIG") has the right of first refusal on all DEA OPR investigations, therefore, OPR forwards all allegations received to

1

**40**

OIG for review and consideration. Furthermore, evidence and non-frivolous allegations of serious misconduct by DEA employees must be reported by OIG to DEA's OPR. 28 C.F.R. § 0.29c(c).

5.     Misconduct is generally defined as any violation of federal, state, and local law and/or violation of DEA's Standards of Conduct. Among the matters that must be reported to OPR is "participat[ion] in unauthorized or illegal searches of property [,] automobiles [,] or persons, arrests, electronic intercepts, or use of excessive force." DEA Planning and Inspection Manual, Section 8307.1(E).

6.     OPR investigations serve to gather and document facts, interview subjects and witnesses, and provide a thorough and complete source of materials on which DEA's Board of Professional Conduct can make disciplinary recommendations. Discipline can range from a reprimand to removal.

7.     If information developed during an OPR investigation suggests criminal culpability on the part of a DEA employee, OPR can present the matter to a relevant authority for potential criminal prosecution.

8.     I have become aware of Plaintiff Robert Arias' civil lawsuit, in which he purports to assert Fourth Amendment excessive force claims against current and/or former DEA agents and task force officers in their individual capacity.

2

**41**

9.    On November 9, 2018, DEA's Office of Chief Counsel notified OPR of Mr. Arias' federal lawsuit alleging excessive force, referring the matter to OPR for appropriate action. The investigation into this matter is still pending.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed this 16 day of November 2022, in Arlington, Virginia

Gary Owen
Deputy Chief Inspector
Office of Professional Responsibility

3

**42**

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Robert Arias | ) |
| | ) |
| | ) |
| v. | )    Case No. 17-cv-516-SM |
| | ) |
| | ) |
| U.S. Government, et al. | ) |
| | ) |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' SECOND
MOTION FOR SUMMARY JUDGMENT**

1.      The Plaintiff objects to the Defendants' Second Motion for Summary Judgment,

for the reasons set forth in the accompanying Memorandum of Law, incorporated by reference

herein and submitted contemporaneously herewith.

2.      The Plaintiff requests that the Court deny the Motion for Summary Judgment and

grant such other and further relief as the Court deems to be just and equitable.

Respectfully submitted,

ROBERT ARIAS

By his attorneys,

ORR & RENO, P.A.

Dated:  December 14, 2022        By:    /s/ Jeremy D. Eggleton
                                                              Jeremy D. Eggleton, Esq. (BNH #18170)
                                                              ORR & RENO, P.A.
                                                              45 S. Main Street
                                                              P.O. Box 3550
                                                              Concord, New Hampshire 03302-3550
                                                              Tel.:   603-224-2381
                                                              Fax:   603-224-2318
                                                              E-Mail: jeggleton@orr-reno.com

**43**

Case 1:17-cv-00516-LM   Document 68   Filed 12/14/22   Page 2 of 2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was forwarded by ECF to counsel of record.


Dated:  December 14, 2022             /s/ *Jeremy D. Eggleton*
                                       Jeremy D. Eggleton

4137483

Case 1:17-cv-00516-LM   Document 68-1   Filed 12/14/22   Page 1 of 6

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Robert Arias | ) | |
| | ) | |
| v. | ) | Case No.  17-cv-516-SM |
| | ) | |
| U.S. Government, et al. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Robert Arias, the Plaintiff, submits this Memorandum of Law in support of his objection to the Defendants' Motion for Summary Judgment.  He states:

Relying on the United States Supreme Court's June 8, 2022 decision in Egbert v. Boule, 142 S.Ct. 1793 (2022), the Defendants argues that this new law has altered the Bivens legal framework under which this Court properly denied the Defendants' claims for summary judgment by its Order of January 19, 2021 (*see* Document 56).  See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971) (recognizing cause of action for excessive force claims against federal agents).  That is not the case.  The fundamental flaw in the Defendants' reasoning is that the Plaintiff in this case is not seeking to have this Court—or any Court—infer a *new* Bivens-related cause of action.  This is a conventional excessive force claim against arresting agents, a claim long recognized to fall within the ambit of Bivens.  See Norton v. Cross Border Initiative, No. 06-cv-490-PB, Slip op. at *3, n. 2 (D.N.H. June 6, 2007) (*citing Saucier v. Katz*, 533 U.S. 194, 198-99 (2001) for "recognizing [the] availability of Bivens action to redress claim that federal agent utilized excessive force during arrest.").

1

**45**

In <u>Egbert</u>, the U.S. District Court for the Western District of Washington, reviewed a factual scenario in which a federal agent threw down a property owner whose lodging property the federal agent was entering in order to investigate immigration-related paperwork for a customer staying there. Because this was a new factual scenario, different from traditional excessive-force-during search or arrest scenarios, the plaintiff asked the trial court to recognize a new implied cause of action under <u>Bivens</u>. Specifically, the plaintiff in <u>Egbert</u> was not himself subject to a warrant and the federal agent was not seeking to search his property or arrest him. *Egbert*, 142 S.Ct. at 1804-05. Rather, the defendant was a Border Patrol agent in the midst of policing the U.S. border to "interdict persons attempting to illegally enter or exit the United States or goods bring illegally imported into or exported from the United States." *Id.* at 804 (quoting 6 U.S.C.A. §211(e)(3)(A)).

The trial court rejected that request. *Id.* at 1802. But the Ninth Circuit reversed, interpreting the facts as consistent with a conventional <u>Bivens</u> claim. *Id.* at 1805. The Supreme Court (Thomas, J.) disagreed, ruling that the Border Patrol element made the situation a "new context," for <u>Bivens</u> purposes, "where, as here, national security is at issue." *Id.* The new context required the Supreme Court to apply a standardized test for whether it could recognize a new kind of <u>Bivens</u> claim under the circumstances. *Id.* The Supreme Court's conclusion was that the national security element associated with the conduct of the Border Patrol disfavored judicial recognition of a new cause of action by implication. *Id.* Comparing the <u>Egbert</u> context with <u>Hernandez v. Mesa</u>, 140 S.Ct. 735 (2020), in which the Supreme Court rejected implication of a <u>Bivens</u> claim against Border Patrol agents who shot and killed a child on Mexican territory, the Supreme Court concluded that creation of a new <u>Bivens</u> claim was fundamentally an aspect of

legislative authority. <u>Egbert</u> at 1803 ("If there is even a single reason to pause before applying

<u>Bivens</u> in a new context, a court may not recognize a <u>Bivens</u> remedy.") (quoting *Hernandez*, 140

S.Ct. at 743). For the Supreme Court, that new context was "the national security of the United

States" as manifested in "immigration investigations in this country." *Id.* at 1806. As a

consequence of the national security implications of the work of the Border Patrol, the Supreme

Court declined to recognize a new <u>Bivens</u> claim for damages by a third party injured by Border

Patrol conduct. *Id.* at 1805-6.

No such new context exists in this case. The Plaintiff has pled a <u>Bivens</u> claim in a

completely conventional context, *i.e.*, the use of excessive force during a garden-variety arrest,

under a valid warrant, on controlled substances charges. <u>See</u> <u>Norton v. Cross Border Initiative</u>,

No. 06-cv-490-PB, Slip op. at *3, n. 2. The Defendants' effort to distinguish the facts of this case

(which involved an arrest) from Bivens (which involved a search and seizure *and* an arrest)

ignores decades of case law affirming that excessive force used by arresting officers against a

suspect gives rise to a right of action under <u>Bivens</u>. <u>See</u> <u>Ziglar v. Abbasi</u>, 137 S.Ct. 1843, 1856-57

(2017) ("<u>Bivens</u> does vindicate the Constitution by allowing some redress for injuries, and it

provides instruction and guidance to federal law enforcement officers going forward. The settled

law of <u>Bivens</u> in this common and recurrent sphere of law enforcement, and the undoubted

reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.");

<u>Norton v. Cross Border Initiative</u>, No. 06-cv-490-PB, Slip op. at *3, n. 2 (citing *Saucier v. Katz*,

533 U.S. at 198-99). In sum, the <u>Egbert</u> decision does not alter the manner in which trial courts

should consider long-recognized categories of <u>Bivens</u> claims. <u>See</u> <u>Kennedy v. Massachusetts</u>,

Civil Action No. 22-11152-NMG, Slip Op. at *4 (D. Mass Nov. 30, 2022) ("<u>Egbert</u> did not

3

Case 1:17-cv-00516-LM   Document 68-1   Filed 12/14/22   Page 4 of 6

overrule Bivens, nor did it overrule the First Circuit's relevant Bivens jurisprudence) (*citing* Pagan-Gonzalez v. Moreno, 919 F.3d 582, 599-600 (1st Cir. 2019)).

With respect to the Defendants' argument that the Supreme Court has never held that Bivens claims may extend to failure-to-intervene scenarios, and some district courts have declined to do so. Others have recognized that failure-to-intervene gives rise to a Bivens claim. *See Damiani v. Duffy*, 277 F.Supp.3d 692 (D. Delaware 2017) ("[F]or liability to attach under § 1983 or *Bivens* for the failure to intervene in another's use of excessive force, a plaintiff must show that: (1) defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene.")(quoting Smith v. Mensinger, 293 F.3d 641, 650 (3rd Cir. 2002)). The case law suggests that the controlling factor is whether the agent(s) who failed to intervene were part of the arresting contingent. See Campbell v. City of Yonkers, 19 CV 2117 (VB) and 19 CV 9555 (VB), Slip Op. at *10 (S.D. N.Y. Sept. 16, 2020) (finding that a failure-to-intervene claim is not a "new context," for Bivens analysis purposes, when the officers who allegedly failed to intervene were part of the group engaged in the excessively forceful arrest) (permitting Bivens claims for failure to intervene to proceed). The Plaintiff has alleged that the remaining defendants in this matter were present for and participated in his excessively forceful arrest. See Document 56 at *11-12 ("Each of the remaining [four] defendants, however, either actively participated in Arias' arrest or was present for and witnessed, his arrest."). Thus, absent some contradictory case law from the Supreme Court or the First Circuit, of which there is none, the Plaintiff's failure-to-intervene claims are not a new context under Bivens.

The Defendants also argues, with support from the Declaration of Gary Owen, that the DEA has initiated an administrative review of the Plaintiff's allegations and, consequently, the Court should grant dismissal under the theory that the existence of administrative alternatives to new Bivens causes of action forecloses the extension of Bivens into "new contexts." See, e.g., Egbert, 142 S.Ct. at 1806-07. But this is not an argument for dismissal of already-recognized categories of Bivens claims, such as a claim of excessive force during arrest, which was the context of the original Bivens action. Rather, this is an argument against recognizing an implied claim under Bivens based upon *new contexts* such as Border Patrol enforcement actions involving national security. *Id.*; see, also, Drewniak v. U.S. Customs and Border Protection, 554 F.Supp.3d 348, 360-61 (D.N.H. 2021) (other forms of relief being available to the plaintiff barred extension of Bivens relief to conduct of Border Patrol as a new class of defendants). As noted above, this is not a new Bivens context. Bivens has provided a remedy for claims of excessive force being used in the execution of a warrant for more than fifty years. Nothing about the availability of internal administrative investigations has barred Bivens claims in all that time. E.g., DeMayo v. Nugent, 517 F.3d 11, 17 (1st Cir. 2008) (confirming plaintiff had Bivens claim against DEA agents for unlawful search and seizure).

Finally, the Court concluded on May 7, 2018 that the Plaintiff had stated claims under Bivens for excessive force, and failure to intervene. *See* Document 8 at 3. The Defendants had an opportunity to object and to move for reconsideration of that determination—and their exceptions are preserved for appeal.[1] But for now, that conclusion is the law of this case. Egbert

---

[1] The cases cited by the Defendants for the proposition that failure-to-intervene is a new class or context of Bivens claims all arise from 2019, during a period when the Defendants were pursuing a first summary judgment effort in this matter based upon qualified immunity theories. They could have argued previously that excessive force and failure-to-intervene claims were separate and distinct theories, but they did not. The only question posed here,

did not address, nor did it purport to address, claims against federal agents using excessive force in the normal course of arresting a suspect.

Respectfully submitted,

ROBERT ARIAS

By his attorneys,

ORR & RENO, P.A.

Dated: December 14, 2022          By:    /s/ *Jeremy D. Eggleton*
                                         Jeremy D. Eggleton, Esq. (BNH #18170)
                                         ORR & RENO, P.A.
                                         45 S. Main Street
                                         P.O. Box 3550
                                         Concord, New Hampshire 03302-3550
                                         Tel.:    603-224-2381
                                         Fax:    603-224-2318
                                         E-Mail: jeggleton@orr-reno.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was forwarded by ECF to counsel of record.

Dated: December 14, 2022          /s/ *Jeremy D. Eggleton*
                                  Jeremy D. Eggleton

4136412

---

therefore, is whether Egbert should alter the Court's prior reasoning that the Plaintiff has stated a Bivens claim, see Document 8, and submitted sufficient facts to create a genuine dispute of material fact. Document 56; *see* Fed. R. Civ. P 56(a). For the reasons more fully explained above, it should not.

6

**50**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>     Defendants. | Case No. 1:17-CV-516-LM |

DEFENDANTS' REPLY TO OBJECTION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.     INTRODUCTION.

On November 15, 2022, the remaining defendants moved for summary judgment because the recent Supreme Court decision in *Egbert v. Boule*, __ U.S. __, 142 S. Ct. 1793 (2022) establishes that this Court should decline Plaintiff's invitation to extend the judicially implied remedy of *Bivens*[1] to the facts of this case. DN 66. Plaintiff objects to the defendants' motion, arguing that the facts of this case do not arise in a new context from those in *Bivens*. DN 68.

The Court should grant summary judgment to the defendants for three reasons. First, the specific facts of this case – an arrest in a public area pursuant to a valid warrant – differ from those in *Bivens* in significant ways such that this case plainly arises in a new context. Second, Plaintiff concedes that the existence of alternative remedial processes, including administrative review by the Drug Enforcement Administration, is a special factor that counsels against extending a *Bivens* remedy here. Finally, Plaintiff's reliance on this Court's initial screening

---

[1] *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

order pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(a) is misguided, as Defendants' motion is not a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), but a motion for summary judgment pursuant to Fed. R. Civ. P. 56. Therefore, the Court should grant summary judgment to the remaining defendants.

II.    ARGUMENT

    1.    <u>Plaintiff's Claims Present a New Context.</u>

Plaintiff's claims would extend the *Bivens* remedy into a new context. Plaintiff attempts to couch the circumstances of his arrest as arising from the same context as the arrest in *Bivens* but his attempt falls short. The Supreme Court in *Egbert* held that even "similar allegations of excessive force," "almost parallel circumstances," or a "similar 'mechanism of injury'" as *Bivens* "are not enough to support the judicial creation of a cause of action." *Egbert*, 142 S. Ct. at 1805. As long as the "case is different in a meaningful way from previous *Bivens* cases decided by [the United States Supreme Court] then the context is new." *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1859-60 (2017). Even "[a] modest extension of *Bivens* is still an extension" into a new context. *Id.* at 1864. Such an extension is present here.

Plaintiff characterizes the facts of this case as a "garden-variety arrest, under a valid warrant, on controlled substance charges." DN 68-1 at 3. Those facts do not place Plaintiff's claims in a recognized *Bivens* context, however. The Supreme Court described *Bivens* as a claim against federal agents for "handcuffing a man in his own home without a warrant...." *Abbasi*, 137 S. Ct. at 1860. In *Bivens*, the federal agents entered the plaintiff's apartment without a warrant, strip-searched the plaintiff, and threatened to arrest his entire family. *Bivens*, 403 U.S. at 389. Here, by contrast, Arias was arrested in a public parking lot pursuant to a valid arrest warrant. As many courts have recognized, these meaningful factual distinctions present a new

2

Case 1:17-cv-00516-LM   Document 69   Filed 12/01/22   Page 3 of 6

*Bivens* context. *See,* DN 66-1 at 6-7; *see also, e.g., Mejia v. Miller*, 53 F. 4th 501 (9th Cir. 2022)

(no *Bivens* cause of action for excessive force used during arrest in public without a warrant).

Likewise, Plaintiff's claim that the defendants failed to intervene to prevent the use of

allegedly excessive force arises in a new *Bivens* context. Plaintiff disputes this point by citing a

single unpublished out-of-circuit case in which the district court implied a failure-to-intervene

*Bivens* claim. *See* DN 68-1 at 4 (citing *Campbell v. City of Yonkers*, No. 19 CV 2117 (VB),

2020 WL 5548784 (S.D.N.Y. Sept. 16, 2020)).[2] As explained above, the correct standard for

whether a claim presents a new context is whether it differs "in a meaningful way from previous

*Bivens* cases decided *by [the Supreme] Court*." *Abbasi*, 137 S. Ct. at 1859 (emphasis added).

The Supreme Court has never recognized a *Bivens* action for failure to intervene, and various

district courts have refused to extend *Bivens* to claims such as these. *See, Freeman v. Provost*,

CIVIL ACTION NO. 3:19-cv-421-KHJ FKB, 2021 WL 710376, at *3 (S.D. Miss. Jan 27, 2021),

*rep. and rec. adopted*, 2021 WL 709704 (S.D. Miss. Feb. 23, 2021) ("[T]he undersigned

concludes that Plaintiff's Eighth Amendment claims against Defendant Lindo for excessive

force, as well as a broadly construed claim for failure to intervene against a use of excessive

force, may not be brought pursuant to *Bivens*" (citing cases)); *Abdo v. Balsick*, Civil Action No.

18-cv-1622-KMT, 2019 WL 6726230, at *6 (D. Colo. Dec. 11, 2019) (declining to extend

*Bivens* where "Plaintiff assert[ed] excessive force claims, deliberate indifference claims based on

purported failures to adequately remove pepper spray from Plaintiff's face, and a failure to

intervene claim arising out of the excessive force claims."); *Hunt v. Matevousian*, 336 F. Supp.

3d 1159, 1169-70 (E.D. Cal. 2018), *appeal docketed*, No. 18-17464 (9th Cir. Dec. 31, 2018)

---

[2] Plaintiff also cited *Damiani v. Duffy*, 277 F. Supp. 3d 692 (D. Del. 2017), but the district court in that case did not hold that a *Bivens* claim for failure to intervene does not present a new context.

3

(declining to extend *Bivens* to Plaintiff's claims "arising out of assault by officers and failure to intervene in such an assault."). Therefore, the Court should grant summary judgment to Defendants on this claim.

2.    Special Factors Counsel Against Extending a *Bivens* Remedy Here.

It is long settled that a *Bivens* remedy will not be available if there are "'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Carlson v. Green*, 446 U.S. 14, 18 (1980) (quoting *Bivens*, 403 U.S. at 396). This inquiry focuses on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. *Abbasi*, 137 S. Ct. at 1857-58. And, if an alternative remedial structure is in place, the Supreme Court has held that that alone is reason enough not to infer a new *Bivens* cause of action. *Egbert*, 142 S. Ct. at 1808-09. Here, as set forth in the summary judgment motion, DN 66-1 at 8-13, there were several alternative remedial structures available to Plaintiff that preclude extending *Bivens* to an arrest in a public place pursuant to a lawfully obtained arrest warrant.

Plaintiff does not challenge the presence of an alternative remedial measure in this case. *See* DN 68-1 at 5. Nor does he challenge the precedent that when a case presents a new context, the presence of alternative remedial measures bars extension of a *Bivens* remedy. *Id.* He simply argues that because this case does not present a new context, the presence of alternative remedial measures is not relevant. *Id.* However, Defendants have established in their summary judgment motion, and in this reply, that Plaintiff's claims present a new *Bivens* context. As such, the presence of an alternative remedial measure precludes this Court from extending Plaintiff a *Bivens* remedy. Therefore, the Court should grant summary judgment to Defendants.

4

**54**

3.    The Court's Initial Screening Order Does Not Preclude Summary Judgment.

Plaintiff claims that the May 7, 2018 Report and Recommendation, DN 8, is the "law of this case" and should preclude summary judgment in favor of defendants. DN 68. Plaintiff is incorrect. The Court conducted a preliminary review of Plaintiff's complaint because he is incarcerated and filed the complaint in forma pauperis. *See* L.R. 4.3. After conducting that review, the Magistrate recommended that Plaintiff had asserted sufficient facts in this complaint to assert claims against the individual defendants and merit service of the complaint on them. DN 8. Nothing in that Report and Recommendation precluded Defendants from filing a subsequent motion for summary judgment. *Id.* In fact, this Court previously granted summary judgement to two individual defendants. DN 56. Defendants have not alleged that Arias has failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Instead, before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. DN 68. The prior determination that Plaintiff's claims alleged sufficient facts to merit service of the Complaint on the individual defendants should have no bearing whatsoever on whether the undisputed material facts establish that Defendants are entitled to judgment as a matter of law. Plaintiff's reference to the Court's initial screening order is a red herring. The Court should enter summary judgment in favor of Defendants.

III.    CONCLUSION.

For these reasons, the Court should grant summary judgment to Defendants.

5

Case 1:17-cv-00516-LM   Document 69   Filed 12/21/22   Page 6 of 6

JANE E. YOUNG
United States Attorney

By: /s/ Michael McCormack
Michael McCormack
Assistant U.S. Attorney
NH Bar No. 16470
53 Pleasant Street, 4th Floor
Concord, NH  03301
603-225-1552
Date:  December 21, 2022          Michael.McCormack2@usdoj.gov

By: /s/ Terry L. Ollila
Terry L. Ollila
Assistant U.S. Attorney
MA Bar No. 560603
53 Pleasant Street, 4th Floor
Concord, NH  03301
603-225-1552
Date:  December 21, 2022          Terry.Ollila@usdoj.gov

6

**56**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Robert Arias,
     Plaintiff

    v.
                                Case No. 17-cv-516-SM
                                    Opinion No. 2021 DNH 011

Michael Bernard; Noah Herzon;
Ty Kucharski; Christopher Day;
Adalberto Garcia; and Juan Infante,
     Defendants

**O R D E R**

On September 8, 2016, Robert Arias was arrested in an operation that involved the six named defendants, as well as about a dozen other federal law enforcement officers. He claims the arresting officers used excessive force against him (count 1) and says those officers who witnessed his violent arrest failed to protect him from the excessive force used by others (count 2). He seeks monetary damages for physical and emotional injuries he claims to have suffered. See generally Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).[1]

---

[1]    Although several of the named defendants are police officers employed by the cities of Nashua and Manchester, New Hampshire, they appear to have been "detailed" to work on a federal drug interdiction task force. Accordingly, the parties have assumed that, for purposes of this suit, all defendants are

Defendants move for summary judgment, asserting that there are no genuinely disputed material facts and saying they are entitled to judgment as a matter of law.  Alternatively, they say they are entitled to the protections afforded by qualified immunity.  For the reasons discussed, that motion is granted as to two defendants, but denied as to all remaining defendants.

### Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

---

properly treated as federal agents.  See generally 5 U.S.C. §§ 3374(a)(2) and (c)(2).

## Background

During the summer of 2016, members of the High Intensive Drug Trafficking Area Task Force ("HIDTA"), with the assistance of an undercover Drug Enforcement Administration operative, made several controlled purchases of fentanyl-laced heroin from the plaintiff, Robert Arias.

On September 8, 2016, the six named defendants, along with 10 to 15 other law enforcement officers, were assigned to aid in Arias's arrest at the Rockingham Mall, in Salem, New Hampshire. As Arias approached the mall, the decision was made to arrest him in the parking area, before he could exit his vehicle. The car was driven by Arias's wife, Carmen Jose. Arias was seated in the front passenger seat. Once Ms. Jose pulled into a parking spot, several law enforcement vehicles blocked the car in. Jose briefly tried to back up, but realized she was unable to do so. She then put the car in park, as numerous officers, many in plain clothes and with weapons drawn, surrounded the vehicle.

All agree that Arias and Jose complied with the officers' commands and did not resist. Jose was removed from the vehicle without incident. As officers attempted to remove Arias from the vehicle, they quickly realized they could not do so because

3

**59**

Case 1:17-cv-00516-SM    Document 56    Filed 01/19/21    Page 4 of 13

he was wearing a seatbelt.  One of the officers then cut Arias's seatbelt and he was dragged from the car, taken to the ground, and handcuffed.  According to the defendants (some of whom actively participated in the arrest, while others merely observed it), the arrest was quick, routine, non-violent, and unremarkable.  Because Arias offered no resistance, all defendants join in saying that very little force was needed to extract him from the car, take him to the ground, secure his arms and legs, and restrain him in handcuffs.  In support of their view that Arias suffered no significant injuries, defendants point to Arias's booking photos, which do not appear to show any visible injuries to his face or head, and reveal only a small mark or abrasion on the right side of his neck. See Declaration of Michael Bernard, Exhibit 1 (document no. 43-3) at 10-15.

Arias and his wife tell a markedly different story.  They agree that Arias offered no resistance and complied with the officers' commands.  But, they say the officers used excessive force in extracting Arias from the vehicle, taking him to the ground, and restraining him on the ground.  According to Arias's sworn testimony:

4

**60**

When we arrived in the parking lot and stopped, two men, in plain clothes approached the car and had guns drawn.

As they approached the car, I put my hands up. The windows of the car were not tinted, so the men approaching the car could see that I was putting up my hands.

I did nothing throughout the Arrest to resist being arrested.

The two men pulled me from the car, mainly by my neck. It was done very forcibly. At the same time, they cut my seatbelt with a knife and threw me to the ground.

I then noticed that there were many men/officers around me, the majority were in plain clothes and many had their guns drawn. They were yelling something like "don't move."

I was yelling at Carmen, who was pregnant at the time, to "leave" in Spanish. I was worried about her and her pregnancy.

After I was on the ground, there were approximately 7 men/officers on top of me. I was not resisting arrest at all. They were mainly on top of my legs and it hurt my knee. There was an intense pressure on my leg that caused me to scream in pain.

The men/officers again banged my head to the ground, mainly the right side of my head.

I don't remember where they touched me, I just have an intense memory of the pain in my leg.

I lost consciousness and was so afraid that I urinated in my pants.

Again, I was not resisting arrest at all, just yelling out in pain and trying to protect Carmen by not having her see what was happening. I may have been moving because of the pain that they were causing.

They put handcuffs on me after I was on the ground.

5

**61**

> After the handcuffs were on me, the men/officers stepped on me, on my left leg, while I was on the ground. I think it was not necessary as I was already in handcuffs.  They did this multiple times.

Affidavit of Robert Arias (document no. 48-2), at paras. 7-19. See also Arias's Answers to Interrogatories (document no. 43-10) at 3 ("Two agents came out [and] my wife put the car in reverse. The two Agents who exited Macy's ordered us to stop the car.  My wife then came to a complete stop and put the car in park.  One of the Agents then opened the passenger door, [and they] identified themselves as 'DEA Agents.'  One of the Agents used excessive force to take me out [of] the vehicle, by pulling me out by [my] neck when my seatbelt was still on.  One of the Agents then cut off my seatbelt.  They slammed me to the ground [and] several more Agents came.  The[n] one of the Agents cut off my waist belt on my pants.  I pissed my pants out of fear for my life as the Agents continuously assaulted me.  I thought my life was over.").

Arias's wife, Carmen Jose, recounts a similar version of the relevant events and describes the arresting officers as having used more force against Arias than was objectively reasonable under the circumstances.[2]

---

[2]    See generally Graham v. Connor, 490 U.S. 386, 397 (1989) (noting that the inquiry into whether law enforcement officers

I am the wife of Robert Arias, who was arrested on September 8, 2016 ("Arrest") and filed a complaint against the U.S. Government on or about October 2017 (17-CV-516-SM) ("Lawsuit") related to his Arrest. I have not seen the Complaint, but my husband has spoken of it to me.

My husband, Robert, does not speak or understand English. He came to the United States from the Dominican Republic in 2015.

I was present on September 8, 2016 when Robert was arrested in the parking lot of the Rockingham Mall in Salem, New Hampshire.

At the time of the Arrest, I was 3 months pregnant and it was a delicate pregnancy because of my health.

I drove up to the Rockingham Mall parking lot, and Robert was in the passenger seat. Some suspicious men approached the car. Then a vehicle blocked in our car. I was in the driver's seat at the time and Robert was in the passenger seat.

As the men/officers approached me, I told them that I was pregnant and not to touch me.

I saw much of what happened to Robert before I was led away by a man/officer to a car with tinted windows.

At no time during the Arrest did Robert or I resist being arrested. We were both very concerned about my pregnancy.

I saw the men (who were not in uniform) approach our car with guns drawn. They forcibly grabbed Robert out of the car and cut the seatbelt. In addition, they cut the belt to his pants.

---

employed excessive force in the context of an arrest or investigatory stop is an objective one, focused on whether the officers' conduct was "objectively reasonable in light of the facts and circumstances confronting them.")

7

**63**

Case 1:17-cv-00516-SM   Document 56   Filed 01/19/21   Page 8 of 13

I saw them punch Robert on the face when they took him out of the car. They used a choke hold to get Robert out of the car and then slam him to the ground.

When they slammed Robert to the ground, I believe he hit his head because he screamed.

I remember saying "What are you guys doing?" as I could not believe why they were using such force on Robert.

I remember Robert saying to me "Tell them not to hurt me like that" in Spanish.

At this point there were many, many men around, enough to fill a chapel. Most of them were in regular clothes, not police uniforms.

I saw that many men/officers were on top of Robert and started to step on Robert's leg and stomach. At one point, I saw at least 5 men/officers, who were on top of Robert, mainly on his leg and knee.

At this point they also started kicking Robert, mainly in the ribs and I believe it was on the right side.

I saw them pick up Robert and slam him to the ground.

They used such force with Robert that he urinated on himself.

Throughout this whole time, the officers kept their guns drawn even though neither Robert nor I were resisting arrest at all. Our main focus was on my pregnancy. Some of the men/officers put their guns away when Robert was on the ground.

Throughout the Arrest, Robert was screaming at me to "leave" in Spanish as he was concerned about the pregnancy. I believe that Robert was concerned that watching him getting beat up would cause me distress and could affect the pregnancy.

I addition, I remember Robert screaming in pain at times and shouting "my knee, my knee" a number of times. It was very distressing to hear Robert in such

8

pain and not be able to do anything.  Robert does not
speak English, so all these words were in Spanish.

\* \* \*

I saw Robert again that evening at the County jail.
His face was swollen (his eye and lips on the right
side) and he had dark marks.  In addition, he showed
me his knee which was swollen.  He complained of the
hurt.  The swollenness seemed to be getting worse with
time.

Affidavit of Carmen Jose (document no. 48-3) at paras. 2-22, 25.

Corroborating the accounts of Arias and Jose are medical

records showing that Arias sought treatment (in the jail) in

November of 2016 for an injury to his knee.  Subsequently, in

March of 2017, he saw the jail's nurse, who reported that Arias

said he was unable to bend his left knee.  Strafford County

House of Corrections Medical Records (document no. 51-2) at 10.

Three days later, X-rays of Arias's left hip and left knee were

ordered "due to chronic pain."  Id.  The physician's assistant

reported, "Assessment: Chronic hip and knee pain over the last

six months. . ..  I suspect patient has significant degenerative

changes.  Likely will need orthopedic management."  Id.

Jail records reveal that Arias again complained of "hip and

knee pain" in September of 2017.  Id. at 9 ("Seen in unit for ss

c/o hip pain.  CO used as interpreter.  IM states he was seen at

9

**65**

seacoast ortho about 5 months ago and was given a shot for the pain.  It helped for a few days but then the pain returned.").  That same day, Arias was seen by a physician, who prescribed Ibuprofen, 800 mg, twice a day for 90 days.  In June of 2018, Arias was again seen for "chronic hip and knee pain" and the nurse noted "marked [osteoarthritis] L knee; mild OA L hip."  Id. at 7.

More recently, in January of 2019, and again in March of 2019, Arias was seen by jail staff for complaints of chronic pain in his left knee and hip.  One medical note states that a physician reviewed Arias's medical records and entered the following order: "OK to MRI left hip to 'assess lateral hip for chronic bursitis changes and possible gluteal tear.'"  Id. at 5.  Another note suggests that Arias was directed to have an "outside consult" with an orthopedic specialist.  Id.

## Discussion

Two defendants – Juan Infante and Adalberto Garcia – move for summary judgment on grounds that they were not present for, nor did they even witness, Arias's arrest.  Rather, those officers have testified that they remained inside the Rockingham Mall during the entire course of that arrest.  See Affidavit of Juan Infante (document no. 43-6); Affidavit of Adalberto Garcia

10

**66**

(document no. 43-7). Arias does not dispute those statements. Although his complaint identifies those officers as having participated in his arrest, his subsequent answers to interrogatories reveal that he cannot identify Infante or Garcia as having been in the group who allegedly assaulted him (or who allegedly stood by while he was being assaulted). See Answer to Interrogatory No. 2 (document no. 43-10) at 4. See generally Gray v. Cummings, 917 F.3d 1, 5-6 (1st Cir. 2019) (collecting cases and discussing the situation in which a plaintiff has little or no memory of the events underpinning his or her claims).

Because there is no evidence that Infante or Garcia participated in or witnessed Arias's arrest (and there is sworn testimony that they did not), defendants Infante and Garcia cannot be held liable for using excessive force or for failing to intervene and stop other officers who were allegedly using excessive force.

Each of the remaining defendants, however, either actively participated in Arias's arrest, or was present for and witnessed, his arrest. As to those defendants, it is plain that there are genuinely disputed material facts that preclude entry of judgment as a matter of law in their favor. If a jury were

11

to credit the accounts of Arias and his wife, it could plausibly find for Arias on one or more of his <u>Bivens</u> claims against those remaining defendants – that is, a jury could sustainably conclude that one or more defendants violated Arias's Fourth Amendment rights by employing objectively unreasonable force to take him into custody, and after he was in custody.

Finally, given the state of the factual record at this juncture, the doctrine of qualified immunity affords defendants no protection.  As presently developed, the record suggests that: Arias had no history of violence; officers did not have reason to suspect that he would react violently to their efforts to take him into custody; officers had no reason to suspect that Arias might be armed; Arias was not armed; Arias was being arrested for a non-violent crime; and Arias cooperated completely with the arresting officers and offered no resistance.  Under such circumstances, the level of force used against Arias – as alleged by Arias and his wife – would obviously run afoul of the Fourth Amendment's reasonableness requirement.  <u>See, e.g.</u>, <u>Raiche v. Pietroski</u>, 623 F.3d 30, 39 (1st Cir. 2010) ("We need not decide whether there are materially similar cases of controlling authority or a consensus of persuasive authority existing at the time of the incident which would have clearly established the law.  This is because

12

**68**

[the officer's] excessive conduct was such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful.") (citations and internal punctuation omitted).

### Conclusion

Defendants' motion for summary judgment (**document no. 43**) is granted in part and denied in part. As to defendants Juan Infante and Adalberto Garcia, that motion is granted. As to all remaining defendants, however, the existence of genuinely disputed material facts precludes judgment as a matter of law. Their motion for summary judgment is, therefore, necessarily denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 19, 2021

cc:  Robert Arias, pro se
     Jeremy David Eggleton, Esq.
     Michael T. McCormack, AUSA

13

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS, )
)
    Plaintiff, )
)
    v. ) Civil No. 17-cv-516-SM
)
UNITED STATES OF AMERICA, UNITED )
STATES DRUG ENFORCEMENT )
ADMINISTRATION and DEA AGENTS FNU )
DAY, NOAH HERZON, JUAN INFANTE, FNU )
GARCIA, TY KURCHARSKI and FNU )
BERNARD, )
)
    Defendants. )

## DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Christopher Day, Noah Herzon, Juan Infante, Adalberto Garcia, Ty Kucharski and Michael Bernard move this Court to enter summary judgment on their behalf. Because the undisputed material facts demonstrate that the defendants acted reasonably and in accordance with Plaintiff's constitutional rights during his arrest on September 8, 2016, Defendants are entitled to qualified immunity from suit and this Court should enter judgment on their behalf.

In support of this Motion, Defendants refer the Court to the attached declarations, the memorandum of law, and the record of this litigation.

Therefore, Defendants request the Court grant this Motion, entitling each of them to qualified immunity and judgment as a matter of law.

70

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

/s/ Michael T. McCormack

By:_____

Michael T. McCormack
Assistant U.S. Attorney
NH Bar No. 16470
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
michael.mccormack2@usdoj.gov

May 14, 2020

2

**71**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ROBERT ARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 17-cv-516-SM |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION and DEA AGENTS FNU | ) | |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) | |
| GARCIA, TY KURCHARSKI and FNU | ) | |
| BERNARD, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'[1]
MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION**

As construed by this Court, Mr. Arias's Complaint states two Bivens[2] claims against each

individually named defendant for 1) excessive force in effecting his arrest from the front

passenger seat of his car; and 2) failing to protect him from excessive force by other officers

during his arrest, both in violation of the Fourth and Fifth Amendments.  DN 8 at 3.  Defendants

are entitled to summary judgment because, on the undisputed facts material to these claims, four

of the six were not physically involved in removing Arias from the car or placing him in

handcuffs and the two who may have assisted in restraining him while he was on the ground had

minimal contact with him and used no more force than reasonably necessary to restrain him

while he was placed in handcuffs.  None of the defendants witnessed any act of excessive force

---

[1] The United States and the Drug Enforcement Administration (DEA) have been dismissed as defendants in this action.  Document Number (DN) 8 at 5.

[2] Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

from which they could have protected him. As a result, there is no factual basis for Mr. Arias's claims against the individual defendants and they are entitled to qualified immunity, and to entry of judgment as a matter of law.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

During the summer of 2016, High Intensive Drug Trafficking Area Task Force (HIDTA) Officers (TFOs) Michael Bernard and Ty Kucharski, under the supervision of DEA Group Supervisor Noah Herzon, undertook an investigation of Robert Arias for suspected drug trafficking. Declaration of Michael Bernard ("Bernard Dec."), attached as Exhibit A, ¶ 2; Declaration of Noah Herzon ("Herzon Dec."), attached as Exhibit B, ¶ 4; Declaration of Ty Kucharski ("Kucharski Dec."), attached as Exhibit C, ¶ 2. With the assistance of an undercover DEA operative ("UC"), several buys of fentanyl-laced heroin, in increasing quantities, were made from Mr. Arias. Bernard Dec., ¶ 2; Herzon Dec., ¶ 4. The investigation culminated in the arrest of Mr. Arias on September 8, 2016. Declaration of Juan Infante ("Infante Dec."), attached as Exhibit D, ¶ 3; Bernard Dec., ¶ 3; Kucharski Dec., ¶ 3, Herzon Dec., ¶ 3.

On the day of the arrest, the 6 named defendants, along with 10-15 other law enforcement officers, were assigned to aid in Mr. Arias's arrest. Bernard Dec., ¶ 7; Herzon Dec., ¶ 4. Earlier in the day on September 8, 2016, the UC contacted Mr. Arias and arranged a purchase of approximately 1/2 kilogram of heroin in exchange for $10,000.00. Infante Dec., ¶ 3; Bernard Dec., ¶ 3; Herzon Dec., ¶ 3; Declaration of Adalberto Garcia ("Garcia Dec."), attached as Exhibit E, ¶ 3. The exchange was to take place at the food court at the Rockingham Mall in Salem, New Hampshire ("Mall") later in the day once Mr. Arias had sufficient time to put the product together. Infante Dec., ¶ 3; Bernard Dec., ¶ 3, Herzon Dec., ¶ 3, Kucharski Dec., ¶ 4. Members

2

**73**

of law enforcement engaged in surveillance of Mr. Arias, including surveillance by airplane. See Herzon Dec., ¶ 4; Garcia Dec., ¶ 3; Kucharski Dec., ¶ 4.

Prior to the meet time, several members of law enforcement, including TFOs Garcia, Infante, Day and Bernard were situated inside of the Mall to provide safety for the UC and to effectuate the arrest of Mr. Arias. Infante Dec., ¶ 4; Bernard Dec., ¶ 4, Garcia Dec., ¶ 4; Declaration of Christopher P. Day ("Day Dec."), attached as Exhibit F, ¶ 3. Several other members of law enforcement, including TFO Kucharski and Agent Herzon remained outside of the Mall in anticipation of Mr. Arias's arrival. Herzon Dec., ¶ 4; Kucharski Dec., ¶¶ 4-5. Other members of law enforcement continued to surveil Mr. Arias as he made his way to the Mall. See Herzon Dec., ¶ 4; Kucharski Dec., ¶ 4.

Mr. Arias was considerably delayed in putting together the product and the meeting took place late that afternoon. See Day Dec., ¶ 3. As he approached the Mall, a decision was made that Mr. Arias should be arrested prior to his being able to exit his vehicle. Bernard Dec., ¶ 6, Herzon Dec., ¶ 7; Kucharski Dec., ¶ 5. When they received word that the arrest was to occur in the parking area near Macy's, TFOs Day, Bernard, Garcia and Infante were located inside of the Mall. Infante Dec., ¶ 5; Garcia Dec. ¶ 4; Day Dec., ¶ 5. Because they function as undercover officers in a number of drug investigations in New Hampshire and Vermont and are known to the drug trafficking community in the Nashua area, TFOs Garcia and Infante remained inside of the Rockingham Mall outside of the view of the arrest scene, until such time as Mr. Arias had left the scene. Infante Dec., ¶¶ 4-5; Garcia Dec., ¶ 6.

TFO's Day and Bernard headed out of the Macy's entrance towards the Arias vehicle which was parked to the left of the aerial walkway from the Macy's exit to the parking structure. Bernard Dec., ¶ 6; Day Dec., ¶ 5. Once the Arias car pulled into the parking spot which was

3

facing a wall, several law enforcement vehicles approached to block the car in. Bernard Dec.,
¶ 7; Herzon Dec., ¶ 5; Day Dec., ¶ 5. TFO Day arrived on foot from the Mall and assumed the
"point" position in front of the vehicle with his gun drawn, identifying himself and telling Arias
and the female driver to show their hands. Day Dec., ¶¶ 5, 6. TFO Bernard was seconds behind
TFO Day and assumed a position between the aerial walkway and the passenger side of the
vehicle, where he drew his gun in the direction of Arias and identified himself as law
enforcement. Bernard Dec., ¶ 7. The driver of the vehicle put the car into reverse and the car
began to move backwards. Day Dec., ¶ 5; Prindiville Dec. at Attachment 1, Response to
Interrogatory No 1. The backward movement was stopped by the approaching law enforcement
vehicle blockade. Day Dec., ¶ 5.

TFO Day remained in his "point" position, keeping the scene secure until Mr. Arias was
taken into custody. Day Dec., ¶ 6. From his position, TFO Day witnessed the removal of
Mr. Arias from the vehicle, including the removal of his seatbelt. Id., ¶ 7. TFO Day recalls that
Mr. Arias responded as a person who was in shock; he was not aggressive and very little effort
was required to restrain him. Id. At no time did TFO Day observe anything that was
inconsistent with his training and experience of the need to move quickly and gain control of the
suspect to maintain the safety of officers and the public who may be on site. Id., ¶ 8.

TFO Bernard, who was positioned a distance from the passenger side of the vehicle,
secured his weapon once the law enforcement personnel who formed the vehicle blockade had
exited their vehicles and came into TFO Bernard's line of fire. Bernard Dec., ¶ 7. Once his
weapon was secured, TFO Bernard continued towards the Arias vehicle, arriving when Mr. Arias
was already on the ground and handcuffs were being applied. Id. TFO Bernard may have
assisted in restraining Mr. Arias while he was being handcuffed but has no recollection of doing

4

**75**

Case 1:17-cv-00516-SM   Document 43-1   Filed 05/14/20   Page 5 of 24

so. Id. What TFO Bernard does recall is that it was a smooth, routine and unremarkable arrest, without any resistance from Mr. Arias and was over a matter of seconds. Id., ¶ 8.

Agent Herzon was driving a law enforcement vehicle which assumed a position to the passenger rear side of the Arias vehicle in the blockade. Herzon Dec., ¶ 8. No more than seven or eight seconds passed from the time Agent Herzon parked his vehicle until Mr. Arias was in handcuffs. Id., ¶ 9. By the time Agent Herzon exited his vehicle and reached Mr. Arias, handcuffs were already being applied. Id. Although he has no recollection of doing so, Agent Herzon may have assisted with holding Mr. Arias as the handcuffs were being applied. Id. Agent Herzon does recall that there was nothing unusual, alarming or concerning about the arrest; it was routine, quick and uneventful. Id., ¶ 10. Agent Herzon had no further contact with Mr. Arias. Id., ¶ 12.

Just prior to the arrest, TFO Kucharski was in the parking structure where the Arias vehicle eventually parked monitoring radio calls regarding the surveillance of Mr. Arias. Kucharski Dec., ¶ 4. As the Arias vehicle pulled into the parking space, TFO Kucharski got out of his car and, noticing that there was sufficient law enforcement personnel responding to the passenger side of the Arias vehicle, headed to the driver's door, focusing his attention on securing the Arias vehicle's driver. Id., ¶¶ 6-7. The driver exited the car voluntarily and TFO Kucharski placed her in handcuffs as a part of securing the scene. Id., ¶ 6. He spoke with the driver outside of the vehicle on the driver's side. Id., ¶ 7. The driver agreed to be interviewed and TFO Kucharski waited with her until Mr. Arias had been transported from the scene. Id. TFO Kucharski had no direct involvement with Mr. Arias at the arrest site, but does not recall that the officers who did remove and restrain Mr. Arias did so with any difficulty or unusual force. Id., ¶¶ 8-9.

5

Once Mr. Arias was safely in custody, TFO Day returned inside the Mall to ensure that the UC could safely leave the Mall. Day Dec., ¶ 10. TFO Day had no contact with Mr. Arias. Id. TFO Bernard called Salem Police Department ("Salem PD") and requested that a cruiser be dispatched to transport Mr. Arias from the arrest site to Salem PD. Bernard Dec., ¶ 11. TFO Bernard then proceeded to assist TFO Kucharski with the driver of the Arias vehicle. Id., ¶ 12; Kucharski Dec., ¶ 7. TFOs Bernard and Kucharski transported the vehicle driver to Salem PD where they interviewed her. Kucharski Dec., ¶ 7. TFOs Bernard and Kucharski then interviewed Mr. Arias with the assistance of TFO Garcia. Garcia Dec., ¶ 8.

TFO Infante remained inside the Mall throughout the entire incident and had no contact whatsoever with Mr. Arias. Infante Dec., ¶ 5. He left the Mall only after Mr. Arias had either been secured in a Salem PD cruiser or had already left the scene. Id.

Mr. Arias eventually pled guilty to distribution of a controlled substance and possession with intent to distribute a controlled substance and was sentenced to 120 months in prison. United States v. Robert Rainery Arias, No. 16-cr-160-01-LM, U.S.D.C., D.N.H., DN 97.

## III.   APPLICABLE LEGAL STANDARDS

### A.   Excessive Force

Mr. Arias claims that excessive force was used in effecting his arrest. The constitutional right implicated by this allegation is the Fourth Amendment's injunction that citizens are "to be secure in their persons…against unreasonable…seizures." See Graham v. Connor, 490 U.S. 386, 394-95 (1989) (holding "that all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest… should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than under a 'substantive due process' approach.") As established in Graham:

6

**77**

> [d]etermining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. . . . [T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application" . . ., however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . .The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .With respect to a claim of excessive force, the same standard of reasonableness of the moment applies: "Not every push or shove, even it if may later seem unnecessary in the peace of a judge's chambers," . . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

Id. at 396-97 (internal citations omitted).

Further, Graham established that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the fact and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 387. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.

**B.    Qualified Immunity**

Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). To determine whether qualified

7

**78**

immunity applies, the Court considers whether a public official has violated a constitutionally protected right and whether the particular right that the official violated was clearly established at the time of the violation. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). Whether a right is "clearly established" entails assessing "(1) 'the clarity of the law at the time of the alleged civil rights violation' and (2) whether, on the facts of the case, 'a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights.'"[3] Id. at 63 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). "'[T]o overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "Thus, if a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights, we must grant him qualified immunity." Id. This analysis is fact specific. Id.

"The purpose of qualified immunity is to protect reasonable, if mistaken, decision making by government officials, and it does not matter whether the mistake is related to broad principle or specific application." Lopez-Quinones v. Puerto Rico National Guard, 526 F.3d 23, 27 (1st Cir. 2008) (internal citation omitted). The shield provided to government officials by qualified immunity is broad: it protects from suit "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The aim of the qualified immunity doctrine is "to avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment." Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010). Because the doctrine serves as "an *immunity from suit* rather than a mere defense to liability[,] ... it is effectively lost if a case is erroneously permitted to go to trial."

---

[3] After Pearson, the analysis no longer has to be conducted in this strict procedural order.

8

**79**

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). Thus, to overcome a qualified immunity defense, the plaintiff must show not only that the defendants used excessive force, but that the level of force chosen "cannot in any way, shape, or form be justified" under the pertinent facts. Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009). Further, a plaintiff bringing a Bivens action must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (emphasis added).[4]

## C.    **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(c), a summary judgment motion should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Genuine," in the context of Rule 56(c), "means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 38 (1st Cir. 1993) (quoting United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992)). "Material," in the context of Rule 56(c), means that the fact has "the potential to affect the

---

[4] Plaintiff's claims fail on this ground alone in that Plaintiff's responses to discovery contradict the allegations in his Complaint. In response to an interrogatory asking Mr. Arias to name or identify by description each officer who he claims to have been excessive or punitive during the arrest, he responds, "I can't remember the identity of the officers...I closed my eyes." Declaration of Judith Prindiville, attached as Exhibit G ("Prindiville Dec.") at Attachment 1, Response to Interrogatory No. 2; see also Response to Interrogatory No. 1.

outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

Courts faced with a motion for summary judgment should read the record "in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The moving party has the initial burden of demonstrating the absence of an issue of material fact necessitating a trial. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 328 (1st Cir. 2008). If the moving party carries the burden, the party opposing the motion must present affirmative evidence showing that a factual dispute exists. Id.

## IV. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AND SUMMARY JUDGMENT BECAUSE FOUR WERE NOT INVOLVED IN THE ARREST; THE TWO WHO MAY HAVE ASSISTED HAD MINIMAL CONTACT WITH HIM; AND NONE  SAW ANY ARRESTING OFFICER USE MORE FORCE THAN REASONABLY NECESSARY TO REMOVE HIM FROM THE CAR AND PLACE HIM IN HANDCUFFS.

### A. Defendants Garcia and Infante Were Not Present At The Time Mr. Arias Was Being Taken Into Custody.

It is undisputed in this case that both TFOs Garcia and Infante were situated inside of the Mall with no sight line to the arrest which occurred in the parking lot. Initially, the plan was for the arrest of Mr. Arias to take place inside of the Mall, on the premise of a drug buy. Infante Dec., ¶ 3. Both TFOs Garcia and Infante were assigned to a team inside of the Mall, which included the UC, as well as a team of officers whose responsibility it was to provide security to the UC should something untoward happen. Infante Dec., ¶ 4; Garcia Dec., ¶ 4. Once the decision was made to take Mr. Arias into custody in the parking lot of the Mall, TFOs Garcia and Infante made their way from the food court within the Mall to the entrance of the Mall closest to the anticipated arrest. Infante Dec., ¶ 5; Garcia Dec., ¶ 5. They remained well inside of the

10

**81**

Mall, with no view of the area in which Mr. Arias was taken into custody, until well after Mr. Arias was in the Salem PD cruiser for transport to Salem PD. Infante Dec., ¶ 5; Garcia Dec., ¶ 6. During the time period at issue, both TFOs Garcia and Infante acted as undercover officers in drug investigations in New Hampshire and Massachusetts. Infante Dec., ¶ 4; Garcia Dec., ¶ 5. In order to maintain their covers, neither TFO wished to be seen at the site of the arrest of Mr. Arias disclosing their association with law enforcement, protecting their identity from any other individual related to the drug trade who might be present at, or witnessing, Mr. Arias's arrest. Id. Fifteen to twenty minutes after the arrest, TFOs Garcia and Infante exited the Mall for their vehicles. Infante Dec., ¶ 5; Garcia Dec., ¶ 6. TFO Infante left the scene and had no contact with Mr. Arias. Infante Dec., ¶ 6. TFO Garcia proceeded to Salem PD where he participated in the post-arrest interview of Mr. Arias, approximately one hour after the arrest. Garcia Dec., ¶ 8. Further, because both TFOs Garcia and Infante remained in the Mall, with no view of the arrest in the parking lot, neither of them did, or could have, witnessed any inappropriate force taken against Mr. Arias during the course of his arrest. See Infante Dec., ¶ 5; Garcia Dec., ¶¶ 5-6.

Therefore, based on the undisputed material facts, Mr. Arias cannot show a plausible violation of his constitutional rights by Defendants Garcia and Infante, entitling them to qualified immunity and judgment as a matter of law.

> **B.    Defendant Kucharski Had No Contact With Mr. Arias**
> **Until The Post-Arrest Interview at Salem PD Nor Did He**
> **Witness The Use of Unreasonable Force.**

TFO Kucharski's role on the day of the arrest was to monitor police radios tracking the surveillance of Mr. Arias. Kucharski Dec., ¶ 4. Immediately prior to the arrest, TFO Kucharski was sitting in is vehicle on the second level of the parking garage near the Macy's entrance to the Mall. Id., ¶ 5. Prior to Mr. Arias's vehicle parking at the Macy's entrance, the decision was

11

made to arrest him before he had an opportunity to exit his car. Id. Given that the preplanned arrest team was inside the Mall, the 15-20 officers outside of the Mall needed to quickly adjust their roles to include the take down and arrest of Mr. Arias in his vehicle. When Mr. Arias's vehicle entered the second level of the parking structure and pulled into its ultimate parking space, TFO Kucharski left his vehicle on foot and ran to the driver's door of the Arias vehicle, which was closest to him. Id., ¶ 6. Five to six law enforcement vehicles were approaching at the same time and parked in such a way to block in the Arias vehicle. Id., ¶ 5. TFO Kucharski's focus was on securing the driver. Id., ¶ 6. While TFO Kucharski's focus was on securing the driver, he does, however, recall having looked towards the passenger side of the Arias vehicle and thinking that nothing unusual was occurring with Mr. Arias and that the situation was under control. Id, ¶ 9. Had he witnessed any officer punching, kicking or otherwise acting with excess force, he would have tried to stop it. Id. Further supporting his memory is the fact that the driver of the car, Mr. Arias's wife, did not express any concerns regarding her husband's safety as he was being restrained. Id. TFO Kucharski remained with the driver until such time as Mr. Arias had been removed from the scene. Id., ¶ 7. He had no contact with Mr. Arias at the scene of the arrest. TFOs Kucharski and Bernard then transported the driver to the Salem PD to be interviewed. Id. TFO Kucharski's first contact with Mr. Arias on September 8, 2016, was during his post-arrest interview at Salem PD. Id., ¶ 9.

The undisputed facts regarding TFO Kucharski's involvement in the arrest of Mr. Arias demonstrate that he had no physical contact with Mr. Arias, nor did he witness any other officers display inappropriate physical contact with Mr. Arias. As such, TFO Kucharski is entitled to qualified immunity and judgment as a matter of law.

12

**83**

**C.    Although TFO Day Was In The Immediate Area Of The Arrest, He Had No Physical Contact With Mr. Arias Nor Did He Witness The Use Of Any Force In Excess Of What Was Required to Effect Mr. Arias's Arrest.**

On the day of the arrest, TFO Day was assigned as cover for the UC who was waiting to meet Mr. Arias at the food court inside the Mall. Day Dec., ¶ 4. When word was issued that Mr. Arias would not be entering the Mall but instead would be taken into custody outside in the parking structure, TFO Day ensured the safety of the UC and then moved towards the Macy's entrance. Id., ¶ 5. The situation was fluid and his primary purpose was to ensure that Mr. Arias did not enter the Mall. Id. Upon seeing the car pull in and park, he drew his gun and, with his badge displayed, assumed a "point" position in front of the car, directing both occupants to show their hands. Id. Although TFO Day cannot say with certainty that he remained "on point" throughout the arrest, he does not recall approaching the passenger side of the car or participating in Mr. Arias's extraction from the car, assisting in laying him down in a prone position on the ground beside the car, or assisting in restraining him while handcuffs were applied. Id., ¶ 6. Maintaining point would have been his normal role in such arrests. Id. Because numerous officers converged at the passenger door as it came to a stop, there was no need for him to assist in the extraction and cuffing. Id.

From his position in front of the Arias vehicle, TFO Day had a clear vision of the removal of Mr. Arias from the car, and his eventual restraint. Day Dec., ¶ 7. TFO Day confirms that Mr. Arias was belted in the car and that the belt had to be unlatched or cut. Id. TFO Day recalls that that Mr. Arias was not aggressive, more stunned than anything, and very little force was required to restrain him. Id. TFO Day did not observe Mr. Arias to be injured in any way or recall him yelling out in pain. Id. Nor more than one minute passed before Mr. Arias was secured in custody. Id. Further, it is TFO Days's practice to write a separate report in each

instance that he encounters any type of resistance, either passive or aggressive, or any significant force in used. Id., ¶ 9. There was nothing about this arrest that prompted him to write such a report. Id.

The undisputed facts in this case demonstrate that TFO Day neither had physical contact with Mr. Arias nor did he witness the use of undue physical force by any member of law enforcement. As such, he is entitled to qualified immunity and judgment as a matter of law.

Thus, it is undisputed that Defendants Infante and Garcia never left the confines of the Mall and were not present at and did not participate in Mr. Arias's arrest. Infante Dec., ¶ 4, Garcia Dec., ¶ 6. Although Defendant Day approached the front of Mr. Arias' car with his badge visible and his gun drawn, he did not approach the passenger side of the car and did not participate in the extraction, restraint, brief search, and cuffing of Mr. Arias. Day Dec., ¶ 6. Defendant Kucharski did approach the car but he was solely involved in securing the female driver of the car and had no contact with Mr. Arias. Kucharski Dec., ¶¶ 6-9

### D.    To The Extent Defendants Bernard or Herzon May Have Had Any Physical Contact With Mr. Arias, It Was Minimal and Not Unreasonable.

TFO Bernard was assigned to provide cover for the UC in the food court where the transaction was to take place and to assist in the arrest if it occurred inside the Mall. Bernard Dec., ¶ 4. When it was determined that Mr. Arias would not be entering the Mall and instead the arrest would be effected as soon as the Arias car came to a stop in the parking lot, TFO Bernard ran out to the parking lot to assist. Id., ¶ 6. As he arrived at the Macy's parking lot entrance, Mr. Arias's car had pulled to a stop some 15 to 20 feet away and was blocked in by several law enforcement vehicles. Id., ¶¶ 6, 7. TFO Bernard, approaching from the front passenger side of the car, drew his gun, and made eye contact with Mr. Arias. Id., ¶ 7. As other agents converged on the car within seconds and came into his line of fire, TFO Bernard holstered his gun and

14

began to walk towards the passenger side of the car as other officers opened the passenger door and began to pull Mr. Arias from the car. Id. TFO Bernard confirms that Mr. Arias was belted and that the belt had to be removed before he could be taken out of the car and placed on the ground. Id. By the time TFO Bernard arrived beside the car, Mr. Arias had already been fully removed from the car and was laying on the ground. Id. Although TFO Bernard has no present recollection of having done so, he says that it is possible that he may have helped to restrain Mr. Arias on ground while the handcuffs were applied. Id. By the time he got close enough to help, there were already a number of officers assisting in the process and his assistance, if any, would have been minimal. Id. TFO Bernard called the Salem PD to dispatch a cruiser to the Mall, after which he proceeded to the driver's side of the Arias vehicle to speak with the driver. Id., ¶¶ 11-12. TFO Bernard's next contact with Mr. Arias was at the Salem PD. Id., ¶ 12.

Agent Herzon was in his vehicle on the second floor parking lot next to the Macy's entrance. Herzon Dec., ¶ 4. Aside from the six named defendants in this action, there were some 10 to 15 other officers at the Mall to assist in the arrest. Id., ¶ 6. When Mr. Arias's car pulled into the parking space near the Macy's entrance, Agent Herzon immediately pulled his vehicle in beside the car, as did several other law enforcement officers. Id., ¶¶ 7-8. By the time Agent Herzon got out of his vehicle, a number of other officers had surrounded Mr. Arias's car and some had already physically removed him from the car and he lay prone on the ground. Id., ¶¶ 8-9. Agent Herzon does not know who specifically opened the passenger door or who reached in to pull Mr. Arias from the car. Id., ¶ 9. By the time Agent Herzon approached Mr. Arias, he was already being restrained and efforts were being made to apply the handcuffs. Id. It took only seven or eight seconds from the time Agent Herzon pulled up beside the Arias car until Mr. Arias was placed in cuffs. Id. Although he does not specifically recall doing so,

15

**86**

Agent Herzon believes that it is possible that he may have placed his hands on Mr. Arias to restrain him as the cuffs were applied. Id. He does not recall who actually applied the cuffs. Id.

Both Officer Bernard and Agent Herzon advise that standard procedure would have at least one officer restrain the suspect's head away from the officers to avoid him biting or spitting on them. Bernard Dec., ¶ 8; Herzon Dec., ¶ 8. One or more would focus on restraining his legs from kicking or attempting to stand. Id. And one or more would place the subject's hands behind his back and apply the handcuffs. Id. In the heat of the event, neither know which officers were involved in extracting Mr. Arias from the car, placing him on the ground, restraining him or applying the handcuffs. Although they both state that it is possible that they might have helped to restrain him on the ground, they do not recall doing so and both state that their contact with him was minimal. Id. Neither recall anything unusual. Id. Both state that the arrest was quick and uneventful. Id. "[I]t was a smooth, routine, and unremarkable arrest; Arias did not put up any resistance and he was handcuffed within a matter of seconds after being removed from the car." Bernard Dec., ¶ 9. "There was nothing unusual, alarming or concerning about this arrest. It was routine and uneventful." Herzon Dec., ¶ 8. Further, Agent Herzon states that he did not see anyone kneeling on Mr. Arias's head or standing on his ankles, punching or kicking him, and he would have immediately ordered them to stop if he had seen such conduct. Id.

In particular, both Officer Bernard and Agent Herzon expressly note that the quick physical removal of a dangerous drug suspect from a car, his placement prone on the ground beside the car, his restraint on the ground while handcuffs are applied, and a quick search for weapons or contraband are all frequently employed. Herzon Dec., ¶¶ 7, 10-11; Bernard Dec., ¶ 9. The objective is to gain immediate control of the suspect to prevent him from taking

16

defensive or evasive action.  Herzon Dec., ¶ 7; Bernard Dec. ¶ 9; Day Dec., ¶ 8.  Surprise and immediate physical control of the suspect are essential to prevent the suspect from accessing a gun or other weapon, mounting physical resistance to the arrest, or to escape or destroy evidence.  Herzon Dec., ¶ 7; Day Dec., ¶ 8.  "In light of the nature, quantity, and street value of the drugs involved in this case, the procedure was warranted and efficiently used to swiftly and safely place the suspect in custody, minimizing the risk of harm to everyone involved."  Bernard Dec., ¶ 9; see also Day Dec., ¶ 8.  Both also state that it is standard procedure and a safety precaution to make a quick search of the suspect, including the groin area, to check for any weapons, contraband, and for handcuff keys, which are sometimes found on such suspects.  Bernard Dec., ¶ 10; Herzon Dec., ¶ 11.

Over the prior month or so, Mr. Arias had sold increasing quantities of fentanyl-laced heroin to a DEA UC of increasing street value.  Bernard Dec., ¶ 2; Herzon Dec., ¶ 4.  This particular sale was for one-half kilo of fentanyl-laced heroin with a street value of $10,000.  Bernard Dec., ¶ 3; Herzon Dec., ¶ 3.  In light of these circumstances, it was reasonable for the arresting officers to assume that Mr. Arias or any of his friends and associates who may also be in the area and providing him cover would be armed, might attempt to escape, resist arrest, or attempt to destroy the evidence.  Herzon Dec., ¶ 3 ("At the time of a scheduled buy, the dealers are in possession of drugs and sensitive to their vulnerabilities from the buyer or his assistants that may steal the drugs from them. They are also vigilant about possible law enforcement intervention.  For those reasons, they may have their own security on site or are often carrying a weapon themselves.  Any time a drug trafficker is arrested extreme caution and quick action are essential in maintaining the safety of all involved"), ¶ 7; Bernard Dec.,¶ 9 ("It is essential to act quickly to take away the suspect's ability to react, so that he can be swiftly removed from the

17

**88**

Case 1:17-cv-00516-SM Document 43-1 Filed 05/14/20 Page 18 of 24

vehicle and immediately placed in cuffs, minimizing possible harm to the arresting officers and the nearby members of the public, and to forestall the suspect's use of any force in resistance to the arrest."); Day Dec., ¶ 4 ("All [drug] arrests are undertaken with extreme caution and with the expectation that the dealer, his cohorts, and others in the vicinity may be armed and respond with open fire, attempt to escape or to take hostages…especially so in situations involving… heroin, fentanyl, cocaine and even more so as the quantities and amounts of cash involved in the transactions increase.") Further a brief search of the suspect's body and immediate surroundings for arms, contraband, or even handcuff keys is routine and a common precaution. Bernard Dec., ¶ 10; Herzon Dec., ¶ 8 (" Law enforcement searches are thorough and are meant to discover items as small as a handcuff key, and always include a search of an arrestee's private parts as it is a prime location for hiding contraband or weapons.").

In short, Mr. Arias offers no specific evidence identifying any of the defendants in this case and he offers no affirmative evidence linking any of the alleged conduct to any specific defendant. He offers no case law establishing that, in effecting the arrest of a known dealer of half a kilo of fentanyl-laced heroin having a street value of $10,000, who has previously provided increasing quantities of the same controlled substance, the arresting officers must first have affirmative evidence that he is armed before they can forcibly corner him in his vehicle, extract him from the vehicle, restrain him prone on the ground to briefly search for weapons or contraband and to handcuff him. To the extent Mr. Arias contends that it was, per se, unreasonable to use any force in taking him into custody absent some physical demonstration on his part of that he was armed and dangerous, actively resisting arrest, or attempting to flee, he overstates the applicable standard of objective reasonableness. The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or the threat thereof

18

**89**

Case 1:17-cv-00516-SM   Document 43-1   Filed 05/14/20   Page 19 of 24

to effect it." Graham, 490 U.S. at 396. Whether the force used is objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of seizure.'" Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)). This assessment "must be judged from the perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight." Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015) (quoting Plumhoff v. Rickard, 572 U.S. 765 (2014)).

Here, the officers previously had made a succession of drug buys of fentanyl-laced heroin from him in increasing amounts and street values. He was apprehended in the process of meeting with an UC buyer for the sale of half a kilo of the drug worth some $10,000. Although his car had come to a stop in the parking space, the driver placed the car in reverse and it rolled slightly before being fully boxed-in by the law enforcement vehicles. Prindiville Dec. at Attachment 1, Response to Interrogatory No. 1; Day Dec., ¶ 5. As a matter of common sense, arresting a drug dealer is inherently dangerous and the arresting officers are not required to expose themselves, or the attending public, to serious or fatal injury before exercising reasonable force to subdue and physically control the suspect to minimize the palpable risk of injury to all concerned, prevent him from resisting the arrest, or from destroying evidence. The scene of the arrest was now at the entrance to a busy public mall from the parking lot at which members of the public were present. The cumulative quantity of the drug involved in all transactions exposed Mr. Arias to substantial time in prison. See United States v. Robert Rainery Arias, No. 16-cr-160-01-LM, U.S.D.C., D.N.H., DN 97. To the extent Mr. Arias contends that the force

19

**90**

used in effecting his arrest was not reasonable absent a visible threat of force, active physical resistance to his arrest, or attempt to destroy evidence, any reasonable officer involved in the arrest considering the totality of circumstances could reasonably believe that his immediate physical extraction from the car, brief restraint on the ground while a search for weapons or contraband was conducted, and placing him in handcuffs was reasonable to address the several risks credibly posed by him.

In the context of investigative "Terry" stops, the Supreme Court has held that an officer witnessing and investigating suspicious behavior consistent with the possible imminent robbery of a store by three suspects could reasonably assume that they might be armed, thus warranting a brief pat down search for weapons when approaching them to inquire about their intentions, even if he had no probable cause at that time to arrest them for a crime. Terry v. Ohio, 392 U.S. 1, 28 (1968). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27. In contrast to the investigatory search in Terry, the arresting officers in this case had probable cause to arrest Mr. Arias after multiple sales to undercover officers and the arrest took place while he was attempting to sell an additional sizeable quantity of drugs involving some $10,000. Arresting officers in those circumstances reasonably could perceive that Mr. Arias likely would be armed, dangerous, resist arrest, attempt to destroy evidence, and pose a serious risk of serious or possibly even fatal harm to the officers and the attending public. Thus, the decision to effect the arrest by boxing in his car, immediately physically extract him, place him prone on the ground, momentarily search him for weapons or contraband, and apply handcuffs was a reasonable use of force to neutralize the several risks he posed.

20

**91**

Agent Herzon is confident that no officer on site knelt on Arias's head, stood on his ankles, punched, kicked or otherwise used unnecessary or excessive force in restraining or handcuffing him. Herzon Dec., ¶ 10. Had he observed any undue force, Agent Herzon, the Group Supervisor on this case, would have directed that it stop. Id. Similarly, TFO Bernard did not view anything excessive or out of the ordinary in the removal, restraint or placing of handcuffs on Mr. Arias. Bernard Dec., ¶ 10.

TFO Bernard and Agent Herzon are entitled to qualified immunity and judgment on their behalf as the undisputed facts show that neither used excessive force against Mr. Arias nor viewed any use of excess force by other officers for which they were required to intervene.

It is undisputed that TFO's Infante and Garcia never left the confines of the mall and were not present at and did not participate in Mr. Arias's arrest. Infante Dec., ¶ 4, Garcia Dec., ¶ 6. Although TFO Day approached the front of Mr. Arias' car with his badge visible and his gun drawn, he did not approach the passenger side of the car and did not participate in the extraction, restraint, brief search, and cuffing of Mr. Arias. Day Dec., ¶ 6. TFO Kucharski did approach the car but he was solely involved in securing the driver of the car and had no contact with Mr. Arias. Kucharski Dec., ¶¶ 6-9 Similarly, TFO Bernard's involvement includes only his initial drawing of his weapon and that he may have potentially assisted in restraining Mr. Arias when the handcuffs were being applied. Bernard Dec., ¶ 7.

The undisputed facts do not bear out Mr. Arias' allegations that three of the defendants knelt on his head or stood on his ankles. As noted, Defendants Day, Infante, Garcia, and Kucharski had no contact with him during the arrest. Infante Dec., ¶ 4, Garcia Dec., ¶ 6; Kucharski Dec., ¶ 8; Day Dec. ¶ 6. Defendants Bernard and Herzon may have tried to help in restraining Mr. Arias as the other officers searched and cuffed him, but they have no recollection

21

**92**

Case 1:17-cv-00516-SM   Document 43-1   Filed 05/1 20   Page 22 of 24

of doing so.  Bernard Dec., ¶ 7; Herzon Dec., ¶ 9.  Even if they did lay a hand on him to help restrain him, their contact was minimal.  Bernard Dec., ¶ 7; Herzon Dec., ¶ 9.  No reasonable officer helping to restrain Mr. Arias in this fashion could reasonably have perceived that such contact was unreasonable and violated his fourth amendment right to be free of unreasonable search and seizure.

Further, Defendants Garcia and Infante never left the Mall and did not witness the arrest. Therefore, they did not witness any excessive force by any arresting officer.  Garcia Dec., ¶ 10; Infante Dec., ¶ 6.  Although Defendants Bernard, Day, Kucharski, and Herzon were in the vicinity of the car at the time of the arrest, none witnessed any acts or conduct by any other arresting officer which they perceived as excessive or unreasonable force which would have called for their intervention.  Bernard Dec., ¶¶ 8-10; Day Dec., ¶¶ 8, 9; Kucharski Dec., ¶ 9; Herzon Dec., ¶ 10.  Given the uncontested testimony of all six defendants, there is no factual basis for Mr. Arias's assertion that they any of them witnessed the use of excessive force against him which they should have stopped, entitling them to judgment on that claim.

As previously noted, Mr. Arias admits that he had his eyes closed during the arrest and that he has no idea about the identity of the officers who arrested him.  Prindiville Dec. at Attachment 1, Response to Interrogatory No. 2.  In support of his allegations, Mr. Arias provided to undersigned counsel a cell phone video, "depicting the whole assault" and a still photograph allegedly showing an "Agent stepping on my leg pressing down on it."  Prindiville Dec. at Attachment 1, Response to Interrogatory No. 15.  A review of this evidence offers no support for Mr. Arias's claim of excessive force.

The still photograph shows Mr. Arias already in handcuffs sitting on the curbing, obviously after the arrest has been effected.  Prindiville Dec. at Attachment 2.  There is, in fact, a

Case 1:17-cv-00516-SM   Document 43-1   Filed 05/14/20   Page 23 of 24

man standing beside Mr. Arias. Id. But, on close examination, that man's leg is behind Mr. Arias's leg and not resting on, or restraining, him in any way. This photograph offers nothing in support of Mr. Arias's claim that he was "assaulted for a few minutes and…then I was handcuffed." Id. at Attachment 1, Response to Interrogatory No. 1. Nor does it show someone standing on his leg. Rather it shows Mr. Arias already handcuffed, sitting on a curbing, with another man standing behind him after the arrest. Id. at Attachment 2.

Similarly, the video offers no support for Mr. Arias's allegations of excessive force. While Mr. Arias claims that the video "depicts the whole assault," the video simply shows Mr. Arias sitting on the curbing with his hands cuffed behind his back, and a number of law enforcement personnel standing in his general area, not physically engaging him in any way. See Prindiville Dec. at Attachment 3. Significantly, the video shows an individual, presumably law enforcement, holding an evidence bag, indicative of the fact that Mr. Arias is already in custody and that his vehicle is being, or has been, searched for evidence. See id. Thus, neither the photograph nor the video depict any conduct demonstrating the exercise of any excessive force in the course of his arrest.

Finally, attached as Attachment 1 to the Bernard Dec. is a copy of the booking records from Salem PD, which include photographs taken of Mr. Arias when he was booked and interviewed at the Salem PD shortly after the arrest and later at the Strafford County Department of Corrections pending his arraignment and trial. These photographs do not depict any injury, bruises, scratches or abrasions. Nor do they depict any evident impairment or evidence of pain or trauma. There were no visible injuries or impairments arising from his arrest at the scene or during his booking at Salem PD. Bernard Dec., ¶ 13; Herzon Dec., ¶ 13; Kucharski Dec., ¶ 10; Garcia Dec., ¶ 9; Day Dec., ¶ 7. Mr. Arias did not make any complaint of any such injury at that

23

**94**

Case 1:17-cv-00516-SM   Document 43-1   Filed 05/14/20   Page 24 of 24

time. Id. Although injury is not required to establish an unreasonable search and seizure, Bastein v. Goddard, 279 F.3d 10, 14-15 (1st Cir. 2002), the absence of any such injury is relevant in determining whether the force used to effect the arrest was unreasonable. See Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir. 1991).

V.    CONCLUSION

The undisputed facts in this case show that of the six named defendants, two – Garcia and Infante - were never present at or saw the arrest. Two others – Day and Kucharski – did not approach the passenger side of the car, participated in Mr. Arias's arrest, or see any force in excess of that reasonably needed to effect Mr. Arias's immediate removal from the car and submission to custody. The final two - Bernard and Herzon - did not participate in Mr. Arias's extraction from the vehicle and bringing him prone to the ground, and while they may have extended a hand to restrain Mr. Arias on the ground while he was cuffed, their contact was minimal. And, none of the four at the scene of the arrest saw any conduct by the other arresting officers that they perceived to be excessive or unreasonable to place him in custody. Therefore, all six defendants are entitled to qualified immunity and to entry of summary judgment on the undisputed facts of this case.

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

By: /s/ Michael T. McCormack
Michael T. McCormack
Assistant U.S. Attorney
NH Bar No. 16470
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
michael.mccormack2@usdoj.gov

May 14, 2020

24

**95**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 17-cv-516-SM |
| | ) |
| UNITED STATES OF AMERICA, UNITED | ) |
| STATES DRUG ENFORCEMENT | ) |
| ADMINISTRATION and DEA AGENTS FNU | ) |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) |
| GARCIA, TY KURCHARSKI and FNU | ) |
| BERNARD, | ) |
| | ) |
| Defendants. | ) |

DECLARATION OF MICHAEL BERNARD
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.     I, Michael Bernard, am currently employed as a Sergeant with the Salem, New Hampshire Police Department.  I have been employed by the Salem Police Department since March of 2005.  From March 2015 through November 2017, I was assigned to the High Intensity Drug Trafficking Area Task Force (HIDTA) and operated out of the Manchester, New Hampshire office of the United States Drug Enforcement Administration (DEA).  I make this declaration based on personal knowledge and information provided to me in the course of my employment with the Salem Police Department and my connection to HIDTA.

2.     During my time with HIDTA, I, along with HIDTA Officer (TFO) Ty Kucharski was assigned the investigation of Robert Arias (Arias) relative to his potential involvement with drug trafficking.  Over the summer of 2016, an undercover HIDTA officer (UC) had established contact with Arias and made several purchases (buys) of increasing amounts of fentanyl-laced

96

Case 1:17-cv-00516-SM   Document 43-2   Filed 05/14/20   Page 2 of 6

heroin, confirmed by chemical analysis, from Arias. I had no direct contact with Arias during that time.

3.      It was decided that one final buy would be arranged by the UC and that Arias would be arrested at that time. The meet time was arranged for late in the day of September 8, 2016. At the buy, Arias was to supply the UC with approximately 1/2 kilogram of heroin in exchanged for $10,000.00 in cash. The UC and Arias had agreed to meet in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall).

4.      My role that afternoon was as part of the arrest team, should the arrest occur inside the Mall. In addition, I provided safety to the UC should anything unexpected occur. I stationed myself inside the Mall so that the UC was in my sight at all times. I communicated with the surveillance team through my cell phone.

5.      Commensurate with the start of my employment with the Salem, New Hampshire Police Department, I attended the New Hampshire Police Standards and Training Council. My first position with Salem was as a patrolman, where I effectuated street level drug arrests, motor vehicle stops, and consent searches. In December 2009, I was promoted to a detective where I initially investigated all types of cases, but after a couple of years my focus shifted to drug investigations. I estimate that during my time as a patrolman and detective, I participated in hundreds of arrests, a large number of them were parking lot drug interdiction arrests where the alleged drug dealer and/or user or buyer was inside of a vehicle prior to being taken into custody. I was assigned to HIDTA in March of 2015 and attended DEA basic narcotics school, through which I received training on drug investigations generally and specifically on identification of drugs, drug trafficking trends, and how to handle suspects. During my time with HIDTA, I

2

participated in scores of drug investigations and arrests, again a fair amount of those occurring with the subject inside of a vehicle.

6.      At some point, it was decided that the arrest, would occur outside of the Mall. Once I was told that Arias had entered the parking area and was located in a vehicle on the second level of the parking garage to the left of and facing Macy's, I headed towards the Macy's entrance to assist.  Arias' vehicle was parked, facing the Mall, approximately 10-20 feet from the end of the walkway into the parking lot and to the left.

7.      By the time I reached the site of the arrest, law enforcement vehicles had surrounded Arias' car.  Arias was in the passenger seat.  We made eye contact.  I drew my weapon in his direction and announced myself as a law enforcement officer and ordered the occupants to put their hands where I could see them.  Within seconds, law enforcement on foot approached the car, coming in the line of fire between me and Arias.  I immediately holstered my weapon and started walking towards Arias.  I observed officers open the car door and attempt to remove Arias.  However, he was seat belted and officers had to remove the seatbelt before they took Arias out of his seat and directly to the ground.  By the time I reached Arias, he was on the ground.  I did not participate in removing Arias from the car.  Although it is possible that I may have assisted in restraining Arias or applying his handcuffs, I have no recollection of that.  There were a number of officers at his side by the time I was close enough to help.  In addition to the six officers named as defendants in this suit, there were approximately 10-15 other officers on site who actively participated in this arrest.  The majority of those officers were plain clothed with no indicia of their names.  Any assistance I may have provided was momentary and minimal.

3

**98**

Case 1:17-cv-00516-SM   Document 43-2   Filed 05-13-20   Page 4 of 6

8.  As I approached Arias, consistent with standard procedure, Arias was being restrained by multiple officers.  One officer would be restraining Arias' head in a direction away from the officers to avoid the possibility of being bitten or spit at; another would be restraining his ankles to keep his legs from kicking out and potentially standing; and one to two officers would be restraining his hands and placing the handcuffs.  I do not have any recollection of which officers were involved in restraining him or placing him in handcuffs.  At no time did I view anything out of the ordinary or excessive in that process.  In fact, what I recall is that it was a smooth, routine and unremarkable arrest; Arias did not put up any resistance and he was handcuffed within a matter of seconds after being removed from the car.  I did not see anyone use excessive force in removing him from the car, restraining him or handcuffing him.

9.  It is of primary importance when effecting a felony arrest to gain immediate control of a suspect to reduce the risk that the suspect will take evasive or defensive action, i.e., the use of a weapon.  It is essentially to act quickly to take away the suspect's ability to react, so that he can be swiftly removed from the vehicle and immediately placed in cuffs, minimizing possible harm to the arresting officers and the nearby members of the public, and to forestall the suspect's use of any force in resistance to the arrest.  In light of the nature, quantity, and street value of the drugs involved in this case, the procedure was warranted and efficiently used to swiftly and safely place the suspect in custody minimizing the risk of harm to everyone involved.

10.  While it is standard procedure for an arrestee to be immediately searched after being restrained and again prior to placement in the transportation off scene, I have no recollection of observing the search.  Arrestees have been known to hide handcuff keys on their person and any search has to be thorough enough to locate potential keys, as well as other

4

Case 1:17-cv-00516-SM   Document 43-2   Filed 05/14/20   Page 5 of 6

contraband.   Again, however, I have no recollection of seeing anything that day out of the ordinary or that I thought was unnecessary, excessive or unusual.

11.   Once Arias was in custody, I immediately placed a call to Salem Police Department to have a marked cruiser come to the scene to transport him back to Salem Police Department.   No more than 15 minutes passed from the time Arias was in custody until he was taken from the scene in the Salem Police Department cruiser.

12.   Sometime after I made the call to Salem for the cruiser, I proceeded to the driver side of the vehicle to speak with the driver of the vehicle who had been placed in custody by another group of law enforcement officers on site.   I did not see Arias again until I observed him in the booking room at Salem Police Department.

13.   At no time did I observe Arias to have any obvious injuries (e.g., bruises, scratches, abrasions, limps, or difficulty moving or pain).   Although I do not speak Spanish and did not communicate directly with Arias, I was not aware that he complained to anyone at any time of being in pain or of being injured.   If Arias had made anyone aware of medical injuries while at Salem Police Department, the Department would, at a minimum, have contacted the Salem Fire Department and had Arias seen by a paramedic.   Given the fact that this case was assigned to me and TFO Kucharski, I would have been made aware of such an occurrence.   I am not aware that Arias made complaints of injury at any time while he was in the custody of DEA. I have included with this Declaration as Attachment 1 a true an accurate copy of the booking records from Salem Police Department, which include photographs of Arias taken within an hour or so after the arrest.

I declare that the foregoing is true and correct.

5

**100**

/s/ Michael Bernard

———————————————

Michael Bernard
Former HIDTA Task Force

Executed on this   12th   day of June, 2019

6

**101**



| | **Salem Police Department**<br>**Arrest Report** | Page: 1<br>11/12/2018 |
|---|---|---|

**Arrest #: 16-1436-AR**
**Call #: 16-23059**

Date/Time Reported: 09/08/2016 @ 1824
Arrest Date/Time: 09/08/2016 @ 1825
Booking Date/Time: 09/08/2016 @ 1837



TN #: H020162266
Court: Other Court
Court Date: 09/08/2016 @ 1830
Reporting Officer: Detective Michael Bernard
Booking Officer: Police Officer Joseph Touma
Approving Officer: Detective Sergeant Steve Woidyla

Signature: _____
Detective: Detective Michael Bernard

Signature: _____

| # | DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | ARIAS, ROBERT RAINIERY<br>43 SPRINGFIELD ST Apt. #2<br>LAWRENCE MA 01840 | M | W | 33 | NOT AVAIL | 978-645-7486 |

Military Active Duty: N
HEIGHT: 509        WEIGHT: 160        HAIR: BLACK      EYES: BROWN
BODY: NOT AVAIL.              COMPLEXION: NOT AVAIL.
DOB: 01/22/1983          PLACE OF BIRTH: DOMINICAN REPUBLIC
LICENSE NUMBER: NOT AVAIL.          ETHNICITY: HISPANIC

_____ [CONTACT INFORMATION] _____

Home Phone          (Primary)      978-645-7486

_____ [APPEARANCE] _____

GLASSES WORN: NO

TATTOOS: TAT R CALF(ST MICHAEL), TAT LF ARM(SKULL), TAT NECK(D)

_____ [FAMILY/EMPLOYMENT INFORMATION] _____

MARITAL STATUS: MARRIED

SPOUSE'S NAME: JOSE, CARMEN
FATHER'S NAME: ARIAS, PEDRO
MOTHER'S NAME: ARIAS-VILLAR, JUANA

OCCUPATION: UNEMPLOYED

```
                        Salem Police Department                  Page: 2
                            Arrest Report                        11/12/2018

                        Arrest #: 16-1436-AR
                          Call #: 16-23059
```

| # DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|

_____[RIGHTS/BOOKING CHECKS]_____

```
        RIGHTS ADVISED BY: Detective Joseph L Touma      DATE/TIME:  09/08/2016 @ 1838
              PHONE USED: N
        ARRESTEE SECURED: N

          FINGERPRINTED: N
           PHOTOGRAPHED: N
          SUICIDE CHECK: Performed
                PERSONS: State&Federal
              WANTED BY: DEA FOR DRUGS
      NCIC VEHICLE CHECK: Not Performed
       INJURY OR ILLNESS: N
```

| # OFFENSE(S) | ATTEMPTED | TYPE | CLASS |
|---|---|---|---|

```
     LOCATION TYPE: Parking Lot/Garage        Zone: Route 3
     MARP
     1 MALL RD
     SALEM NH 03079

 1   ARREST ON A WARRANT; OUTSIDE AGENCY            N          Not Applicable
                        594      7
            OCCURRED: 09/08/2016   1824
     SUSPECTED OF USING: Not Applicable
         BIAS AGAINST: No Bias
```

## Salem Police Department

Page: 1

NARRATIVE FOR DETECTIVE MICHAEL BERNARD

Ref: 16-1436-AR

DEA arrest. Please refer to DEA case number CG-16-0055 for case details. No SPD charges.
Case closed.

# Salem Police Department
## Image Associated With Case Number 16-1436-AR
Image Description: ARIAS



# Salem Police Department
## Image Associated With Case Number 16-1436-AR
Image Description: ARIAS



# Salem Police Department
## Image Associated With Case Number 16-1436-AR
### Image Description: ARIAS



# Salem Police Department
## Image Associated With Case Number 16-1436-AR
### Image Description: ARIAS



# Salem Police Department
## Image Associated With Case Number 16-1436-AR
Image Description: ARIAS



# Salem Police Department
## Image Associated With Case Number 16-1436-AR
Image Description: ARIAS





se 1:17-cv-00516-SM    Document 43-3    Filed 05/14/20    Page 11 of





Case 1:17-cv-00516-SM   Document 43-3   Filed 05/14/20   Page 13 of





## OMS  Offender Management System

# Booking Observation Report

MAIN

**Today's Date:** 11/14/2018 12:58

| Name: ARIAS, ROBERT | Booking #: 16-02920 |
|---|---|
| Sex: Male | Permanent #: 16-01254 |
| Race: Hispanic | SSN: |
| Birth Date: 01/22/1983 | |

## Booking Observation Questions
Answers are 'Y' = Yes, 'N' or Blank = No, 'R' = Refused To Answer

| Order | Question | Y/N/R | Comments |
|---|---|---|---|
| 5 | IS HE/SHE UNCOOPERATIVE | N | |
| 10 | CURRENTLY UNDER INFLUENCE OF DRUGS | N | |
| 15 | ANY ALCOHOL ON BREATH | N | |
| 20 | WAS BREATHALYZER TAKEN/RESULTS | N | |
| 25 | ANY SIGNS ALCOHOL/DRUG WITHDRAWAL | N | |
| 30 | DOES HE/SHE APPEAR INTOXICATED | N | |
| 35 | ANY VISIBLE SIGNS OF TRAUMA | N | |
| 40 | IS HE/SHE CONSIDERED ASSAULT RISK | N | |
| 45 | IS HE/SHE CONSIDERED A SUICIDE RISK | N | |
| 50 | INS # | N | |
| 55 | DO YOU SMOKE | N | |
| 60 | DO YOU HAVE ASTHMA | N | |
| 65 | ANY PSYCHOLOGICAL HISTORY | N | |
| 70 | ANY HISTORY OF MENTAL HEALTH DIAGNOSIS /I.E. DEPRESSION | N | |
| 75 | CURRENTLY EXPERIENCING ANY BLEEDING | N | |
| 80 | DO YOU HAVE ANY COUGHING/SPITTING | N | |
| 85 | ANY DIFFICULTY BREATHING | Y | |
| 90 | CURRENTLY EXPERIENCING ANY PAIN | N | |
| 95 | DO YOU HAVE ANY ALLERGIES | N | |
| 100 | ARE YOU PREGNANT | N | |
| 105 | ARE YOU CURRENTLY ON BIRTH CONTROL | N | |
| 110 | DO YOU HAVE A DRUG/ALCOHOL PROBLEM | N | |
| 115 | DO YOU HAVE EPILEPSY | N | |
| 120 | DO YOU HAVE ANY HEART DISEASE | N | |
| 125 | DO YOU HAVE HEPATITIS | N | |
| 130 | DO YOU HAVE HIGH BLOOD PRESSURE | N | |
| 135 | DO YOU HAVE DIABETES | N | |
| 140 | HAVE YOU RECENTLY BEEN ILL/INJURED | N | |
| 145 | ANY RECENT SUICIDE ATTEMPTS | N | |
| 150 | ARE YOU ON ANY SPECIAL DIET | N | |
| 155 | DO YOU HAVE TUBERCULOSIS | N | |
| 160 | DO YOU HAVE ANY DENTAL ISSUES | N | |
| 165 | ANY RECENT MEDICAL TREATMENT | N | |
| 170 | TAKING ANY MEDICATION | N | |
| 175 | TAKING ANY MEDICATION CONT'D | N | |
| 180 | OTHER HEALTH ISSUES NOT MENTIONED | N | |
| 185 | OTHER HEALTH ISSUES NOT MENTIONED | N | |
| 190 | MEDICAL TREATMENT PRIOR JAIL | N | |
| 195 | INCARCERATED HERE W/I LAST 7 YEARS | N | |
| 200 | CURRENTLY MONITORED BY SCCCP | N | |

Case 1:17-cv-00516-SM    Document 43-3    Filed 05/13/20    Page 17 of 18

## Booking Observation Questions
Answers are 'Y' = Yes, 'N' or Blank = No, 'R' = Refused To Answer

| Order | Question | Y/N/R | Comments |
|-------|----------|-------|----------|

By my signature, I agree that the above is true to the best of my knowledge.

_____

Inmate Signature

_____

Witness Signature

**Booking Observation Report**                                          **Page 2 of 2**

**118**



OMS  Offender Management System

**Inmate Image History**

Today's Date: 11/14/18 12:57
Full Name: ARIAS, ROBERT
Permanent #: 16-01254

Booking #: 16-02920    Booking Date: 9/8/16 22:38

Front
9/9/16  1:22

Side
9/9/16  1:22

Side
9/9/16  1:22

Inmate Image History                                                                Page 1 of 1

**119**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                           )
                                                        )
    Plaintiff,                                          )
                                                        )
    v.                                                  )   Civil No. 17-cv-516-SM
                                                        )
UNITED STATES OF AMERICA, UNITED                        )
STATES DRUG ENFORCEMENT                                 )
ADMINISTRATION and DEA AGENTS FNU                       )
DAY, NOAH HERZON, JUAN INFANTE, FNU                     )
GARCIA, TY KURCHARSKI and FNU                           )
BERNARD,                                                )
                                                        )
    Defendants.                                         )

DECLARATION OF NOAH A. HERZON
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.     I, Noah A. Herzon, am currently employed as a Group Supervisor with United States Drug Enforcement Administration (DEA), Manchester, New Hampshire Field Division. I have been employed by DEA since 2009 and held the position of Group Supervisor since June of 2016. As a Group Supervisor, I supervise both DEA special agents and members of local and state law enforcement who have been assigned to the High Intensity Drug Trafficking Area Task Force (Task Force Officers or TFO). I make this declaration based on personal knowledge and information provided to me in the course of my employment with the DEA.

2.     My employment with DEA began with 19 weeks of training at the DEA Academy in Quantico, Virginia. The training consists of all things relevant to becoming a DEA agent, including, but not limited to the identification of drugs, effectuating an arrest, writing reports and the use of defensive tactics. Of particular importance in this case was the many days spent on

**120**

how to make a physical arrest, specifically how to safely remove an arrestee from a vehicle, how to keep law enforcement and the arrestee safe, that the ground is the safest place to gain custody of the arrestee, how to apply handcuffs and how to avoid mistakes in making an arrest. The key is to move quickly and use the element of surprise to take away from the arrestee any opportunity to take any evasive or defensive action, including the use of a gun. The quicker law enforcement gains control of the situation, the less danger to law enforcement, the arrestee or the public.

3.    My first assignments with DEA were in the Philadelphia and New York City offices. Both of those offices are extremely busy and the cases involve large amounts of drugs, money and weapons. My work in New York also involved international cases where the drug amounts were in the thousands of kilograms. I estimate that I was personally involved in more than 200 arrests in my 7 years in New York. The cases I have encountered in New Hampshire generally involve smaller, but still significant, quantities or drugs and money. I have been involved in about 125 drug arrests in New Hampshire, about one-half of them involved suspects located in a motor vehicle. However the nature of the cases is the same as in a larger metropolitan area. At the time of a scheduled buy, the dealers are in possession of drugs and sensitive to their vulnerabilities from the buyer or his assistants that may steal the drugs from them. They are also vigilant about possible law enforcement intervention. For those reasons, they may have their own security on site or are often carrying a weapon themselves. Any time a drug trafficker is arrested extreme caution and quick action are essential in maintaining the safety of all involved.

2

**121**

Case 1:17-cv-00516-SM   Document 43-4   Filed 05/14/20   Page 3 of 6

4.      During the summer and fall of 2016, I oversaw an investigation of Robert Arias (Arias) relative to his potential involvement with drug trafficking.   TFOs Michael Bernard and Ty Kucharski were the lead officers in that investigation.   Over the summer of 2016, an undercover Task Force Officer (UC) had established contact with Arias and made several increasingly large purchases (buys) of fentanyl-laced heroine from Arias.   I had no direct contact with Arias during that time.

5.      It was decided that one final buy would be arranged by the UC and that Arias would be arrested at that time.   The meet time was arranged for late in the day of September 8, 2016.   At the buy, Arias was to supply the UC with approximately 1/2 kilogram of heroin in exchange for $10,000.00.   The UC and Arias had agreed to meet in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall).

6.      At the time of the arranged meeting, I was outside of the Mall in my vehicle monitoring the surveillance team's radio conversations.   I have read the Complaint in this matter and understand that Arias has named me and five TFOs as defendants to this lawsuit.   In addition to the six of us, I estimate that there were 10 to 15 other officers on site and participating in one way or another in the arrest.   Most of those officers were in plain clothes, with either a coat or hat that identified them as law enforcement, but wearing nothing that would identify them by name.

7.      At some point, it was decided that the take down, or arrest, would occur outside of the Mall.   At a planned vehicle arrest of a possibly armed drug dealer, as was the case with Arias, it is standard practice to box in the car so that it cannot move.   Officers immediately storm the car and physically remove the suspect before he has time to react or take any defensive

3

**122**

action. This minimizes the risk of harm to the arresting officers, the arrestee, and any members of the public who may be nearby.

8.     Surveillance radioed that Arias was the passenger in his vehicle which had entered the parking area and was located on the second level of the parking garage to the left of and facing Macy's. I drove my vehicle to the location to assist. Arias' vehicle was parked, facing the Mall, approximately 10-20 feet from the end and to the left of the walkway from the entrance to the Mall from the parking lot. I pulled my vehicle behind Arias's vehicle on the passenger side of the car as part of a blockade of vehicles pinning Arias's vehicle in.

9.     By the time I reached the site of the arrest, other law enforcement vehicles had surrounded Arias' car and he was being physically removed from the car. Arias was already out of the car and on the ground when I exited my car. I did not see who reached in to take Arias out of the car; he was out of the car and being placed on the ground when I pulled my vehicle up. It all happened very quickly and without incident. I estimate only seven or eight seconds passed from the time I pulled my vehicle into the blockade until Arias was in handcuffs. I may or may not have placed my hands on Arias, assisting with his restraint. I have no recollection of doing so, but feel confident that if I did touch him, it was momentary and minor in nature. I do not recall who placed Arias in handcuffs.

10.    I understand that Arias alleges that excessive force was used against him in removing him from his vehicle and in the process of restraining him and placing him in handcuffs. It is not unusual for law enforcement officers effecting an arrest to restrain an arrestee's head to one side away from the officers to minimize the possibility of a bite or spitting by the arrestee. Officers are also trained to restrain an arrestee's arms by pulling them to his

4

**123**

Case 1:17-cv-00516-SM   Document 43-4   Filed 05/14/20   Page 5 of 6

back and by restraining his legs, either by holding them or by putting weight on the arrestee's ankles, usually with a knee. However, officers would not kneel on the arrestee's head or stand on his ankles. Had I observed that happen, I would have instructed them to stop. I am confident that no officer knelt on Arias's head, stood on his ankles, punched, kicked or otherwise used unnecessary or excessive force in the restraint or handcuffing of Arias. There was nothing unusual, alarming or concerning about this arrest. It was routine, quick and uneventful.

11.     I understand from the Complaint that Arias also complains about being inappropriately touched during a body search. I do not recall the specifics of the searches of Arias; again, everything was routine and nothing stands out as inappropriate. Training would have lead law enforcement in this instance to search Arias for weapons and drugs either while he was on the ground or immediately after he was stood up. Arias would have been searched again prior to entering the vehicle for transport to the Salem Police Department for booking. Law enforcement searches are thorough and are meant to discover items as small as a handcuff key, and always include a search of an arrestee's private parts as it is a prime location for hiding contraband or weapons. I did not participate in either search of Arias, nor do I recall viewing anything at all that day that exceeded the bounds of a reasonable search or arrest.

12.     My recollection is that Arias was removed from the scene fairly quickly, within a matter of minutes, and transported to the Salem Police Department for booking. I, too, proceeded to Salem Police Department some time later but did not encounter Arias there. I have not had contact with Arias since September 8, 2016.

13.     I do not speak Spanish. I did not speak with Arias at the arrest site. I am not aware that he complained to anyone about injuries he incurred as part of the arrest. I did see

5

**124**

Arias at the arrest site at close range and did not observe any injuries (e.g., bruises, scratches, abrasions, limps, or difficulty moving or pain).

I declare that the foregoing is true and correct.

/s/ Noah A. Herzon

Noah A. Herzon
Group Supervisor
DEA - Manchester, NH

Executed on this 11th day of June, 2019

6

**125**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )    Civil No. 17-cv-516-SM
                                             )
UNITED STATES OF AMERICA, UNITED             )
STATES DRUG ENFORCEMENT                      )
ADMINISTRATION and DEA AGENTS FNU            )
DAY, NOAH HERZON, JUAN INFANTE, FNU          )
GARCIA, TY KURCHARSKI and FNU                )
BERNARD,                                     )
                                             )
        Defendants.                          )

DECLARATION OF TY KUCHARSKI
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.      At all times relevant to the Complaint in this action, I, Ty Kucharski, was employed by the Nashua Police Department and assigned to the High Intensity Drug Trafficking Area Task Force (HIDTA) and operated out of the Manchester, New Hampshire office of the United States Drug Enforcement Administration (DEA). I make this declaration based on personal knowledge and information provided to me in the course of my employment with the Nashua Police Department and my connection to HIDTA.

2.      During my time with HIDTA, I, along with HIDTA Officer (TFO) Michael Bernard was assigned the investigation of Robert Arias (Arias) relative to his potential involvement with drug trafficking. Over the summer of 2016, an undercover HIDTA officer (UC) had established contact with Arias and made several drug purchases (buys) from Arias. I had no direct contact with Arias during that time.

**126**

3.      It was decided that one final buy would be arranged by the UC and that Arias would be arrested at that time.   The meet time was arranged for late in the day of September 8, 2016.   At the buy, Arias was to supply the UC with approximately 1/2 kilogram of heroin in exchange for $10,000.00.   The UC and Arias had agreed to meet in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall).

4.      My role that afternoon was as part of the surveillance team.   Just prior to the arrest, I was sitting in my vehicle outside of the Mall, monitoring the surveillance.

5.      At some point, it was decided that the arrest would occur outside of the Mall, before Arias had the opportunity to exit his car.   Arias was a passenger in a vehicle driven by Carmen Jose.   Arias's vehicle entered the second level of the parking garage at the Mall and parked to the left of and facing Macy's.   I was in my vehicle nearby.   Once Arias's vehicle pulled into the parking spot, I exited my car on foot and proceeded to his vehicle while five or six law enforcement vehicles surrounded Arias's vehicle, blocking it from leaving the parking spot.

6.      The driver's side door was the one closest to me and I recall seeing other law enforcement officers in the immediate vicinity of the passenger door.   Therefore, I focused my attention on the driver, Carmen Jose.   I don't at this time have any strong recollection of the details regarding Ms. Jose getting out of the car, only that it was uneventful.   Ms. Jose was not subject to an arrest warrant and she was taken into custody solely as a means of securing the scene.   Consistent with my regular practice, I would have opened the door and asked Ms. Jose to exit the vehicle, after which I would have placed her in handcuffs.   Because I have no contrary recollection and, in fact, recall nothing out of the ordinary, I feel confident that is what occurred.

2

**127**

Case 1:17-cv-00516-SM  Document 43-5  Filed 05/14/20  Page 3 of 4

7.      I have a specific recollection of speaking with Ms. Jose in the area of the driver's side of the vehicle and that she agreed to be interviewed. After Arias was removed from the scene by a Salem Police Department cruiser, I escorted Ms. Jose to my vehicle and TFO Bernard and I transported her to Salem Police Department to be interviewed.

8.      I understand from reading the Complaint in this matter that Arias alleges that I assaulted him by either kicking, punching, dragging or pulling him from the car and that I stood by while others did the same and chose not to stop them. First, I had no contact with Arias until I participated in his interview at Salem Police Department later that day. My focus was on securing Ms. Jose. There were five to six other officers involved in securing Arias.

9.      I have no knowledge at this time which officers were involved with removing Arias from the vehicle and placing him under arrest. I do recall having a conscious thought that officers on the passenger side of the car had the situation under control and did not require assistance with Arias. Had I seen anyone punching, kicking or otherwise acting with excess force, I would have put a stop to it. I recall seeing Arias on the ground once he was secured and being stood and walked to the Salem cruiser for transport without difficulty. I do not speak Spanish. Ms. Jose, who is either Arias' wife or girlfriend, did not express at any point concern that Arias was being manhandled or hurt by the arresting officers. The entire arrest was unremarkable in that it was routine, fast and without incident.

10.     TFO Bernard and I interviewed Ms. Jose at Salem Police Department. After our interview of Ms. Jose, we undertook to interview Arias with the assistance of TFO Garcia as the translator. At that time I was in close proximity to Arias and there were no visible signs of injury, e.g. blood, cuts or bruises. Nor did he complain about any injuries or about any force

3

**128**

used effectuating his arrest.   If I had seen an injury or if he had complained of one, he would have been evaluated and, if appropriate, taken to the hospital for treatment.

11.   I have had no further contact with Arias.

I declare that the foregoing is true and correct.

/s/ Ty Kucharski

_____

Ty Kucharski
Former HIDTA Task Force

Executed on this 24th day of May, 2019

4

**129**

Case 1:17-cv-00516-SM Document 43-6 Filed 05/11/20 Page 1 of 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ROBERT ARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 17-cv-516-SM |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION and DEA AGENTS FNU | ) | |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) | |
| GARCIA, TY KURCHARSKI and FNU | ) | |
| BERNARD, | ) | |
| | ) | |
| Defendants. | ) | |

DECLARATION OF JUAN INFANTE
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.      I, Juan Infante, have been assigned to the High Intensity Drug Trafficking Area Task Force (HIDTA or the Task Force) operated out of the Manchester, New Hampshire office of the United States Drug Enforcement Administration since October 2015.   I make this declaration based on personal knowledge and information provided to me in the course of my through my assignment to HIDTA.

2.      During my time with HIDTA, I was involved in the investigation of Robert Arias (Arias) relative to his potential involvement with drug trafficking.   Over the summer of 2016, the Task Force had established contact with Arias and made several drug purchases (buys) from him.   I did have direct contact with Arias and was able to identify him.

3.      It was decided that one final buy would be arranged and that Arias would be arrested at that time.   The meet time was arranged for late in the day of September 8, 2016.   At

**130**

the buy, Mr. Arias was to supply approximately 1/2 kilogram of heroin in exchange for $10,000.00. The meet was to take place in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall).

4.  My role on September 8, 2016, required me to stay inside of the Mall in plain clothes. I do a fair amount of undercover work in New Hampshire and Massachusetts and in order to maintain my undercover persona, I do not interact with law enforcement in public settings. I was not to participate in the actual arrest of Arias; to do so would undermine my cover.

5.  Law enforcement positioned outside of the Mall advised that Arias had entered the parking area and was located in a vehicle on the second level of the parking garage to the left of and facing Macy's. I headed to the Macy's end of the Mall. From inside the Mall, I could not see the arrest scene nor did I have a radio to monitor the arrest scene. I did see a law enforcement officer entering the Mall with his law enforcement vest on. I remained inside the Mall for no longer than 15 minutes and exited the door near Macy's and headed directly to my car. Arias was not in the vicinity of his car at that time. I did not participate in the booking or interviews that took place at Salem Police Department following the arrest.

6.  I have read the Complaint in this matter. I understand that Arias alleges that I "pulled, punched, kicked and dragged plaintiff prior to arrest" and that my "behavior was erratic while continuously hitting and screaming plaintiff." Following that alleged direct participation in his arrest, he alleges that I "stood by while others did the same." None of that happened. I remained inside of the Mall from before the arranged meet time until Arias was secured and either seated in the Salem Police Department cruiser or on his way to Salem Police Department.

2

**131**

I neither participated in the arrest nor saw the arrest take place.   To have exposed myself as law enforcement at that time would have threatened my safety and destroyed my ability to continue to function in my undercover persona.

7.    I am unaware, even to this day, of any unusual circumstances of the arrest, that any excessive force was used during the arrest, or that Arias suffered any type of injury as a result of the arrest.

I declare that the foregoing is true and correct.

/s/ Juan Infante

_____

Juan Infante
HIDTA Task Force Officer

Executed on this 30th day of May, 2019

3

**132**

Case 1:17-cv-00516-SM   Document 43-7   Filed 05/14/20   Page 1 of 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                )
                                             )
        Plaintiff,                           )
                                             )
v.                                           )   Civil No. 17-cv-516-SM
                                             )
UNITED STATES OF AMERICA, UNITED             )
STATES DRUG ENFORCEMENT                      )
ADMINISTRATION and DEA AGENTS FNU            )
DAY, NOAH HERZON, JUAN INFANTE, FNU          )
GARCIA, TY KURCHARSKI and FNU                )
BERNARD,                                     )
                                             )
        Defendants.                          )

DECLARATION OF ADALBERTO GARCIA
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.      I, Adalberto Garcia, am currently employed as a Sergeant with the Nashua, New

Hampshire Police Department.   I have been employed by the Nashua Police Department since

July of 2007.   From October 2015 through September 2018, I was assigned to the High Intensity

Drug Trafficking Area Task Force (HIDTA) and operated out of the Manchester, New

Hampshire office of the United States Drug Enforcement Administration.   I make this

declaration based on personal knowledge and information provided to me in the course of my

employment with the Nashua Police Department and my connection to HIDTA.

2.      During my time with HIDTA, I was involved in the investigation of Robert Arias

(Arias) relative to his potential involvement with drug trafficking.   Over the summer of 2016, an

undercover HIDTA officer (UC) had established contact with Arias and made several drug

133

purchases (buys) from Arias. I had on a couple of occasions participated in surveillance related to those undercover buys. I, however, had no direct contact with Arias during that time.

3.      It was decided that one final buy would be arranged by the UC and that Arias would be arrested at that time. The meet time was arranged for late in the day of September 8, 2016. At the buy, Mr. Arias was to supply the UC with approximately 1/2 kilogram of heroin in exchanged for $10,000.00. The two were to meet in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall). Earlier in the day of September 8, 2016, I participated in ground surveillance of Arias. As the meet time approached, I drove to the Mall and parked on the second level of the garage outside of the entrance near Macys.

4.      My best recollection at this time is that the arrest team, which did not include me, would apprehend Arias before he entered the Mall to make the exchange with the UC. My role that afternoon was to accompany the UC to the food court at the Mall. My job was to provide for his safety should anything unexpected occur. I met the UC in the food court and communicated with the surveillance team through my cell phone.

5.      I learned from the surveillance team that Arias had entered the parking area and was located in a vehicle on the second level of the parking garage to the left of and facing Macy's. The UC and I headed towards Macy's in case our assistance was required. The UC and I sat on a bench inside the Mall approximately 50 to 75 yards from the entry to the Mall. Our sight line was limited to what could be seen directly through the doors, straight into the parking lot. Arias' vehicle, which was parked 10-20 feet to the left of the door was not visible from our location.

2

**134**

6. Sitting on the bench looking directly forward, we observed patrons entering the Mall, who clearly were watching what was going on outside in the parking area to the left of the door and commenting as they passed us that someone outside the door was being arrested by law enforcement. The UC and I remained seated on the bench for about 15-20 minutes. I then rose from my position, walked forward and exited through the Mall door, heading directly to my vehicle. I did not stop or head towards the arrest location. At the time, I was involved in undercover police work in Southern New Hampshire and Massachusetts and did not wish to be associated with law enforcement by anyone who might be outside and recognize my undercover persona. As I approached my vehicle, I had a quick interaction with plain-clothed HIDTA Officer Ty Kucharski, who asked if I could assist with translation services at the Salem, New Hampshire Police Department, where Arias was being booked. I got into my vehicle and proceeded to the Salem Police Department.

7. Robert Arias was not visible to me as I exited the Mall. My first recollection of seeing Arias after my surveillance of his car terminated earlier in the day, was in the booking area of the Salem Police Department. I recall looking into the booking area and that a Lawrence Police Department detective was there assisting with translation services. I do not believe that I actually entered the booking area or interacted with Arias while he was in the booking area.

8. I did participate in an interview of Arias at the Salem Police Department after the booking was complete. This interview lasted about 30 minutes and occurred about 1 hour after his arrest.

9. At no time after his arrest, did I observe Arias to have any injuries (e.g., bruises, abrasions, limps, or difficulty moving or pain), nor did I hear Arias complain to anyone about

3

**135**

being in distress or pain. Had Arias complained about injuries or pain, he would have been provided with a medical evaluation to assess his complaints.

10. In sum, I remained inside of the Rockingham Mall with no line of vision of the arrest of Mr. Arias for the duration of his arrest. At no time did I touch Arias. I did not even see him taken into custody. By the time I exited the Mall, Arias had been handcuffed and was not visible to me on site. I am unaware, even to this day, of any usual circumstances of the arrest or that any excessive force was used during the arrest.

I declare that the foregoing is true and correct.

/s/ Adalberto Garcia

_____

Adalberto Garcia
Former HIDTA Task Force

Executed on this 21st day of May, 2019

4

**136**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ROBERT ARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 17-cv-516-SM |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION and DEA AGENTS FNU | ) | |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) | |
| GARCIA, TY KURCHARSKI and FNU | ) | |
| BERNARD, | ) | |
| | ) | |
| Defendants. | ) | |

DECLARATION OF CHRISTOPHER P. DAY
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1.      I, Christopher P. Day, am currently employed as a detective with the Manchester, New Hampshire Police Department.   I have been employed by the Manchester Police Department since 2009.   Since 2015, I have been assigned to the High Intensity Drug Trafficking Area Task Force (HIDTA) and operated out of the Manchester, New Hampshire office of the United States Drug Enforcement Administration.   I make this declaration based on personal knowledge and information provided to me in the course of my employment with the Manchester Police Department and my connection to HIDTA.

2.      During my time with HIDTA, I was asked to assist with the arrest of Robert Arias (Arias), a known drug trafficker.   Over the summer of 2016, an undercover HIDTA officer (UC) had established contact with Arias and made several drug purchases (buys) from Arias.

3.      It was decided that one final buy would be arranged by the UC and that Arias would be arrested at that time.   The meet time was arranged for late in the day of September 8,

**137**

2016. The two were to meet in the food court at the Rockingham Mall in Salem, New Hampshire (the Mall). I was part of a team situated inside the Mall to protect the UC in the event something unexpected should occur.

4. Prior the start of my law enforcement career, I attended the New Hampshire Police Standards and Training Council. Once assigned to DEA, I attended the DEA drug and drug interdiction schools. I have also attended the DEA special reaction team (SRT) school and the New Hampshire special weapons and tactics team (SWAT) training, both of which focus on arrests, takedowns, and felony motor vehicle stops. From the start of my law enforcement career in 2005, my focus has been on drug interdiction. For the first seven years, I was a patrolman where a majority of the arrests I was involved with were motor vehicle related. Since 2012, my work has been strictly related to drug cases, giving me specialized experience in the arrest of drug dealer drug dealers handling various kinds and quantities of controlled substances. Over my career, I estimate that I have participated in or been present at the arrest of approximately 100 drug dealers in numerous contexts including search warrant executions, vehicle stops, and planned buy and arrest operations. All are undertaken with extreme caution and with the expectation that the dealer, his cohorts, or others in the vicinity may be armed and may respond with open fire, attempt to escape or to take hostages. Although the risks are always present, they are especially so in situations involving drugs like heroin, fentanyl, cocaine, and even more so as the quantities and amounts of cash involved in the transactions increase.

5. The Arias arrest was a fluid situation. At one point, we learned that the arrest would take place outside of the Mall, before Arias could actually enter the Mall. I made sure that the UC was adequately protected and headed to the Macy's exit where I understood Arias's

2

**138**

vehicle was parking. My purpose was singular; it was to keep Arias from making contact with the UC. I reached the walkway from the garage to the Mall and sat on a bench where I could see the parking area. Once the first vehicle had pulled in behind Arias's vehicle to block it in, I headed towards the car. I approached with my law enforcement badge visible, my gun drawn and directing both Arias and the driver of the car to show me their hands. The driver put the car in reverse and the car moved slightly. The movement was stopped when other law enforcement vehicles joined the blockade and prevented further movement.

6. I recall that at least one officer approached the driver's side to secure the driver and that I told the officer to put the car in park. My recollection is that I assumed the role of the point man, meaning that I provided cover for the other officers who conducted the actual take down of Arias and the driver. While I cannot say with absolute certainty that I remained the point man throughout, it is consistent with my normal role and my training. There were multiple officers on site and, therefore, no need for me to give up the point man role and assist with the arrest.

7. I do recall that the passenger door was opened and that Arias was not removed through the window. Arias was wearing a seat belt and the belt was either unclipped or it may have been cut. I personally do not carry a tool adequate to cut a seat belt, but some officers do. Arias did not resist attempts to remove him from the car. His demeanor was more of a person in shock, stunned by the fact that the arrest was occurring. He was not aggressive and, as a result, there was very little force needed to restrain him. My recollection is that it all happened very smoothly and quickly. No more than one minute passed from the time I approached Arias's car

3

until he was in custody on the ground. I did not observe Arias to be injured in any way nor do I recall him yelling out in pain.

8. Nothing that I observed during the arrest of Arias struck me as out of the ordinary. This procedure is frequently used in situations of this kind to gain control of the suspect immediately in order to eliminate or reduce his ability to assimilate and respond to the developing circumstances and to take any evasive or defensive action - in particular, to draw and fire a gun. Surprise is the primary element of the procedure and is designed to give the suspect no time to react, so that he can be swiftly removed from the vehicle and immediately placed in cuffs, minimizing possible harm to the arresting officers and the nearby members of the public, and to forestall the suspects' use of any force in resistance to the arrest. In light of the nature, quantity, and street value of the drugs involved in this case, the procedure was warranted and efficiently used to swiftly and safely place the suspect in custody minimizing the risk of harm to everyone involved.

9. My education, training and experience has taught me that whenever I encounter resistance, either passive or aggressive, or any force of any type is used in the context of my law enforcement career, I write a report. Depending on the nature of the operation, it is not always necessary for each involved officer to write a separate report. However, it is my personal practice to do so in each instance of resistance. There was nothing about this arrest that prompted me to write a report.

10. Once the situation outside was stable and Arias was being escorted to the Salem Police Department cruiser sent to transport him, I returned inside of the Mall to check on the UC and to make sure the UC departed the Mall safely. I had no further contact with Arias.

4

I declare that the foregoing is true and correct.

/s/ Christopher P. Day

Christopher P. Day
HIDTA Task Force Officer

Executed on this _____ day of June, 2019

5

**141**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT ARIAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 17-cv-516-SM |
| | ) |
| UNITED STATES OF AMERICA, UNITED | ) |
| STATES DRUG ENFORCEMENT | ) |
| ADMINISTRATION and DEA AGENTS FNU | ) |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) |
| GARCIA, TY KURCHARSKI and FNU | ) |
| BERNARD, | ) |
| | ) |
| Defendants. | ) |

DECLARATION OF JUDITH NORTHRUP PRINDIVILLE
IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the authority of 28 U.S.C. § 1746, I make the following declaration:

1. I am Judith Northrup Prindiville, a Paralegal Specialist for the Civil Division of the United States Attorney's Office for the District of New Hampshire ("USAO"). I have been employed by the USAO since 1985, and have held the position of Paralegal Specialist since April of 1990. In that capacity, I have had various duties assigned to me. I make this declaration based upon personal knowledge or information provided to me during the course of my employment with the USAO.

2. In this case, I was assigned responsibility to gather and organize the discovery. I have been assigned to this case since its receipt in the USAO and am familiar with its history.

3. On April 30, 2019, the USAO, on behalf of the defendants, propounded interrogatories and requests for production of documents on Mr. Arias. On May 22, 2019, the

1

**142**

USAO received responses to its requests from Mr. Arias.   Included with this Declaration as Attachment 1 are excerpts of the responses to interrogatories which we received from Mr. Arias.

4.    In response to Interrogatory No. 15, Mr. Arias indicated that he had a videotape of the arrest, depicting the "whole assault" and a photograph of "the Agent stepping on my leg pressing down on it."   The video evidence referred was not attached to the discovery responses.

5.    On May 30, 2019, I accompanied AUSA T. David Plourde to Strafford County Department of Corrections, where we, along with an interpreter, met with Mr. Arias.   Mr. Arias agreed to provide AUSA Plourde with the cell phone video and photograph.   Mr. Arias stated that the video was taken by a family acquaintance, the identity of who he did not know, and sent to his mother's cell phone.   He did not have possession of either the video or photograph, indicating that his mother had possession of them at her home in the Dominican Republic. AUSA Plourde provided Mr. Arias with a cell phone number with the understanding that Mr. Arias would request that his mother forward the video evidence to AUSA Plourde.

6.    On or about June 10, 2019, AUSA Plourde received three texts from an unknown cell phone, transmitting a still photograph and a cell phone of Mr. Arias at the time of his September 8, 2016 arrest.   I copied those text messages to a computer in the USAO.   Included with this Declaration are electronic versions of the still photograph (Attachment 2) and the cell phone video (Attachment 3).

2

**143**

I declare, under penalty of perjury, that the foregoing is true and correct.


/s/ Judith Northrup Prindiville

_____
Judith Northrup Prindiville
Paralegal Specialist
Executed on:   July 16, 2019                    USAO - District of New Hampshire


3

US ATTORNEY'S OFFICE NH
MAY 22 2019 PM03:42

U.S. DISTRICT COURT
DISTRICT OF NH
2019 MAY 22 AM 10: 02

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                      )
                                                   )
        Plaintiff,                                 )
                                                   )
        v.                                         )    Civil No. 17-cv-516-SM
                                                   )
UNITED STATES OF AMERICA, UNITED                   )
STATES DRUG ENFORCEMENT                            )
ADMINISTRATION and DEA AGENTS FNU                  )
DAY, NOAH HERZON, JUAN INFANTE, FNU                )
GARCIA, TY KURCHARSKI [sic]and FNU                 )
BERNARD,                                           )
                                                   )
        Defendants.                                )

DEFENDANTS' FIRST SET OF INTERROGATORIES
TO PLAINTIFF ROBERT ARIAS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants Day, Herzon,

Infante, Garcia, Kucharski and Bernard request that you answer the following written questions

in writing, under oath, within 30 days from the date this notice was served.

INSTRUCTIONS FOR USE

A.    You are to state all information which is in your possession or any investigators,

agents, friends, or other people helping you in this case.

B.    These interrogatories are intended as continuing interrogatories requiring you to

answer by supplemental answer, setting forth any information within the scope of the

interrogatories as may be acquired by you, your agents, and other representatives following the

date of your original answers to these interrogatories or as otherwise required by Rule 26 of the

Federal Rules of Civil Procedure.

1

**145**

C.     If you lack the information necessary to answer any of the following interrogatories, please describe the specific efforts made by you or anyone else on your behalf to get the information and state when you anticipate obtaining the information and supplementing your answers.

D.     For the purpose of answering these interrogatories, you should use the following definitions:

1.     "Identify" or "identity" shall mean, with respect to a person, stating the name of that person, their residence address, residence telephone number, current occupation and position/title, occupation and position/title at the time they performed the activity stated in the question, business address and business telephone number.

2.     "Identify" or "identity" shall mean, with respect to a business, stating the name of that business, its address, its telephone number, and the type of business.

3.     "Health care provider" means to physicians, nurses, chiropractors, osteopaths, ophthalmologists, holistic practitioners, physical therapists, acupuncturists, occupational therapists, psychologists, psychiatrists, counselors, social workers, and any other health care providers.

E.     If you send any document in response to these interrogatories, write on them the specific question to which it relates.

F.     If you claim any of the information is privileged from disclosure, state the type of privilege and the grounds upon which the claim of privilege is based.

2

**146**

INTERROGATORY NO. 1:

Give a detailed description of the events that occurred, involving you, in the Rockingham

Mall parking lot from the time you entered the Pleasant Lane Mall parking lot on September 8,

2016, until the time you left the parking lot.

My wife was driving, I was seated in the passenger seat. We parked on the second floor level parking lot. In front of Macy's Two Agents came out. My wife then put the car in Reverse. The two Agents who exited Macy's ordered us to stop the car. My wife then came to a complete stop And put the car in park. One of the Agents then opened the passenger door, who Identified themselves As "DEA Agents". One of the Agents used excessive force to take me out the vehicle, by pulling me out by neck when my seat belt was still on. One of the Agents then cut off my seat belt. They slammed me to the ground Several more Agents came the one of the Agents cut off my waist belt on my pants. I pissed my pants out of fear for my life As the Agents continuously Assulted me. I thought my life was over I was Assulted for a few minutes. Then I was handcuffed And driven to the Salem police station. As soon as the Agents Stated they was "DEA Agents" I put my hands up And did not Resist I cooperated And the DEA Agent's still used excessive force.

3

**147**

INTERROGATORY NO. 2:

Explain the sequence of events that occurred that brought you from inside of your vehicle through each and every act you allege to have been excessive or punitive at the time of your arrest on September 8, 2016.   Include in your answer, the number of officers involved, the names of the officers involved and a description of the height, race, the clothing, the equipment worn by each officer involved, what each officer did, and identify any statements made during the arrest.

I can't not Remember the identity of the officers I was being Assulted And I was in fiar for my life I closed my eyes And pissed on myself. I thaught my life was ouer when I was getting Assulted they the officers.

)

4

**148**

## INTERROGATORY NO. 3:

Estimate the amount of time that elapsed from the time the officers approached your car through the alleged assault as described in your Complaint.

It took place ~~for a few~~ Right AWAY for A few Minutes.

5

INTERROGATORY NO. 15:

State, in detail, all statements or information you have obtained from any person relating to the alleged assault at the time of your arrest and identify by name, title, rank and address, each person from whom you obtained a statement or information.

Somebody video taped the whole Assult And Sent it. I have the video. And I have A photograph of the Agent stepping on my leg pressing down on it.

17

**150**

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

/s/ T. David Plourde

By:
T. David Plourde
Assistant U.S. Attorney
Chief, Civil Division
NH Bar No. 2044
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
david.plourde@usdoj.gov

April 30, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of April, 2019, an original and one copy of the above interrogatories were served, via first class, return receipt requested, postage prepaid mail, on Robert Arias, c/o Strafford County Department of Corrections, 266 County Farm Road, Dover, New Hampshire 03820.

/s/ T. David Plourde

_____
T. David Plourde, AUSA

21

**151**

Executed at _____SCDOC_____ this _10_ day of _MAY_____, ~~2008~~. 2019

_Robert arias_
~~Walter Norton~~ Robert Arias

State of _New Hampshire_ )
                                    ) ss.
County of _Strafford_ )

    Personally appeared before me the above-named _Robert Ariaf_ and has sworn an oath that the answers to the foregoing Interrogatories are true and correct to the best of his/her knowledge or belief.

_____
Notary Public ISABEL PADIAL, NOTARY PUBLIC
                    MY COMMISSION EXPIRES JUNE 15, 2021

My commission expires: _____

22

**152**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ROBERT ARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 17-cv-516-SM |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION and DEA AGENTS FNU | ) | |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) | |
| GARCIA, TY KURCHARSKI and FNU | ) | |
| BERNARD, | ) | |
| | ) | |
| Defendants. | ) | |

NOTICE OF CONVENTIONAL FILING

Attachment 2 to Exhibit G of Defendants' Renewed Motion for Summary Judgment

is electronic media which has been conventionally filed as Document Number 27-11.

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

By:  /s/ Michael T. McCormack
Michael T. McCormack
Assistant U.S. Attorney
NH Bar No. 16470
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
michael.mccormack2@usdoj.gov

May 14, 2020

**153**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                          )
                                                       )
        Plaintiff,                                     )
                                                       )
        v.                                             )        Civil No. 17-cv-516-SM
                                                       )
UNITED STATES OF AMERICA, UNITED                       )
STATES DRUG ENFORCEMENT                                )
ADMINISTRATION and DEA AGENTS FNU                      )
DAY, NOAH HERZON, JUAN INFANTE, FNU                    )
GARCIA, TY KURCHARSKI and FNU                          )
BERNARD,                                               )
                                                       )
        Defendants.                                    )

<u>NOTICE OF CONVENTIONAL FILING</u>

Attachment 3 to Exhibit G of Defendants' Renewed Motion for Summary Judgment

is electronic media which has been conventionally filed as Document Number 27-12.

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

By:  /s/ Michael T. McCormack
Michael T. McCormack
Assistant U.S. Attorney
NH Bar No. 16470
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
michael.mccormack2@usdoj.gov

May 14, 2020

**154**

Case 1:17-cv-00516-SM    Document 48    Filed 09/29/20    Page 1 of 4

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Robert Arias | ) |
| | ) |
| v. | )  Case No. 17-cv-516-SM |
| | ) |
| U.S. Government, et al. | ) |
| | ) |

## PLAINTIFF'S OBJECTION
## TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Arias objects to the Government's Motion for Summary Judgment (Document #43) and Memorandum of Law (Document #43-1) on the ground that there is a dispute of material fact as to whether the Defendants used excessive force in arresting him on September 8, 2016. In addition, the Government's Motion fails as a matter of law because the Defendant officers are not entitled to qualified immunity. In support hereof, Plaintiff states:

1.      Plaintiff incorporates herein the Affidavit of Robert Arias, the Affidavit of Carmen Jose (and Exhibits, including a photograph and a video clip), and his contemporaneously filed Memorandum of Law.

2.      Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

1

**155**

3.      In this context, a "material fact" is one that "ha[s] the 'potential to affect the outcome of the suit under the applicable law.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23 (1st Cir. 2017) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)).

4.      A "genuine dispute" exists if "a reasonable jury could resolve the" disputed fact in the nonmovant's favor. *Ellis v. Fidelity Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018) (quoting Cherkaoui, 877 F.3d at 23–24).

5.      The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); accord *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016).

6.      Once the movant has properly presented such evidence, the burden shifts to the nonmoving party to "designate 'specific facts showing that there is a genuine issue for trial,' " Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor," *Flovac*, 817 F.3d at 853 (brackets omitted) (internal quotation marks omitted) (quoting *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

7.      Incorporated into this Motion are the Affidavits of the Plaintiff and his wife, Carmen Jose, both witnesses to the arrest of the Plaintiff.  Supported by these affidavits, Plaintiff provides the Court with genuine issues of material fact that support a finding that the law enforcement officers who arrested him on September 8, 2016 used excessive force.  *See* Memorandum of Law, Statement of Disputed Facts.  In addition, the Plaintiff's affidavits and argument raises genuine issues of dispute concerning the declarations of the arresting officers and their identities and presence on the scene.  These facts are material, and the dispute is

2

**156**

genuine, in that a reasonable trier of fact could believe the Plaintiff and/or his witnesses as to those issues.

8. In addition, the Defendants cannot prevail as a matter of law on the basis of qualified immunity. As more fully described in the contemporaneously filed Memorandum of Law, the facts shown in the Plaintiff's Affidavit, the Affidavit of Carmen Jose, and the verified Complaint, viewed in the light most favorable to the Plaintiff, make out a violation of the constitutional right against the use of excessive force during an arrest. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). Furthermore, the case law discussed in the accompanying Memorandum demonstrates that the right not to be physically harmed, including kicked, punched, and slammed to the ground, during an unresisting arrest was "clearly established" at the time of the arrest in this case. *Id.*

9. A proposed order is not submitted as part of this objection as the relief requested is a straight denial of the Motion for Summary Judgment.

For these reasons, the Plaintiff requests that the Court:

A. Deny Defendants' Motion for Summary Judgment;

B. Grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

ROBERT ARIAS

By his Attorneys,

Dated: September 29, 2020    By:    */s/ Jeremy D. Eggleton*
Jeremy D. Eggleton, Esq. (BNH #18170)
ORR & RENO, P.A.
45 S. Main Street, P.O. Box 3550
Concord, New Hampshire 03302-3550
Tel.:    603-224-2381
Fax:    603-224-2318
E-Mail: jeggleton@orr-reno.com

3

**157**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing objection was forwarded by ECF to counsel of record.

Dated:  September 29, 2020

/s/ *Jeremy D. Eggleton*
Jeremy D. Eggleton

2902233_1

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

---

Robert Arias                                    )

                                                )

        v.                                      )          Case No. 17-cv-516-SM

                                                )

U.S. Government, et al.                         )

                                                )

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OBJECTION
## TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Arias disputes the material facts asserted by the Government in connection with the Government's Motion for Summary Judgment (Document #43) and Memorandum of Law (Document #43-1), specifically, the critical fact as to whether the Defendants used excessive force in arresting him on September 8, 2016. In addition, the Government's Motion fails as a matter of law because the Defendant officers are not entitled to qualified immunity.

I.      Statement of Facts in Dispute[1]

In response to the facts asserted by the Government and the Defendants concerning the events of September 8, 2016, Plaintiff Robert Arias responds with the following material facts

---

[1] Mr. Arias served discovery requests on Defendants on September 18, 2020. Mr. Arias agreed to the Defendants' request for a two week extension to provide answers. Thus, Mr. Arias reserves the right to supplement this Memorandum should Defendants' responses to discovery raise additional material facts at issue.

1

**159**

Case 1:17-cv-00516-SM   Document 48-1   Filed 09/29/20   Page 2 of 13

drawn from his Complaint, verified under oath, and from his affidavit[2] and the affidavit of his wife, Carmen Jose, all incorporated herein by reference:

The parties agree that Mr. Arias was arrested by the Defendants when he pulled into the parking lot of the Rockingham Mall in Salem, N.H. He agrees that the arrest was affected upon him while he was seated in the passenger seat of a car driven by his wife, Carmen Jose. Mr. Arias agrees with the Defendant officers that he never resisted arrest, nor did he attempt to flee. He agrees that, upon seeing the police, he put his hands up and complied with every instruction. However, the arrest was not as depicted in the declarations of the Defendant officers. The following facts are averred in rebuttal to the facts alleged by the Defendants in their declarations:

After cutting his seatbelt with a knife, two men pulled Mr. Arias from the car forcibly and by the neck. Affidavit of Robert Arias at ¶10. Mr. Arias saw guns drawn and put his hands up, not resisting the officers or the arrest. *Id.* at ¶¶7, 8. Knowing his wife Carmen Jose, who was driving, was pregnant and had a fragile pregnancy, Mr. Arias began to shout at her in Spanish to leave the location. *Id.* at ¶12. The arresting officers threw him to the ground and piled on him, banging his head on the ground. *Id.* at ¶¶13-14; *see* Affidavit of Carmen Jose at ¶12 ("When they slammed Robert to the ground, I believe he hit his head because he screamed."). One or more arresting officers were on his legs, causing intense pressure that hurt his knee and made

---

[2] There are minor discrepancies between Mr. Arias' verified Complaint, filed *pro se*, and the facts in his affidavit. For example, he recalls in his Complaint that the police struck his head on the car door as he was being removed from the car; whereas in his affidavit he clarified that he struck his head during the Defendants' act of throwing him to the ground. "A document filed pro se is 'to be liberally construed' and a 'pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 US. At 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). There are also minor differences between his specific recollection of events during the arrest, and those of his wife, Carmen Jose. *Compare*, Arias Aff. and Jose Aff. On the whole, though, the two affidavits complement each other and any differences are not material, or can be explained by their separate physical and emotional perspectives on the events. For example, Ms. Jose and Mr. Arias agree that officers cut Mr. Arias' seat belt and forcefully removed him from the car, slamming him on the ground. They also both agree that officers slammed his head on the ground and were on top of Mr. Arias and stepping on him, even after he was handcuffed, and hurt his knee/leg. Finally, they both corroborate that the actions of the officers was so out of proportion to the event that Mr. Arias urinated on himself.

2

**160**

Case 1:17-cv-00516-SM    Document 48-1    Filed 09/29/20    Page 3 of 13

him scream in pain. Arias Aff. at ¶13; Jose Aff. at ¶16 ("I saw that many men/officers were on top of Robert and started to step on Robert's leg and stomach. At one point I saw it least 5 men/officers who were on top of Robert, mainly on his leg and knee."). Mr. Arias blacked out and urinated in his pants. Arias Aff. at ¶16.

After he was cuffed and secured, arresting officers continued to stand on his leg. *Id.* at ¶19. He shouted in pain, "my knee, my knee!" Jose Aff. at ¶22. Mr. Arias felt pain and pressure on his ribs, from kicking and punching. Arias Aff. at ¶20; Jose Aff. at ¶17 ("At this point they also started kicking Robert, mainly in the ribs and I believe it was on the right side."). The officers, according to Mr. Arias, "mishandled me by snatching me out of the car where they continued to punch and kick me … foot on my head, standing on my ankles and pinning me to the ground like a wrestler." Document #1 at 3 (verified Complaint).

Mr. Arias' knee and face were swollen and he had bruises or dark marks on his face after the arrest when he was in custody that evening at the County Jail. *Id.* at ¶25. Mr. Arias was traumatized by the arrest and continues to have dreams about it. Arias Aff. at ¶22. He continues to have ongoing knee and leg pain, issues relating to the head injury, and anxiety and claustrophobia. *Id.* at ¶¶23, 24, 25, 27, 28.

Given that Defendants and Plaintiff *do* all agree that Mr. Arias never once resisted or put up any kind of opposition to the arrest. *Id.* at ¶¶9, 17; Jose Aff. at ¶20 ("[T]he officers kept their guns drawn even though neither Robert nor I were resisting arrest at all."), the above disputed facts create an issue of the use of excessive and unreasonable force during the arrest of Mr. Arias.

3

II.   <u>Standard of Review</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santangelo v. New York Life Ins. Co.*, 785 F.3d65, 68 (1st Cir. 2015). "A genuine issue is one that can be resolved in favor of either party and a material fact is one which has the potential of affecting the outcome of the case." *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 16 (1st Cir. 2013) (quoting *Perez-Cordero v. Wal-Mart Puerto Rico, Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). In deciding a motion for summary judgment, the court draws all reasonable factual inferences in favor of the nonmovant. *Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012). The moving party bears the burden of providing evidence sufficient for the court to hold that "no reasonable trier of fact could find other than in its favor." *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 75 (1st Cir. 2008).

III.   <u>The Government's motion for summary judgment should be denied because there are disputed facts which a reasonable jury could find in favor of the Plaintiff.</u>

a.   <u>Disputed facts pertaining to excessive force and violence of arrest</u>

The Government presents the declarations of Noah Herzon, Michael Bernard, Judith Northrup Prindiville, Christopher Day, Aldaberto Garcia, Juan Infante and Ty Kurcharski. With respect to the central allegations made by Mr. Arias in his Complaint, *i.e.*, that the arresting officers used excessive force and violence in effecting his arrest, the Defendants' Declarations assert that the following facts are undisputed:

At no time did TFO Day observe anything that was inconsistent with his training and experience of the need to move quickly and gain control of the suspect to maintain the safety of officers and the public. Day Dec. at ¶8. TFO Bernard recalled that it was a smooth, routine, and

4

**162**

unremarkable arrest. Bernard Dec. at ¶8. Agent Herzon does recall that there was nothing unusual, alarming or concerning about the arrest; it was routine, quick and uneventful. Herzon Dec. at ¶10. TFO Kucharski had no direct involvement with Mr. Arias at the arrest site, but does not recall that the officers who did remove and restrain Mr. Arias did so with any difficulty or unusual force. Kurcharski Dec. at ¶¶8-9.

The affidavits of Robert Arias and Carmen Jose, and the Verified Complaint signed under oath by Mr. Arias, assert the following facts that demonstrate a dispute of material fact as to the Government's assertions:

After cutting his seatbelt with a knife, two man pulled Mr. Arias from the car forcibly and by the neck. Declaration of Robert Arias at ¶10. Mr. Arias saw guns drawn and put his hands up, not resisting the officers or the arrest. *Id.* at ¶¶7, 8. Knowing his wife Carmen Jose, who was driving, was pregnant and had a fragile pregnancy, Mr. Arias began to shout at her in Spanish to leave the location. *Id.* at ¶12. The arresting officers threw him to the ground and piled on him, banging his head on the ground. *Id.* at ¶¶13-14; *see* Affidavit of Carmen Jose at ¶12 ("When they slammed Robert to the ground, I believe he hit his head because he screamed."). One or more arresting officers were on his legs, causing intense pressure that hurt his knee and made him scream in pain. Arias Aff. at ¶13; Jose Aff. at ¶16 ("I saw that many men/officers were on top of Robert and started to step on Robert's leg and stomach. At one point I saw it least 5 men/officers who were on top of Robert, mainly on his leg and knee."). Mr. Arias blacked out and urinated in his pants. Arias Aff. at ¶16. After he was cuffed and secured, arresting officers continued to stand on his leg. *Id.* at ¶19. He shouted in pain, "my knee, my knee!" Jose Aff. at ¶22. Mr. Arias felt pain and pressure on his ribs, from kicking and punching. Arias Aff. at ¶20; Jose Aff. at ¶17 ("At this point they also started kicking Robert, mainly in the

ribs and I believe it was on the right side."). The officers, according to Mr. Arias, "mishandled me by snatching me out of the car where they continued to punch and kick me … foot on my head, standing on my ankles and pinning me to the ground like a wrestler." Document #1 at 3 (verified Complaint). Mr. Arias' knee and face were swollen and he had bruises or dark marks on his face after the arrest when he was in custody that evening at the County Jail. *Id.* at ¶25. Mr. Arias was traumatized by the arrest and continues to have dreams about it. Arias Aff. at ¶22. He continues to have ongoing knee and leg pain, issues relating to the head injury, and anxiety and claustrophobia. *Id.* at ¶¶23, 24, 25, 27, 28. Defendants and Plaintiff *do* all agree that Mr. Arias never once resisted or put up any kind of opposition to the arrest. *Id.* at ¶¶9, 17; Jose Aff. at ¶20 ("[T]he officers kept their guns drawn even though neither Robert nor I were resisting arrest at all.").

As to the core question of whether the Defendant officers used excessive and unreasonable force on Mr. Arias when arresting him, Plaintiff has presented evidence from which a reasonable jury could find in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). "When an officer making an arrest exceeds the bounds of reasonable force, the force is deemed excessive and the Fourth Amendment right to be free from unreasonable seizure is implicated. '[C]laims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard.' *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Graham v. Conor*, 490 U.S. 386, 388 (1989)). In considering the reasonableness of the force, the Court must consider multiple factors, including: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,'

6

**164**

and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (quoting *Graham*, 490 U.S. at 396).

A reasonable jury could find that the Defendant Officers used excessive force in arresting Mr. Arias. Mr. Arias, his wife, and the Defendants *agree* that Mr. Arias was never resisting arrest at any point during the arrest. They agree that Mr. Arias was not attempting to evade arrest. As soon as the officers appeared, guns drawn, Mr. Arias' hands went up and stayed up. Arias Aff. at ¶¶8-9. While the alleged crime at issue related to selling narcotics—a serious issue—it was not a violent crime, and nothing about Mr. Arias at the moment of his arrest "posed an immediate threat to the safety of the officers or others." *Raiche*, 623 F.3d at 36. Mr. Arias should not have been hurt in any way during the arrest and his knee and head injuries are indications that unreasonable force was used.

Based on the prevailing legal standard, a reasonable jury could find that the officers exceeded the bounds of reasonable force when they threw Mr. Arias onto the ground, slammed his head on the pavement, punched and kicked his ribs, stood on his leg and knee, removed his pants and groped his private areas, and caused him to urinate in his pants out of fear and pain. Further evidence is the knee and head injuries that Mr. Arias continues to suffer due to the arrest. Arias Aff. at ¶¶25, 27, 30. Accordingly, there is a dispute of material fact as to whether the Defendant Officers exceeded the bounds of reasonable force, and the Defendants' Motion for Summary Judgment should be denied.[3]

---

[3] The same disputes of fact require a trial on the second prong of the *Bivens* claim, *i.e.*, that the Defendant officers present during the arrest breached a duty to intervene to prevent excessive force being used against Mr. Arias during the arrest. Whether an arrest was in fact effected using unreasonable and excessive force is an element of the duty-to-intervene claim. Therefore, the disputes of fact created by Plaintiff's and his wife's affidavits, and the verified Complaint, are material.

7

**165**

Case 1:17-cv-00516 SM   Document 48-1   Filed 09/29/20   Page 8 of 13

b. Disputed facts pertaining to identity of arresting officers and contact with Plaintiff

The Defendants assert, with support from declarations, that two of the named Defendants were not present (Defendant Officers Infante and Garcia). However, in opposition, Mr. Arias has stated *under oath* that "Agent Garcia did use excessive force when effecting arrest. . . ." He knowingly and intentionally assisted other agents in kicking, punching, dragging and humiliating Plaintiff in plain view of citizens in a public area [and] did cause me injury by holding my head down with his knee for a period of time." Document #1 at 19 (verified under oath, *id.* at 29). With respect to Defendant Infante, Mr. Arias alleged, under oath, that "Officer Infante did use excessive force when effecting arrest on [me]. He knowingly and intentionally pulled, punched, kicked and dragged [me] prior to arrest. This agent's behavior was erratic while continuously hitting and screaming [at me.]" Document #1 at 15. There is, thus, a dispute of material fact as to whether Defendants Garcia and Infante were present at the time of arrest and whether they participated in the arrest.

Similarly, of the remaining Defendant officers, two admit in their declarations to "possibly" touching Mr. Arias during the arrest. *See* Kucharski Dec. at ¶7; Day Dec. at ¶6; Bernard Dec. at ¶7; Herzon Dec. at ¶9; *see*, generally, Document #43-1 at 10-16.

However, Mr. Arias has asserted *under oath* in his Complaint that Defendants Kurcharski, Day, Bernard and Herzon were each directly involved in his arrest and had physical contact with him. *See* Document #1 at 7 (alleging Defendant Day "threw me back in the car, cut seat belt and proceeded to throw me on the ground ... then forcibly held me down by pinning my legs, by standing on them, and continuously hitting me."); *id.* at 11 ("Agent Herzon with the assistance of other agents did grab plaintiff roughly and tried to pull Plaintiff from an automobile while he was still belted to the seat, causing Plaintiff to choke and cut circulation off in his arms

8

**166**

and legs. This agent also retaliated against Plaintiff for expressing concern as to the assault by grabbing Plaintiff by the neck and head area and throwing him to the ground."); *id.* at 23 ("Agent [Kurcharsky] did use excessive force when effecting the arrest on Plaintiff. He knowingly and intentionally assisted in assaulting Plaintiff by either kicking, punching, dragging or pulling plaintiff from car."); *id.* at 27 ("Agent Bernard did use excessive force when effecting arrest on Plaintiff. Agent [Bernard] did knowingly and intentionally assault Plaintiff when he assisted others in kicking, punching, grabbing, dragging and holding Plaintiff down while being arrested.").

Thus, the assertions of fact by the arresting officers, or participating officers, that they were not present, had no contact with Mr. Arias, or only "possibly" had contact with Mr. Arias, are disputed by verified assertions, *under oath*, by Mr. Arias in his original verified Complaint. *Cf. Erickson v. Pardus*, 551 U.S. at 94 (*pro se* filings should be liberally construed so as to do substantial justice) (quoting *Estelle v. Gamble*, 429 U.S. at 106) (*citing* Fed. R. Civ. P. 8(f)).

Whether the named Defendants are the proper parties is a question of fact. To the extent that the Defendants' Motion is taken as an argument that the Plaintiff has failed to name the proper Defendants, their identity and role in the arrest of the Plaintiff are central to whether the Plaintiff can state a claim against them. Thus, the dispute over whether the named Defendants were present, were involved in the Plaintiff's arrest, or may or may not have touched him during the arrest is material to these issues. Plaintiff has presented evidence that creates a dispute of fact as to these questions and the Defendants' Motion for Summary Judgment should be denied.

IV.    <u>Defendants are not entitled to qualified immunity.</u>

"The doctrine of qualified immunity provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing

9

**167**

the constitutional rights of private parties." *Whitfield v. Melendez–Rivera*, 431 F.3d 1, 6 (1st

Cir.2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523

(1987)). The doctrine "provides defendant public officials an immunity from suit and not a mere

defense to liability." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). "[T]he qualified

immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown

by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was

'clearly established' at the time of the defendant's alleged violation."[4] *Maldonado*, 568 F.3d at

269.

This Court has the discretion to determine which of the two prongs should be evaluated

first. *Gidley v. Oliveri*, 641 F. Supp. 2d 92, 98 (D.N.H. 2009). In principle, the discretion exists

so as to avoid the need for the Court to weigh into whether a given set of facts made out a novel

violation of a constitutional right—potentially requiring the parties and the Court to litigate a

new constitutional matter when reference to existing case law (under the second prong) would

suffice. *See*, generally, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the distinction is

not required because the constitutional violation was obvious *and* clearly established prior to this

incident.

"[A] violation is clear 'either if courts have previously ruled that materially similar

conduct was unconstitutional,' or if the conduct was 'such an obvious violation of the Fourth

Amendment's general prohibition on unreasonable force that a reasonable officer would not have

required prior case law on point to be on notice that his conduct was unlawful.'" *Raiche v.*

---

[4] A third factor is sometimes applied, to wit, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right. *Jennings v. Jones*, 499 F.3d 2, 18 (1st Cir. 2007). There remains debate as to whether an official could reasonably exert unreasonable force, a contradiction in terms that might arise at the edges of questionable conduct. *Id.* at 18-19. In this case, however, the actions described by Ms. Jose and Mr. Arias-- kicks, head hitting the ground and stepping on legs, for a suspect that was not resisting arrest and for a nonviolent offense—are not marginal, and clearly would have put an objective reasonable officer on notice of excessive and unreasonable use of force in violation of Fourteenth Amendment rights. *See id.*

10

**168**

*Pietroski*, 623 F.3d 30, 38 (1st Cir. 2010) (*citing Jennings v. Jones*, 499 F.3d 2, 16–17 (1st Cir. 2007)). There is ample case law and common sense in support of the proposition that during the arrest of a non-resisting, compliant suspect with his hands already in the air, throwing him on the ground, slamming his head on the pavement, kicking and punching his ribs, and standing on his legs as he screamed in pain were excessive acts of force. This was clearly established prior to Mr. Arias's arrest and something any reasonable law enforcement officer, including the Defendant officers, should have known at the time.

The First Circuit has previously ruled that no prior case law was necessary to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness. *Raiche*, 623 F.3d at 39; *see, also, Comfort v. Town of Pittsfield*, 924 F.Supp. 1219, 1228 (D.Me. 1996) (allegedly slamming unresisting suspect's head into door jamb would, if true, violate fourth amendment); *Fowles v. Stearns*, 886 F. Supp. 894, 901 (D.Me.1995) (alleged conduct of police officers who punched and kicked handcuffed plaintiff, who did not resist arrest, if true, would violate the Fourth Amendment); *McLain v. Milligan*, 847 F. Supp. 970, 976 (D.Me.1994) (alleged conduct of police officer who, after handcuffing Plaintiff, "kicked [his] legs out from under him, forced him to his knees, slammed his chest and face onto the concrete, placed his knee down on plaintiff's back, picked his head up by the hair and slammed his face down onto the pavement," if true, would violate the Fourth Amendment); *Mercurio v. Town of Sherborn*, 287 F. Supp.3d 109, 119 (D. Mass. 2017) ("There is no real dispute that the officers would not have been justified in forcibly placing the plaintiff on the ground and dragging her to the police car if she was already under control and not resisting."); *Jennings*, 479 F.3d at 114 (twisting ankle of non-resisting suspect after he had stopped resisting and was crying out in pain was excessive force); *cf.*

11

**169**

*Cheever v. Erdmark*, No. CIV.06-CV-351-JM, 2009 WL 1608739, at *2 (D.N.H. June 2, 2009) ("Slamming people against walls and the floor and kicking them in the face, back, head and ribs is objectively sufficiently egregious that it offends evolving standards of decency in clear violation of the Eighth Amendment's prohibition against cruel and unusual punishment.").

In other words, it is "clearly established" that throwing Mr. Arias to the ground, slamming his head, standing on his legs, and punching and kicking his ribs, as he has alleged, was excessive force when he was—indisputably—not resisting arrest. *Maldonado*, 568 F.3d at 269. But even if there is no direct case in this Court involving the specific allegations asserted by the Plaintiff and his wife in their affidavits, the general conduct at issue has been repeatedly found to be excessive in other First Circuit cases, where, as here, it is undisputed that the Plaintiff did not resist arrest and was not threatening the officers or the public at the time of the arrest. *See Jennings*, 99 F.3d at 17 (no need for specific precedent when the constitutional violation is so obvious that any officer would be on notice as a matter of common sense); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Indeed, the officers themselves suggest that they were cognizant of the clearly established standards for excessive force at the time of Plaintiff's arrest. As Defendant Kucharski put it, "Had I seen anyone punching, kicking, or otherwise acting with excess force, I would have put a stop to it." Kucharski Dec. at ¶9; *see, e.g.*, Herzon Dec. at ¶10 ("Had I observed that happen, I would have instructed them to stop."). Clearly, the Defendant officers' defense in this matter turns on the conduct alleged by Plaintiff *not having happened*. They concede that this conduct would be conduct that, if it had happened as alleged, should have been stopped. Kurcharski Dec. at ¶9. Thus, this case turns on whether the punching and kicking, the slamming of Mr. Arias'

12

**170**

head, the standing or stomping on his legs occurred or not. That is the definition of a material dispute of fact that can only be resolved by a jury.

Because the Defendant officers moving for summary judgment cannot show (a) that the material facts are undisputed, nor (b) that they are entitled to qualified immunity, the Court should deny their Motion for Summary Judgment.

Respectfully submitted,

ROBERT ARIAS

By his Attorneys,

Dated: September 29, 2020     By:     /s/ Jeremy D. Eggleton
                                        Jeremy D. Eggleton, Esq. (BNH #18170)
                                        ORR & RENO, P.A.
                                        45 S. Main Street, P.O. Box 3550
                                        Concord, New Hampshire 03302-3550
                                        Tel.:   603-224-2381
                                        Fax:    603-224-2318
                                        E-Mail: jeggleton@orr-reno.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing memorandum of law was forwarded by ECF to counsel of record.

Dated: September 29, 2020          /s/ Jeremy D. Eggleton
                                   Jeremy D. Eggleton

2882672_1

**171**

Case 1:17-cv-00516-SM   Document 48-2   Filed 09/29/20   Page 1 of 3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

Commonwealth of Pennsylvania
County of ___*Clearfield*___

Robert Arias                )
                            )
        v.                  )
                            )   Case No. 17-cv-516-SM
                            )
U.S. Government, et al.      )
                            )

## AFFIDAVIT OF ROBERT ARIAS

I, Robert Arias, plaintiff in the above-referenced matter, do under oath declare and state:

1. I am currently incarcerated at Moshannon Valley Correctional Institution in Philipsburg, Pennsylvania.

2. I am married to Carmen Jose.

3. I am originally from the Dominican Republic and came to the United States in 2015. I married Carmen Jose in January 2016 and we are still married.

4. I do not speak English and understand very little English. My native language is Spanish.

5. On or about October 2017, I had a person help me with filing a complaint against the U.S. Government (17-CV-516-SM) ("Lawsuit") related to my arrest on September 8, 2106 ("Arrest"). I told my story to the person, a gentleman that I met in New Hampshire in Strafford County, while in prison, and he wrote up the complaint for the Lawsuit.

6. My wife, Carmen, and I were driving to the Rockingham Mall in Salem, New Hampshire on September 8, 2016. Carmen was driving and I was in the passenger seat.

7. When we arrived in the parking lot and stopped, two men, in plain clothes approached the car and had guns drawn.

8. As they approached the car, I put my hands up. The windows of the car were not tinted, so the men approaching the car could see that I was putting up my hands.

9. I did nothing throughout the Arrest to resist being arrested.

10. The two men pulled me from the car, mainly by my neck. It was done very forcibly. At the same time, they cut my seatbelt with a knife and threw me to the ground.

1

**172**

11. I then noticed that there were many men/officers around me, the majority were in plain clothes and many had their guns drawn. They were yelling something like "don't move."

12. I was yelling at Carmen, who was pregnant at the time, to "leave" in Spanish. I was worried about her and her pregnancy.

13. After I was on the ground, there were approximately 7 men/officers on top of me. I was not resisting arrest at all. They were mainly on top of my legs and it hurt my knee. There was an intense pressure on my leg that caused me to scream in pain.

14. The men/officers again banged my head to the ground, mainly the right side of my head.

15. I don't remember where they touched me, I just have an intense memory of the pain in my leg.

16. I lost consciousness and was so afraid that I urinated in my pants.

17. Again, I was not resisting arrest at all, just yelling out in pain and trying to protect Carmen by not having her see what was happening. I may have been moving because of the pain that they were causing.

18. They put handcuffs on me after I was on the ground.

19. After the handcuffs were on me, the men/officers stepped on me, on my left leg, while I was on the ground. I think it was not necessary as I was already in handcuffs. They did this multiple times.

20. I do not recall anybody punching or kicking me, but it was very confusing and all I could remember was the pain and fear. There was pain/pressure on my ribs, I do not recall from where it came.

21. I did not do anything to warrant being treated in this manner as the whole time, I was cooperating with the men/officers and did not resist at all.

22. I was traumatized by the Arrest. I have dreams about it.

23. I was hurt afterwards. Ever since that time, the pain in my leg doesn't go away. I take ibuprofen three times a day. When I walk around it doesn't hurt, but when I lay down it hurts.

24. Nobody asked me if I needed medical attention at the Rockingham Mall during the Arrest nor at the police station after. I was so confused by what had happened. When I got back to the County Jail, my head and leg really hurt.

2

25. I asked for medical help at the County Jail. At that point I did get medical assistance for the pain in my leg. They took some x-rays and gave me pills for the pain. They didn't tell me anything and didn't show me the x-rays so I have very little information on what was wrong with my leg.

26. I believe that there were some people from Massachusetts who were recording the Arrest. Carmen may have photographs/video from these people.

27. After the Arrest, due to the banging of my head during the Arrest, I've been having issues with my head hurting and not being able to remember things. I didn't used to forget so many things as I do now.

28. I told people about the head injury and related issues, but have never been treated for this. I have claustrophobia and other issues where my heart is racing.

29. I have complained about the headaches and memory issues. They treated me in New Hampshire, but not here. I received medication but I don't remember what it was.

30. I filed the Lawsuit because I did not resist arrest at all on September 8, 2106 and yet, based on the force with which I was taken into custody, I now have constant pain in my knee, headaches, and memory issues.

Further affiant sayeth not.

This record was acknowledged before me

on _____9/11/2020_____

by _____Robert Arias_____

Robert Arias - 15434-049
Moshannon Valley
Correctional Institution
555 Geo Drive
Philipsburg, PA 16866

## VERIFICATION

STATE OF PENNSYLVANIA
COUNTY OF ___Clearfield___

Signed and sworn before me by Robert Arias, known to me or duly proven, on this the _11_ day of September, 2020.

By: _____Christine Baum_____

Name and title: Notary Public

My commission expires:

2869728_1.docx

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Christine Baum, Notary Public
Lawrence Twp., Clearfield County
My Commission Expires March 30, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

3

**174**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Robert Arias | ) |
| | ) |
| | ) |
| v. | )     Case No. 17-cv-516-SM |
| | ) |
| U.S. Government, et al. | ) |
| | ) |

## AFFIDAVIT OF CARMEN JOSE

I, Carmen Jose, do under oath hereby swear and affirm:

1. I currently reside at 168 Spruce Street, Second Floor, Manchester, NH 03101. I have 3 children and I am on disability.

2. I am the wife of Robert Arias, who was arrested on September 8, 2016 ("Arrest") and filed a complaint against the U.S. Government on or about October 2017 (17-CV-516-SM) ("Lawsuit") related to his Arrest. I have not seen the Complaint, but my husband has spoken of it to me.

3. My husband, Robert, does not speak or understand English. He came to the United States from the Dominican Republic in 2015.

4. I was present on September 8, 2016 when Robert was arrested in the parking lot of the Rockingham Mall in Salem, New Hampshire.

5. At the time of the Arrest, I was 3 months pregnant and it was a delicate pregnancy because of my health.

6. I drove up to the Rockingham Mall parking lot, and Robert was in the passenger seat. Some suspicious men approached the car. Then a vehicle blocked in our car. I was in the driver's seat at the time and Robert was in the passenger seat.

7. As the men/officers approached me, I told them that I was pregnant and not to touch me.

8. I saw much of what happened to Robert before I was led away by a man/officer to a car with tinted windows.

1

**175**

9. At no time during the Arrest did Robert or I resist being arrested. We were both very concerned about my pregnancy.

10. I saw the men (who were not in uniform) approach our car with guns drawn. They forcibly grabbed Robert out of the car and cut the seatbelt. In addition, they cut the belt to his pants.

11. I saw them punch Robert on the face when they took him out of the car. They used a choke hold to get Robert out of the car and then slam him to the ground.

12. When they slammed Robert to the ground, I believe he hit his head because he screamed.

13. I remember saying "What are you guys doing?" as I could not believe why they were using such force on Robert.

14. I remember Robert saying to me "Tell them not to hurt me like that" in Spanish.

15. At this point there were many, many men around, enough to fill a chapel. Most of them were in regular clothes, not police uniforms.

16. I saw that many men/officers were on top of Robert and started to step on Robert's leg and stomach. At one point, I saw at least 5 men/officers, who were on top of Robert, mainly on his leg and knee.

17. At this point they also started kicking Robert, mainly in the ribs and I believe it was on the right side.

18. I saw them pick up Robert and slam him to the ground.

19. They used such force with Robert that he urinated on himself.

20. Throughout this whole time, the officers kept their guns drawn even though neither Robert nor I were resisting arrest at all. Our main focus was on my pregnancy. Some of the men/officers put their guns away when Robert was on the ground.

21. Throughout the Arrest, Robert was screaming at me to "leave" in Spanish as he was concerned about the pregnancy. I believe that Robert was concerned that watching him getting beat up would cause me distress and could affect the pregnancy.

22. I addition, I remember Robert screaming in pain at times and shouting "my knee, my knee" a number of times. It was very distressing to hear Robert in such pain and not be able to do anything. Robert does not speak English, so all these words were in Spanish.

23. I believe that the men/officers thought that Robert was telling me to do something or giving me information that would threaten them or affect the arrest, as they became more forceful with Robert as he was yelling in Spanish and they lead me away to a place where I could not see Robert.

24. I say them handcuff Robert after he was on the ground and after they had kicked him in the ribs and been on top of his leg.

25. I saw Robert again that evening at the County jail. His face was swollen (his eye and lips on the right side) and he had dark marks. In addition, he showed me his knee which was swollen. He complained of the hurt. The swollenness seemed to be getting worse with time.

26. Attached to this affidavit are both a photograph (Exhibit A) and a video (Exhibit B) that I received from Robert's mother that were taken by a bystander to the Arrest. While I do not know the name of the bystander, the picture and video accurately reflect what I saw of the Arrest.

27. On Exhibit A, you can see somebody kicking Robert in the knee during the Arrest.

28. My pregnancy in September 2016 ended in a miscarriage.


Further affiant sayeth not.                    _Carmen Jose_                    9-8-20

                                               Carmen Jose


## VERIFICATION


STATE OF NEW HAMPSHIRE
COUNTY OF HILLSBOROUGH

Signed and sworn before me by Carmen Jose, known to me or duly proven, on this the 08 day of September, 2020.

                                   By: _____
                                   Name and title:
                                   My commission expires: 03-11-2022

2869779_1.docx

EPIFANIO GIL
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
March 11, 2022

3

**177**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ROBERT ARIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 17-cv-516-SM |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DRUG ENFORCEMENT | ) | |
| ADMINISTRATION and DEA AGENTS FNU | ) | |
| DAY, NOAH HERZON, JUAN INFANTE, FNU | ) | |
| GARCIA, TY KURCHARSKI and FNU | ) | |
| BERNARD, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANTS' REPLY TO
OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The remaining defendants moved for summary judgment on their behalf because, based on the undisputed facts, each of them is entitled to judgment as a matter of law. Document Number (DN) 43. Plaintiff objects to the defendants' motion, alleging that a genuine issue of material fact exists precluding summary judgment. DN 48. Because Plaintiff has failed to present evidence to contest the supported declarations of the defendants, he has failed to create a genuine issue of material fact. Further, Plaintiff has not identified, and cannot identify, specific acts by each individual defendant that constitute a violation of Plaintiff's constitutional rights. Consequently, Plaintiff failed to sufficiently plead a *Bivens* claim, and each defendant is entitled to qualified immunity. For each of these reasons, the Court should grant summary judgment for the defendants.

178

Case: 23-1618   Document: 00118080310   Page: 179   Date Filed: 12/01/2023   Entry ID: 6607242
Case 1:17-cv-00516-SM   Document 51   Filed 10/20/20   Page 2 of 8

## ARGUMENT

I.  **PLAINTIFF HAS FAILED TO CREATE A GENUINE ISSUE
    OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT.**

A party opposing a properly supported motion for summary judgment, as Mr. Arias is here, must put forth evidence undermining the moving parties' evidence, in order to create a genuine issue of material fact, warranting a denial of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986); *Fontanez-Nunez v. Janssen Ortho LLC,* 447 F.3d 50, 54-55 (1st Cir. 2006) (to defeat summary judgment, the non-moving party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations or rank speculation."). The party opposing summary judgment "may not simply rely on the absence of evidence, but rather must point to definite and competent evidence showing the existence of a genuine issue of material fact . . . a laundry list of possibilities and hypotheticals and speculation about mere possibilities, without more, is not enough to stave off summary judgment." *Essa v. Genzyme Corporation*, 2020 DNH 179, 2020 WL 5983831, at *1 (D.N.H. Oct. 8, 2020) (quoting *Perez v. Lorraine Enters., Inc.,* 769 F.3d 23, 29-30 (1st Cir. 2014) and *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 451-52 (1st Cir. 2014)).

In support of Defendants' Motion for Summary Judgment, Defendants submitted detailed, sworn declarations, which set forth their experience, how they came to be involved with the arrest of Plaintiff, what role they played in the actual arrest, what they witnessed at the site of the arrest, and any first-hand knowledge they had about the arrest. *See* DNs 43-2 through 43-8. When documentation was available to support the declarations, it was attached. *Id.* Plaintiff challenges the veracity of Defendants' declarations by submitting affidavits of himself and his wife. Plaintiff's affidavits, however, without specifics, claim that Defendants' declarations are

2

**179**

Case 1:17-cv-00516-SM   Document 51   Filed 10/20/20   Page 3 of 8

untruthful.   DNs 48-2, 48-3.   That alone is not sufficient to defeat the defendants' properly-supported motion for summary judgment.   *Anderson,* 477 U.S. at 256-57 ("discredited testimony in not [normally] considered a sufficient basis for drawing a contrary conclusion . . . Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).   By his own admission, Plaintiff admits that there are minor discrepancies in his description of the events at issue.   DN 48-1 at 2, n.2.   However, those discrepancies between his own statements and the underlying record are more than "minor;" they distort Plaintiff's story in such a way that no reasonable jury could believe it.   Plaintiff makes allegations of excessive force against the defendants arising from kicks and punches made in the course of the arrest.   *Id.* at 3.   Contradicting his own allegations, in his affidavit in opposition to the Defendants' motion for summary judgment, Plaintiff declares:

> 20.   I do not recall anyone punching or kicking me . . . all I could remember was pain and fear.   There was pain and pressure on my ribs, I do not recall where it came from.

DN 48-2, ¶ 20.   Plaintiff's statement is consistent with the declarations of the defendants that none of them kicked or punched Plaintiff, nor did they witness any such force.   DN 43-2, ¶ 8; DN 43-4, ¶ 10; DN 43-5, ¶¶ 8, 9; DN 43-8, ¶¶ 7-9.   To the extent that Carmen Jose's declaration supports the allegations of kicking and punching (*see* DN 48-3, ¶¶ 11, 17), it is important to note that Ms. Jose was on the opposite side of the car and undergoing her own arrest, no doubt

3

**180**

skewing her view of those details. DN 43-4, ¶¶ 7, 9. To support her affidavit, Ms. Jose refers to the unauthenticated photograph and video originally submitted with the defendants' motion for summary judgment. At paragraph 26, Ms. Jose states "the picture and video accurately reflect what I saw of the Arrest." DN 48-3, ¶ 26. The picture and video, however, capture a moment after Mr. Arias was already in custody – sitting against a vehicle, in restraints, and an officer in the background with an evidence bag. DNs 43-9, 43-10. A reasonable jury could not find that the video shows any force used by an officer, including those named in Plaintiff's Complaint.[1]

The medical evidence in this case further undermines the accuracy of Plaintiff's and Ms. Jose's affidavits. Ms. Jose declares that she saw Mr. Arias the night he was taken into custody and his

> face was swollen (his eye and lip on the right side) and he had dark marks. In addition, he showed me his knee which was swollen. He complained of the hurt.

DN 48-3, ¶ 25. Within a couple of hours of the arrest, Mr. Arias was booked at the Salem, New Hampshire Police Department. DN 43-3. The booking process included photographs and an intake questionnaire. *Id.* This evidence does not support Ms. Jose's affidavit. The booking photos were close ups of Mr. Arias' head and neck and show no injury. *Id.* at 10-15. In response to the booking questions, Mr. Arias responded that he had no visible signs of trauma, no bleeding, no pain and no recent illness or injury. *Id.* at 16.

---

[1] Plaintiff and his wife disagree about what is depicted in the still photograph, DN 43-10. Mr. Arias believes it shows an officer standing on his leg, DN 43-10 at 6, while Ms. Jose sees an officer kicking Mr. Arias in the knee. DN 48-3, ¶ 27. Defendants disagree that the photograph shows anything other than a pair of human legs standing on the opposite side of Mr. Arias's leg from which the photograph was taken.

4

Mr. Arias declares that

> [w]hen I got back to the County Jail, my head and leg really hurt . . . I asked for medical help at the County Jail [and] at that point, I did get medical assistance for the pain in my leg.

DN 48-2, ¶¶ 24, 25.   The medical records from Strafford County Department of Corrections (DOC) contradict that statement.   On intake at Strafford County, Plaintiff "verbally denie[d] any immediate need to speak with medical, dental, mental health at this time."   Supplemental Declaration of Judith Prindiville, attached as Exhibit H, Attachment 1 at 12.   In fact, the records reflect that, while Plaintiff did seek medical attention for mental health and cold symptoms after his intake at Strafford County DOC, he did not complain of pain until November 12, 2016— nearly two months after his arrest—at which time he was prescribed Tylenol.   *Id.* at 11-12.

Plaintiff has not even attempted to challenge, in any real way, the fact established by the defendants that neither Defendant Garcia nor Defendant Infante were even present at the arrest. Both submitted sworn declarations, consistent with the other declarations, that they were inside of the Rockingham Mall at the time of arrest and, in order to protect their safety as undercover officers, as well as that of their families, stayed out of the view of the arrestees and any onlookers.   DNs 43-6, 43-7.   Plaintiff's statements to the contrary carry little weight in light of Mr. Arias's own statement that "I cannot remember the identity of the officers . . .   I closed my eyes" (DN 43-10 at 4) and do not create a genuine issue of material fact.

Because Plaintiff has not put forth reliable evidence to contradict the evidence submitted in support of Defendants' motion for summary judgment, this Court should decline to find that a genuine issue of material fact exists and award judgment to the defendants.

Case 1:17-cv-00516-SM   Document 51   Filed 10/20/20   Page 6 of 8

II.     PLAINTIFF FAILED TO ADEQUATELY PLEAD
        A *BIVENS* ACTION.

Even having now had the opportunity to view and understand the defendants' theory of defense and supporting evidence, Plaintiff's claim still suffers from the same fatal flaw it did at the time of the filing of his complaint.   To state a cognizable *Bivens* claim, Plaintiff must allege acts by each individual defendant that constitute a violation of Plaintiff's constitutional rights. *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Soto-Torres v. Fraticelli,* 654 F.3d 153, 158 (1st Cir. 2011).   Plaintiff has not done that – nor could he.   *See e.g.,* DN 48-1 at 2 ("two men pulled Mr. Arias from the car forcibly"); DN 27-10 (I cannot identify the officers; I closed my eyes).   In fact, Plaintiff is unable to even support the allegation in his Complaint that he was actually punched or kicked.   DN 48-2, ¶ 20.   Plaintiff's Objection is notably vague in some instances where he refers to the "arresting officers," not the defendants, using excessive force.   *See e.g.,* DN 48-1 at 5 (arresting officers threw him to the ground, arresting officers continued to stand on the plaintiff's legs).   Those kind of vague allegations are not enough.   Judgment is warranted for the defendants.

III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Relying on these vague allegations, Plaintiff argues that Defendants are not entitled to qualified immunity because case law demonstrates that an arrestee has the constitutional right not to be physically harmed, including kicked, punched, and slammed to the ground, during an unresisting arrest and that right was "clearly established" at the time of the arrest in this case. DN 48 at 9-13.   Whether a constitutional right exists and was clearly established at the time of the alleged violation, however, is only part of the analysis.   Qualified immunity serves as "an

6

**183**

immunity from suit rather than a mere defense to liability" and for that reason it is of utmost importance that a plaintiff bringing a *Bivens* action must establish "that *each* Government-official defendant, through the official's *own individual* actions, has violated the constitution." *Iqbal*, 556 U.S. at 676 (emphasis added).

By his own admission, Plaintiff cannot say with any certainty what happened to him or, more importantly, whose actions violated his constitutional rights. Plaintiff frames the issue of whether the named defendants are the proper defendants to this action as a question of fact to be determined by this court. DN 48-1 at 9. Because qualified immunity is an immunity from suit and not a defense to liability, allowing an action such as this to proceed as a fishing expedition would effectively eliminate the immunity afforded through qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Plaintiff received Fed. R. Civ. P. 26(a) disclosures in this case; he had the opportunity to bolster his facts through interrogatory responses; he received all evidence submitted in support of Defendants' motion for summary judgment; and has been provided discovery responses propounded after the motion for summary judgment was filed from Defendants. Plaintiff has demonstrated an inability to satisfy the threshold pleading requirement as to this *Bivens* action. *Iqbal*, 556 U.S. at 676. Because he has not even alleged that each individual defendant, through his own actions, violated the Constitution, each Defendant is entitled to qualified immunity from this suit.

CONCLUSION

For these reasons, the Court should find that no genuine issue of material fact exists and that all six defendants are entitled to qualified immunity and to the entry of summary judgment on their behalf.

7

**184**

Case 1:17-cv-00516-SM   Document 51   Filed 10/20/20   Page 8 of 8

Respectfully submitted,

SCOTT W. MURRAY
United States Attorney

/s/ Michael T. McCormack

By:_____

Michael T. McCormack
Assistant U.S. Attorney
N.H. Bar No. 16470
53 Pleasant Street, Fourth Floor
Concord, NH   03301
603-225-1552
Michael.McCormack2@usdoj.gov

October 20, 2020

8

**185**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ROBERT ARIAS,                                         )
                                                      )
            Plaintiff,                                )
                                                      )
      v.                                              )  Civil No. 17-cv-516-SM
                                                      )
UNITED STATES OF AMERICA, UNITED                      )
STATES DRUG ENFORCEMENT                               )
ADMINISTRATION and DEA AGENTS FNU                     )
DAY, NOAH HERZON, JUAN INFANTE, FNU                   )
GARCIA, TY KURCHARSKI and FNU                         )
BERNARD,                                              )
                                                      )
            Defendants.                               )

SUPPLEMENTAL DECLARATION OF JUDITH NORTHRUP PRINDIVILLE
IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In addition to that declared by me on July 16, 2019 in this matter, I declare as follows:

On April 30, 2019, the USAO, on behalf of the defendants, propounded interrogatories

and requests for production of documents on Mr. Arias.   On May 22, 2019, the USAO received

responses to its requests from Mr. Arias.   Interrogatory No. 5 requested Mr. Arias to "[s]tate

each instance of treatment you obtained for the injuries which you claim to have resulted from

the September 8, 2016 alleged assault."   In response, Mr. Arias referred to the attached medical

records from Strafford County Department of Corrections.   A true and accurate copy of

Interrogatory No. 5 and the attached medical records are included with this declaration as

Attachment 1.

**186**

I declare, under penalty of perjury, that the foregoing is true and correct.

/s/ Judith Northrup Prindiville

Judith Northrup Prindiville
Paralegal Specialist
Executed on:   October 20, 2020                USAO - District of New Hampshire

2

**187**

US ATTORNEY'S OFFICE NH
MAY 22 2019 PM 03:42

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

U.S. DISTRICT COURT
DISTRICT OF NH

2019 MAY 22 AM 10: 02

FILED

| | |
|---|---|
| ROBERT ARIAS,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED<br>STATES DRUG ENFORCEMENT<br>ADMINISTRATION and DEA AGENTS FNU<br>DAY, NOAH HERZON, JUAN INFANTE, FNU<br>GARCIA, TY KURCHARSKI [sic]and FNU<br>BERNARD,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)  Civil No. 17-cv-516-SM<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' FIRST SET OF INTERROGATORIES
## TO PLAINTIFF ROBERT ARIAS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants Day, Herzon,

Infante, Garcia, Kucharski and Bernard request that you answer the following written questions

in writing, under oath, within 30 days from the date this notice was served.

### INSTRUCTIONS FOR USE

A.    You are to state all information which is in your possession or any investigators,

agents, friends, or other people helping you in this case.

B.    These interrogatories are intended as continuing interrogatories requiring you to

answer by supplemental answer, setting forth any information within the scope of the

interrogatories as may be acquired by you, your agents, and other representatives following the

date of your original answers to these interrogatories or as otherwise required by Rule 26 of the

Federal Rules of Civil Procedure.

1

**188**

C.     If you lack the information necessary to answer any of the following interrogatories, please describe the specific efforts made by you or anyone else on your behalf to get the information and state when you anticipate obtaining the information and supplementing your answers.

D.     For the purpose of answering these interrogatories, you should use the following definitions:

1.     "Identify" or "identity" shall mean, with respect to a person, stating the name of that person, their residence address, residence telephone number, current occupation and position/title, occupation and position/title at the time they performed the activity stated in the question, business address and business telephone number.

2.     "Identify" or "identity" shall mean, with respect to a business, stating the name of that business, its address, its telephone number, and the type of business.

3.     "Health care provider" means to physicians, nurses, chiropractors, osteopaths, ophthalmologists, holistic practitioners, physical therapists, acupuncturists, occupational therapists, psychologists, psychiatrists, counselors, social workers, and any other health care providers.

E.     If you send any document in response to these interrogatories, write on them the specific question to which it relates.

F.     If you claim any of the information is privileged from disclosure, state the type of privilege and the grounds upon which the claim of privilege is based.

2

**189**

<u>INTERROGATORY NO. 5</u>:

State each instance of treatment you obtained for the injuries which you claim to have

resulted from the September 8, 2016 alleged assault.    See Attachment

Case 1:17-cv-00516-SM    Document 51-2    Filed 10/20/20    Page 4 of 28

Executed at _____SCDOC_____ this _10_ day of __MAY_____, ~~2008~~. 2019

Robert arias
~~Walter Norton~~ Robert Arias

State of _New Hampshire_ )
County of _Strafford_ ) ) ss.

Personally appeared before me the above-named __Robert Arias__ and has sworn an oath that the answers to the foregoing Interrogatories are true and correct to the best of his/her knowledge or belief.

_____
Notary Public ISABEL PADIAL, NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 15, 2021

My commission expires: _____

Case 1:17-cv-00516-SM   Document 51-2   Filed 10/20/20   Page 5 of 28

CorEMR - ARIAS, ROBERT :: Chart Notes | v3.5.0                                                    Page 1 of 8

 **ROBERT ARIAS**

**#16-02920**

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Chart Notes

# Chart Notes

| | | |
|---|---|---|
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 04/22/2019 13:51          **Author:** LPN Vieira, Marc<br>90 DAY RX REFILL TO DR.Braga :<br>ZOLOFT 50MG PO q HS | **Related Problems** |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 04/06/2019 14:43          **Author:** LPN Vieira, Marc<br>IM approached med cart at 1300 pass with another IM asking that<br>he interpret for him. IM was asking for cough/ cold medicine. IM<br>was told to fill out sick slip; it would be brought to medical, by this<br>nurse, and attempt to get cold protocol started. IM ( through<br>interpreter ) I can't write in English , IM made aware that was not<br>an issue to write his concerns down in Spanish and staff will<br>translate his medical request . Interpreter then stated "so you will<br>give him meds now" IM and Interpreter made aware, that meds are<br>not dispensed on the floor at the time. Interpreter stated to "let's<br>go, we will just ask the other nurse, this asshole is evil " | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 04/05/2019 23:18          **Author:** RN Fermahin, Debra<br>Order from C. Schwleger, PA-C:<br>d/c Clonidine for poor compliance | **Related Problems**<br>MEDICATION REVIEW |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 03/21/2019 15:39          **Author:** RN Ternullo-Pearson, Amy<br>Per C. Schwieger, PAC advise IM that MRI is normal and needs to<br>f/u with ortho with outside consult.<br>Noted Amy TP-RN | **Related Problems**<br>LABS / X-RAYS *Chronic*<br>MUSCULAR / SKELETAL |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 03/21/2019 13:49          **Author:** RNC Warren, Tracy<br>V.O. C. Schwieger PA-C for 90 day medication renewal<br>1. Ibuprofen 800mg po BID PRN | **Related Problems**<br>PAIN |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 02/15/2019 14:03          **Author:** LPN Downing, Nicole<br>T.O.CSchwieger PA<br>OK to renew x 90d<br>1. Risperdal 1mg PO Q HS x 90d<br>noted NLD | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 01/26/2019 14:15          **Author:** LPN Matile, Jamie<br>IM submitted a ss r/t sore throat. Denies post nasal drip. Started<br>on cough syrup protocol. | **Related Problems**<br>HEENT |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 01/23/2019 10:37          **Author:** LPN Dow, Dawn<br>90 day renewal task was reviewed by C.Schwieger, new orders<br>received for:<br>1. renew Zoloft 50mg po q HS x 90 | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 01/11/2019 20:23          **Author:** RN O'Brien, Karen<br>T.O.R.B. C.Braga, MD<br>Reviewed c/o Left hip/knee pain with records from Ortho. Ortho<br>recommendations reviewed and order is as follows:<br><br>1. OK to MRI left hip to "assess lateral hip for chronic bursitis<br>changes and possible gluteal tear." | **Related Problems**<br>MUSCULAR / SKELETAL<br>PAIN<br>MEDICAL RECORDS |

Case: 23-1618    Document: 00118080310    Page: 193    Date Filed: 12/01/2023    Entry ID: 6607242

CorEMR - ARIAS, ROBERT :: Chart Notes | V5.5.0    Case 1:17-cv-00516-SM    Document 51-2    Filed 10/20/20    Page 6 of 28    Page 2 of 8

| | Noted- Karen, RN | |
|---|---|---|
| Type: Medical Note<br>Access: Medical Staff | **Date:** 12/28/2018 09:43    **Author:** LPN Downing, Nicole<br>Order CSchwieger PA<br>Per review of meds 90days (pt is currently takng 100% meds)<br>1. Clonidine 0.1mg PO Q HS x 90d<br>noted NLD | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 12/17/2018 15:14    **Author:** RN Keefe, Melissa<br>90 day renewal WO C Braga MD<br>1. Motrin 800mg PO BID PRN x90 days | **Related Problems**<br>PAIN |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 11/08/2018 14:08    **Author:** LPN Dow, Dawn<br>90 day renewal task was reviewed by C.Schwieger, new orders<br>received for:<br>1. renew risperdol 1mg po q HS X 90 CRUSH | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 11/01/2018 14:35    **Author:** RNC Warren, Tracy<br>V.O. C. Schwieger PA-C for mediation renewal<br>1. Zoloft 50mg po Q HS | **Related Problems**<br>medication renewal |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/26/2018 09:46    **Author:** RN Keefe, Melissa<br>IM is requesting BB pass. Provider notes indicate degenerative<br>changes. PT notes indicate limited ROM on the L knee. BB for<br>limited mobility in hip and knee. | **Related Problems**<br>MUSCULAR / SKELETAL |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/11/2018 11:57    **Author:** LPN Downing, Nicole<br>PT seen today in medical for sick call by CSchwieger PA<br>"Assessment: 1. chronic trochanter bursitis<br>Plan: 1. Needs f/u with othro, I do not have anything else to add<br>from a primary care standpoint<br>noted NLD | **Related Problems**<br>MUSCULAR / SKELETAL |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/11/2018 10:01    **Author:** LPN Downing, Nicole<br>annual CXR negative for TB | **Related Problems**<br>INTEGUMENTARY |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 10/05/2018 11:18    **Author:** LPN Dow, Dawn<br>late entry for 10-4-18: 90 day renewal task was reviewed by<br>C.Schwieger, new orders received for:<br>1. renew clonidine 0.1mg po q HS x 90 | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 09/28/2018 21:44    **Author:** RN O'Brien, Karen<br>T.O C.Braga, MD<br>Reviewed letter received from Marsh Brook Rehab of inmate<br>wanting a knee brace for Left Knee.<br><br>1. No knee brace required at this time.<br><br>Noted- Karen, RN | **Related Problems**<br>LABS / X-RAYS *Chronic*<br>MUSCULAR / SKELETAL |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 09/16/2018 07:52    **Author:** LPN Dow, Dawn<br>late entry for 9-13-18: 90 day renewal task was reviewed by<br>C.Schiweger, new orders received for:<br>1. renew motrin 800mg po bid/PRN x 90 | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 08/17/2018 00:09    **Author:** RN Griffith, Adam<br>S: Spanish speaking I/M seen on medical by limited Spanish<br>speaking RN for s/s requesting to have BP checked due to<br>intermittent trouble breathing, "I feel like I am drowning."<br>Symptoms present today. Also c/o eye pain/headache, arthralgia.<br>describes having visual "floaters" periodically through the day.<br>Denies chest pain. Currently receiving cold protocol meds for URI<br>sx.<br>O: Well appearing adult male in no evident distress. Respirations<br>regular and unlabored. BP borderline HTN 145/90, pulse 92, low<br>grade temp 99.3. Skin PWD. LS CTA all fields. S1S2 readily | **Related Problems**<br>HEENT<br>PAIN |

Case: 23-1618    Document: 00118080310    Page: 194    Date Filed: 12/01/2023    Entry ID: 6607242

Case 1:17-cv-00516-SM    Document 51-2    Filed 10/20/20    Page 7 of 28
CorEMR - ARIAS, ROBERT :: Chart Notes | v5.5.0    Page 3 of 8

| | | |
|---|---|---|
| | auscultated. Of note, I/m exhibits 38 pound weight gain since 3/2017.<br>A: Subjective dyspnea with normal respiratory exam, borderline HTN.<br>P: BP checks 3x/week for 2 weeks and review for results . Refer to on call provider for consideration of any further dx/tx at this time. | |

**Type:** Misc. Note
**Access:** Medical Staff

**Date:** 08/10/2018 12:06        **Author:** LPN Dow, Dawn    **Related Problems**
late entry for 8-9-18: 90 day renewal task was reviewed by
C.Schwieger, new orders received for:
1. renew risperdol 1mg po q HS CRUSH x 90

**Type:** Misc. Note
**Access:** Medical Staff

**Date:** 08/03/2018 00:05        **Author:** LPN Dow, Dawn    **Related Problems**
90 day renewal task was reviewed by C.Schwieger 8-2-18, new
orders received for:
1. renew Zoloft 50mg po q HS x 90

**Type:** Misc. Note
**Access:** Medical Staff

**Date:** 07/07/2018 10:15        **Author:** LPN Dow, Dawn    **Related Problems**
late entry for 7-6-18: 90 day renewal task was reviewed by Dr
Braga, new orders received for:
1. renew clonidine 0.1mg po q HS

**Type:** Misc. Note
**Access:** Medical Staff

**Date:** 06/17/2018 07:15        **Author:** LPN Dow, Dawn    **Related Problems**
late entry for 6-15-18: 90 day renewal task was reviewed by Dr
Braga, new orders received for:
1. renew motrin 800mg po bid/PRN x 90

**Type:** Medical Note
**Access:** Medical Staff

**Date:** 06/07/2018 13:44        **Author:** LPN Downing, Nicole    **Related Problems**
W.O. CSchwieger PA        LABS / X-RAYS *Chronic*
see for chronic hip and knee pain s/p old trauma        MUSCULAR / SKELETAL
ORIF high tibial & fibular fx
marked OA L knee, mild OA L hip
ongoing complaints of pain"
P: Ortho consult
noted NLD

**Type:** Medical Note
**Access:** Medical Staff

**Date:** 05/10/2018 13:16        **Author:** RNC Warren, Tracy    **Related Problems**
In reference to MH findings, I consulted with Dr. Maguire via        PSYCHOLOGICAL / MENTAL HEALTH
secure email to inquire if there was any recommendations pending
seeing I/M next week. Recommendations reviewed with C.
Schwieger PA-C, orders received as follows:
1. Risperdal 1mg po QHS x 90 days.

**Type:** Mental Health Note    **Date:** 05/10/2018 12:51        **Author:** MLADC Lang, Robert    **Related Problems**
**Access:** Medical Staff
S: Im is a thirty-five year-old Spanish speaking male seen for        PSYCHOLOGICAL / MENTAL HEALTH
follow up. Sick call slip states his medication (Zoloft) is not
working, and he is hearing voices and seeing visual hallucinations.
He had been seen for psychiatric evaluation in May and October of
2017 and prescribed Remeron, clonidine and Zoloft. He stopped
the Remeron due to weight gain. He reports the voices have
recently instructed him to throw himself off the second floor. they
have also suggested he cut his throat. He backtracked and stated
they said this most recently a week ago. He was able to contract
for safety with this writer and stated he would speak to a staff
member if thoughts of harming himself arose. He is having visual
hallucinations: "seeing dolls and weird things" most recently four
days ago. He reports sleeping alright some days and not on
others. His appetite is good.
O: Depressed affect, soft tone of voice, audio hallucinations giving
suicidal commands, visual hallucinations, primary language is
Spanish, unable to assess thinking and judgment etc.
A: Major Depressive Episode with Psychotic Features.
P: refer for psychiatric evaluation.

**Type:** Medical Note
**Access:** Medical Staff

**Date:** 05/04/2018 15:00        **Author:** LPN Downing, Nicole    **Related Problems**
W.O. CSchwieger PA (See scanned documents for more info)        PSYCHOLOGICAL / MEDICATION -
1. Zoloft 50mg PO Q HS x 90d        ASSESSMENT
noted NLD

| Type: Medical Note<br>Access: Medical Staff | **Date:** 04/13/2018 13:30   **Author:** LPN Downing, Nicole<br>delayed entry for 4/12/18<br>renewal per CSchwieger PA<br>1. Clonidine 0.1mg PO Q HSx 90d<br>noted NLD | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |
|---|---|---|
| Type: Medical Note<br>Access: Medical Staff | **Date:** 04/01/2018 14:53   **Author:** LPN Downing, Nicole<br>pt seen today in medical c/o R elbow pain x 3days. Pt denies<br>exercising (push-ups, pull-ups etc.)<br>O: PT has full ROM of RUE. No discoloring or swelling/deformity<br>noted<br>A: R elbow pain x 3days<br>P: Encouraged pt to take his motrin twice daily x 2 weeks, if no<br>improvement or worsens provider for assessment | **Related Problems**<br>MUSCULAR / SKELETAL |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 03/22/2018 14:36   **Author:** LPN Dow, Dawn<br>90 day renewal task was reviewed by C.Schwieger today, new<br>orders received for:<br>1. renew motrin 800mg po bid/PRN x 90 | **Related Problems** |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 01/30/2018 06:57   **Author:** LPN Dow, Dawn<br>late entry for 1-26-18: 90 day renewal task was reviewed by Dr<br>Braga , new orders received for:<br>1. renew Zoloft 50mg po q HS x 90 | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 01/12/2018 18:13   **Author:** LPN Leitz, Linda<br>Med Renewal W.O. Dr. Braga MD<br>1) Clonidine 0.1mg PO QHS x 90 days | **Related Problems**<br>MEDICATION REVIEW |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 12/22/2017 19:59   **Author:** RN O'Brien, Karen<br>90 day medication renewals reviewed with C. Braga, MD<br>1. renew ibuprofen 800mg PO BID x90 days,<br><br>Noted- Karen, RN | **Related Problems**<br>MEDICATION REVIEW |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/18/2017 15:19   **Author:** RNC Warren, Tracy<br>Seen today in consultation by Dr. Maguire:<br>IMP: Major Depressive Disorder; h/o Substance Use<br>Recommendations reviewed with C. Braga MD, orders obtained as<br>follows:<br>1. Clonidine 0.1 mg po QHS x 90 days to target sleep<br>2. After 3 days of Clonidine then start Zoloft 50mg po QHS x 90<br>days for anxiety & depression.<br>3. I/M will write back to MH if desires to increase Clonidine to 0.2<br>mg to target sleep | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/13/2017 16:12   **Author:** LDC CCHP Lilly, Patricia<br>The prior note was discussed with the medical director and it was<br>determined that he would be safe on his unit as he contracted for<br>safety and did ask for help. | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 10/13/2017 16:09   **Author:** LDC CCHP Lilly, Patricia<br>S. Inmate seen at his request. He was seen by the consulting<br>psychiatrist on 5/10/17. He was dx with major depressive disorder<br>and substance abuse. He was prescribed Remeron 15mg to<br>address anxiety, depression and sleep. He took the Remeron<br>prescribed 86% of the time in May. On June 16 he stopped taking<br>it complaining of weight gain and that it didn't help his depression<br>and audio hallucination. He complains that the voices he hears are<br>getting worse. The voices are not command in nature. He states<br>he is feeling suicidal all the time. When asked when this started his<br>answer was "for a long time". He denies having a plan and states if<br>the intensity increases he will let the officers or mental health know<br>as he did today. He still feels very depressed and anxious.<br>O. Inmate speaks no English. He was interviewed with interpreter<br># 338587. His eye contact was adequate. His speech was of<br>normal rate and volume with a slight angry tone when ask to clarify | **Related Problems**<br>PSYCHOLOGICAL / MEDICATION -<br>ASSESSMENT |

something. His thoughts were goal directed sequential and on topic. He reports having suicide ideation constantly with no plan. He has no history of self-abuse, denies feeling homicidal or wanting to harm others. His mood was "frustrated". His affect reflected the same. His insight and judgment were adequate.
A. Suicide ideation with no plan. Audio Hallucinations, Depression and Anxiety.
P. RRC line for further evaluation.

| Type: Medical Note Access: Medical Staff | Date: 09/23/2017 18:48          Author: LPN Martin, Eric | Related Problems MUSCULAR / SKELETAL PAIN |
|---|---|---|
| | T.O. C. Braga, MD as follows; IM c/o hip and knee pain d/t osteoarthritis. 1) Ibuprofen 800mg PO BID x 90 days. Noted EAM. | |

| Type: Medical Note Access: Medical Staff | Date: 09/23/2017 16:35          Author: RN Keefe, Melissa | Related Problems MUSCULAR / SKELETAL PAIN |
|---|---|---|
| | Seen on unit for ss c/o hip pain. CO used as interpreter. IM states he was seen at seacoast ortho about 5 months ago and was given a shot for the pain. It helped for a few days but then the pain returned. He stated he was on Tylenol PO BID but that it didn't help so he didn't take it. He describes the pain as a muscle spasm. He reports it wakes him in the night at times. Records review shows records from seacoast ortho are pending. He would like to try Motrin until records can be reviewed and a POC can be created. | |

| Type: Medical Note Access: Medical Staff | Date: 09/22/2017 11:39          Author: LPN Downing, Nicole | Related Problems LABS / X-RAYS Chronic |
|---|---|---|
| | Annual PPD planted LFA, ? hx of + after plant. Will read in 2days | |

| Type: Medical Note Access: Medical Staff | Date: 08/05/2017 02:31          Author: RN Fermahin, Debra | Related Problems PSYCHOLOGICAL / MEDICATION - ASSESSMENT |
|---|---|---|
| | 90 day renewal was reviewed by Dr. Braga 8/4/2017, new orders received for 1) Discontinue Remeron | |

| Type: Misc. Note Access: Medical Staff | Date: 05/22/2017 11:14          Author: LPN Dow, Dawn | Related Problems |
|---|---|---|
| | 90 day renewal task was reviewed by Dr Braga on 5-19-17, new orders were received for: 1. discontinue Tylenol | |

| Type: Medical Note Access: Medical Staff | Date: 05/10/2017 14:09          Author: RNC Warren, Tracy | Related Problems PSYCHOLOGICAL / MENTAL HEALTH |
|---|---|---|
| | Seen in consultation today by Dr. Maguire: IMP: Major Depressive Episode, moderat; Substance Use D/O Recommendations reviewed with C. Braga MD, orders received as follows: 1. Remeron 15 mg po QHS x 90 days to target sleep, anxiety & depression | |

| Type: Mental Health Note Access: Medical Staff | Date: 05/04/2017 12:11          Author: LDC CCHP Lilly, Patricia | Related Problems PSYCHOLOGICAL / MENTAL HEALTH |
|---|---|---|
| | S. MHA completed. Inmate was seen at his request. Inmate is an Ice Inmate and has been charged with conspiracy. Inmate was seen on 4/14/17 when another inmate reported that he thought he was suicidal. At that time inmate denied this and contracted for his safety. He was instructed to put in a slip he became depressed and started to think about suicide. Today he acknowledged that he does feel depressed and wants help. He has never had a mental health hospitalization, taken any psychiatric medications or been seen by mental health on an outpatient basis. He states he is hearing people call his name and when he ask they tell him no. He denies any visual hallucinations. He is sleeping about 4 hours in 24 and is having nightmares. His appetite is decreased and he is giving his trays away. He denies feeling suicidal and is able to contract for his safety. He has no history of self-abuse. "I am just worried about my family and children. My lawyer is telling me I am getting 10 years. He is a healthy male who looks his stated age. He reports no family history. His substance abuse history began in the Dominican as a teen. His first use of Marijuana was 14. Daily | |

| | |
|---|---|
| | use. Last use was 9/8/16. Onset of cocaine was 22. No daily use only weekly. Last use was 9/8/16. On set of Alcohol was 14. No Daily use. Last use was 9/7/16<br>O. Inmate had good eye contact. His speech was of normal tone rate and volume. His thoughts were goal directed sequential and on topic. He reports hearing audio hallucination but no visual. He denies any thoughts of suicide self-harm homicide or harm towards others. His mood was described as "I feel guilty because my girl is here and she was not involved." His affect was controlled wihout lability. His insight and judgment were adequate.<br>A. SX of depression and anxiety with panic attacks.<br>P. Refer to RRC Line for further assessment. | |

| Type: Medical Note<br>Access: Medical Staff | **Date:** 05/01/2017 18:56   **Author:** LPN Leitz, Linda<br>I/M sent Sick Slip in Spanish. Officer Biaz interpreted slip as saying. I/M has headaches for last few days., IS depressed and crying a lot. Checked Meds on Mar and I/M has Tylenol 1000mg Bid/ PRN order but has not taken it. Officer Biaz states that I/M doesn't speak English and will go and tell I/M to show up to med cart to take meds. Also will referee to mental health. | **Related Problems**<br>HEENT<br>PSYCHOLOGICAL / MEDICATION - ASSESSMENT |
|---|---|---|
| Type: Mental Health Note<br>Access: Medical Staff | **Date:** 04/14/2017 14:08   **Author:** LDC CCHP Lilly, Patricia<br>S. Met with inmate with MA who speaks Spanish. We got a report from another inmate that that he might be suicidal. Inmate denies this and states he has been on the top floor and if he wanted to kill himself he would have by now. Inmate had been here for 6-7 months and has not had any issues. He states if he feels down he goes and lies down and it goes away. He was able to contract for his safety.<br>O. Inmate was well groomed. His eye contact was good. His speech was of normal rate, tone and volume. His thoughts were goal directed sequential and on topic. He had no psychotic symptoms, thoughts of suicide, self-harm, homicide or harm towards others. His mood was described as "I am fine". His affect was controlled without lability. His insight and judgment are adequate.<br>A. Inmate is stable at this time<br>P. PRN | **Related Problems**<br>PSYCHOLOGICAL / MENTAL HEALTH |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 03/10/2017 17:56   **Author:** LPN Downing, Nicole<br>T.O. CSchwieger PA<br>For xray L Hip mild osteoarthritis, L knee marked OA<br>1. ORTHO CONSULT<br>noted NLD | **Related Problems**<br>LABS / X-RAYS *Chronic*<br>MUSCULAR / SKELETAL |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 03/09/2017 18:57   **Author:** LPN Matile, Jamie<br>IM seen in Medical by C.Schweiger,PAC:<br>Assessment:<br>#1 CHRONIC HIP PAIN AND KNEE PAIN OVER THE LAST 6 MONTHS<br>Plan:<br>1. X-ray hip left. X-ray knee left.<br>Education: I suspect patient has significant degenerative changes. Likely will need orthopedic management. Young age obviously a major factor. | **Related Problems**<br>MUSCULAR / SKELETAL |
| Type: Misc. Note<br>Access: Medical Staff | **Date:** 03/09/2017 16:01   **Author:** MA Boyd, Stefany<br>X-ray of L hip and L knee ordered due to chronic pain. X-ray ordered for 3-10-17.<br>Claim # 23587401 | **Related Problems** |
| Type: Medical Note<br>Access: Medical Staff | **Date:** 03/06/2017 19:32   **Author:** LPN Matile, Jamie<br>IM submitted a ss r/t not being able to fully bend his L knee after an injury. IM seen in Medical with a Spanish speaking officer. IM stated that he is unable to full bend his L knee. IM was last seen for a knee injury in November 2016. IM appeared to have a surgical scar over the same knee he stated that he cannot fully bend. | **Related Problems**<br>MUSCULAR / SKELETAL |

Case 1:17-cv-00516-SM   Document 51-2   Filed 10/20/20   Page 11 of 28

CorEMR - ARIAS, ROBERT :: Chart Notes | v5.5.0

| | | Related Problems |
|---|---|---|
| Type: Misc. Note<br>Access: Medical Staff | Date: 02/23/2017 13:00          Author: LPN Dow, Dawn<br>90 day renewal task reviewed by C.Schwieger today, new orders received for:<br>1. renew Tylenol 500mg 2 tabs ( 1gram) po bid/PRN x 90 | |
| Type: Medical Note<br>Access: Medical Staff | Date: 02/21/2017 00:44          Author: RN Blake, Cecelia<br>Medical backup called for IM. IM sitting on lower bunk, appears calm. CO states he thinks the IM had hyperventilated due to other things going on at the time on the unit. VS wnl, O2 99% on RA. IM speaks Spanish only and per another IM was requesting a PRN. Chart indicates history of Tylenol. Tylenol protocol started, IM walked to medical for PRN and returned to unit without issue. | Related Problems<br>PSYCHOLOGICAL / MENTAL HEALTH |
| Type: Medical Note<br>Access: Medical Staff | Date: 02/21/2017 00:44          Author: RN Blake, Cecelia<br>Medical backup called for IM. IM sitting on lower bunk, appears calm. CO states he thinks the IM had hyperventilated due to other things going on at the time on the unit. VS wnl, O2 99% on RA. IM speaks Spanish only and per another IM was requesting a PRN. Chart indicates history of Tylenol. Tylenol protocol started, IM walked to medical for PRN and returned to unit without issue. | Related Problems<br>PSYCHOLOGICAL / MENTAL HEALTH |
| Type: Medical Note<br>Access: Medical Staff | Date: 02/18/2017 19:01          Author: RN Griffith, Adam<br>S:: I/M seen on medical after phone call from Unit G re:I/m c/o chest pain. I/m states pressure in precodial area radiating up central chest began approx. 5 minutes PTA in medical, approx. 1815 today. Im relates eating red rice, beans and eggs for dinner, water to drink. I/M was lying down in cell during headcount when symptoms began. Denies dyspnea, N/V, syncopal symptoms.<br>O: Well appearing adult male in no evident distress, skin PWD, resp. regular and unlabored. VSS, see flowsheet for detail. apical pulse equal to peripheral, LS CTA. Normal abd inspection, bs present, slightly hyperactive, soft & non-tender.<br>A: Likely gas/indigestion discomfort, also likely anxiety component.<br>P: Monitor in medical for 20minutes. Symptoms improved over time. Antacid per protocol. I/m educated using Officer Baez as translator. I/m verbalizes understanding. | Related Problems<br>PSYCHOLOGICAL / MENTAL HEALTH<br>GASTROINTESTINAL |
| Type: Medical Note<br>Access: Medical Staff | Date: 11/12/2016 18:11          Author: RN Keefe, Melissa<br>VTO C Braga, MD<br>1. Tylenol 1000mg PO BID PRN pain. | Related Problems<br>PAIN |
| Type: Mental Health Note<br>Access: Medical Staff | Date: 11/07/2016 11:52          Author: MLADC Lang, Robert<br>S: Seen this AM and Im answered safety related questions via translation. He denies threat to self or others, contracted for safety and gave evidence of appropriate orientation to person, place and date. He indicates sleep is poor due to being housed on a cot where it is noisy. He indicated his appetite is good.<br>O: Direct eye contact, affect and mood responsive, translation required as he does not speak English. Denies threat to self or others and contracts for safety.<br>A: Not a threat to self or others, no indications of mental health issues.<br>P: Recommend Level II cot status be cleared to general; population, provider notified. | Related Problems<br>PSYCHOLOGICAL / MENTAL HEALTH |
| Type: Medical Note<br>Access: Medical Staff | Date: 10/25/2016 15:33          Author: LPN Matile, Jamie<br>IM submitted a ss r/t cold sx, started on cold protocol. | Related Problems<br>HEENT |
| Type: Misc. Note<br>Access: Medical Staff | Date: 09/27/2016 05:56          Author: RN Resendes, Lynne<br>I/M seen sleeping comfortably at 0600 med pass. I/M voiced no complaints at this time. | Related Problems |
| Type: Mental Health Note<br>Access: Medical Staff | Date: 09/26/2016 14:37          Author: MLADC Lang, Robert<br>S: Im ws seen and evaluated for safety with a staff member translating as he is Spanish speaking. He had been placed on Level I precautions after threatening to jump off a tier yesterday. He denies any current suicidal ideation or plans, and denies any threat to others. He contracted firmly for safety. The subject identified his wife and children as reasons to live, reporting she is | Related Problems<br>PSYCHOLOGICAL / MENTAL HEALTH |

pregnant with twins at this time.
O: Oriented to three spheres, denies suicidal threat or threat to
others, contracted firmly for safety. No hallucinations or alteration
on thought process evident, oriented to three spheres.
A: The Im is not a current threat to himself or others at this time,
Adjustment Disorder secondary to incarceration.
P: Recommend Level II cot status, follow up with MH.

| Type: Misc. Note<br>Access: Medical Staff | **Date:** 09/25/2016 23:45 | **Author:** RN Resendes, Lynne | **Related Problems** |
|---|---|---|---|

C/O called to medical stating above I/M was having a panic attack
due to being in the booking cell. C/O told this writer that he was
able to calm him down by talking to him. This writer was made
aware by supervisor in charge that this I/M "attempted to throw
himself off tier in unit F." I/M will be brought to medical for suicidal
watch. VS as follows: BP-133/79, HR-86 O2 Sat-100%. I/M was
visibly shaken when brought down to medical. Reminded I/M to
continue with breathing exercises to get through panic attack.

| Type: Medical Note<br>Access: Medical Staff | **Date:** 09/19/2016 23:47 | **Author:** RN Resendes, Lynne | **Related Problems**<br>PSYCHOLOGICAL / MENTAL HEALTH |
|---|---|---|---|

S: Spanish speaking only I/M was sent to medical stating he had
chest pains. Officer Baez was called down to help interpret for this
I/M. I/M is sleeping on a cot in unit F due to h/o of claustrophobia.
I/M states this same occurrence happened two days ago and
symptoms were relieved within thirty minutes of onset. I/M states it
feels like he has pressure on his chest I/M denies any numbness
or tingling in his extremities.
O: I/M appears to be in distress. I/M has clammy, shaky hands. I/M
has appropriate color for race. I/M appears tense. VS as follows:
HR 67 O2 sat 100% Resp 18 BP 137/101 on L arm with machine
R arm manual 142/98. Upon auscultation HR and rhythm are
regular. No murmurs heard. Lung sounds clear in all zones.
Capillary refill <3seconds. After five minutes of talking with I/M his
HR and O2 remained the same. Respirations decreased to 14, BP
decreased to 148/92. Initiated deep breathing techniques with I/M.
After ten minutes respirations decreased to 12 and BP decreased
to 134/88
A: Possible panic attack related to claustrophobia and
incarceration
P: Refer to mental health counselor and instructed I/M to
participate in deep breathing exercises while on unit until I/M is
able to be seen by MH.

| Type: Medical Note<br>Access: Medical Staff | **Date:** 09/16/2016 21:22 | **Author:** LPN Matile, Jamie | **Related Problems**<br>PSYCHOLOGICAL / MENTAL HEALTH |
|---|---|---|---|

IM requests to remain on a cot d/t feeling claustrophobic in the
cells.

| Type: Misc. Note<br>Access: Medical Staff | **Date:** 09/11/2016 11:49 | **Author:** CMA Nicol, Diane D | **Related Problems** |
|---|---|---|---|

I/M had a +PPD LFA, Ordered CXR spoke to Lauren. scheduled
for 9/12/16. order in supply room. Claim # 22339526. see scanned
documents.

| Type: Misc. Note<br>Access: Medical Staff | **Date:** 09/09/2016 02:55 | **Author:** MA Howard, Angelica | **Related Problems** |
|---|---|---|---|

intake of 32 year old male, A&Ox3. i/m is mainly spanish speaking,
this writer used the assistance of google translate during intake.
i/m verbally denies SI/HI/AVH. i/m verbally denies any recent
ETOH use/ drug abuse. i/m is not currently taking any medications
and has NKMA. i/m verbally denies any immediate need to speak
with medical, dental, mental health at this time. i/m informed of sick
call procedure. no lice or nits noted. PPD not planted at this time,
i/m refused. i/m is to be picked up at 0700 on 9/9/16 by USM, not
sure if returning to facility or not, task in place for PPD to be
planted if i/m is to return. VS WNL. i/m cleared back to booking.



## ROBERT ARIAS

**#16-02920**

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Sick Calls
# Medical Sick Calls

## Triage

- 09/24/2017: Annual PPD
- 05/04/2017: MENTAL HEALTH ASSESSMENT
- 11/12/2016: Nursing assessment for musculoskeletal complaints/pain

## Medical

## Dental

- No recent records

## Mental Health

- No recent records

Viewing 1-2 of 2 Items

| Continue >> | **10/11/2018 1112 with Christopher Schwieger [Last Updated: 10/11/2018 1115]** |
|---|---|

| Vitals Taken | Subjective | Note Off |
|---|---|---|
| BP: 139 / 78  Temp: 98.3° F  Weight: - lbs  BMI: 0.0 | **Subjective:** Pt. with persistent hip pain, troch. bursitis, physical therapy. injection x2 with no improvement. | **Note Off Status:** Incomplete **Locked:** No **Interpreter used:** No |
| Pulse: ..  Resp: ..  Height: 0ft 0in  SPO2: -% | **Objective:** Normal gait, tenderness over troch. bursa on the left, exam otherwise neg | |
| | **Assessment:** 1. chronic trochanter bursitis | |
| | **Plan:** 1. Needs f/u with othro, I do not have anything else to add from a primary care standpoint | |
| | **Education:** *blank* | |

Entered by: **Christopher Schwieger** at patient request
🗋 Add Addendum
Recategorize to | Medical ⌄ |

| Continue >> | **03/09/2017 1438 with Christopher Schwieger [Last Updated: 03/09/2017 1444]** |
|---|---|

| Vitals Taken | Subjective | Note Off |
|---|---|---|
| BP: 109 / 63  Temp: 97.4° F  Weight: 182 lbs  BMI: 0.0 | **Subjective:** Patient with complaints of chronic left knee pain. Patient is status post ORIF with external fixation for a high tibial fibula fracture. Patient chronically has had loss range of motion. Patient having increasing symptoms over the last 6 months, patient asserts injury while he was arrested. Also complaints of right hip pain. | **Note Off Status:** Incomplete **Locked:** No **Interpreter used:** No |
| Pulse: 70  Resp: ..  Height: 0ft 0in  SPO2: -% | **Objective:** Walking protecting left leg. Gait altered. Patient has obvious significant deformity left lower extremity upper tibia-fibula. Extension full. Flexion very limited. Patient has significant arthritic changes noted on exam. | |

Case 1:17-cv-00516-SM   Document 51-2   Filed 10/20/20   Page 14 of 28

Page 2 of 2

| | **Assessment: #1**<br>CHRONIC HIP PAIN AND<br>KNEE PAIN OVER THE<br>LAST 6 MONTHS |
|---|---|
| | **Plan:** 1. X-ray hip left.<br>X-ray knee left. |
| | **Education:** I suspect<br>patient has significant<br>degenerative changes.<br>Likely will need orthopedic<br>management. Young age<br>obviously a major factor. |

Entered by: **Christopher Schwieger** at patient request

📄 Add Addendum

Recategorize to | Medical ⌄ |

Viewing 1-2 of 2 Items

201

Case 1:17-cv-00516-SM Document 51-2 Filed 10/20/20 Page 15 of 28

CorEMR - Reports :: MAR by Month | v5.5.0 Page 1 of 1



## ROBERT ARIAS

### #16-02920

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Reports
MAR by Month
# MAR

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✔ | Received |
| 1 | ✕ | Refused |
| 1 | A | Absent |
| 1 | O | Not Given |
| ? | ? | Missing |
| | | Upcoming / Unsaved |
| ~ | ~ | Unscheduled |

| Initials | Name |
|---|---|
| RW | RN Wiedeman, Rebecca |
| MV | LPN Vieira, Marc |
| PD | RN Dubois, Patricia |
| MO | RN O'Haire, Monique |
| MK | RN Keefe, Melissa |
| DF | RN Fermahin, Debra |
| ND | LPN Downing, Nicole |
| MF | Franks, LPN, Melissa |
| KO | RN O'Brien, Karen |

## May 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IBUPROFEN 800MG TAB800MG BID/PRN **Scheduled** | PA-C Schwieger, Christopher | 19% | 0800 | A RW | A MV | ? | ? | A MV | A MK | A ND | A MK | A ND | A MK | A KO | A KO | A MK | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| | | | 2000 | ✔ RW1 | A PD | A PD | ✔ PD1 | A MO | ✔ DF1 | A PD | A MF | ✕ PD | ✔ MF1 | A PD | ? | ✔ PD1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 38% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush **Scheduled** | MD Braga, Christopher | 38% | 2000 | ✔ RW1 | A PD | A PD | ✔ PD1 | A MO | ✔ DF1 | A PD | A MF | ✕ PD | ✔ MF1 | A PD | ? | ✔ PD1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 38% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS **Scheduled** | PA-C Schwieger, Christopher | 38% | 2000 | ✔ RW1 | A PD | A PD | ✔ PD1 | A MO | ✔ DF1 | A PD | A MF | ✕ PD | ✔ MF1 | A PD | ? | ✔ PD1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 38% |

202

Case: 23-1618    Document: 00118080310    Page: 203    Date Filed: 12/01/2023    Entry ID: 6607242
Case 1:17-cv-00516-SM   Document 51-2   Filed 10/20/20   Page 16 of 28
CorEMR - Reports :: MAR by Month | v5.5.0                                                     Page 1 of 1



**ROBERT ARIAS**

**#16-02920**

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (16434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Reports
MAR by Month
# MAR

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✔ | Received |
| 1 | ✕ | Refused |
| 1 | A | Absent |
| 1 | O | Not Given |
| ? | ? | Missing |
| | | Upcoming / Unsaved |
| ~ | ~ | Unscheduled |

| Initials | Name |
|---|---|
| MF | Franks, LPN, Melissa |
| AT | RN Ternullo-Pearson, Amy |
| MK | RN Keefe, Melissa |
| ND | LPN Downing, Nicole |
| MO | RN O'Haire, Monique |
| MV | LPN Vieira, Marc |
| PD | RN Dubois, Patricia |
| MM | RN Marshall, Melody |
| KO | RN O'Brien, Karen |
| DF | RN Fermahin, Debra |
| JM | LPN Matile, Jamie |
| RP | LPN Poirier, Rebecca |

## April 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 33% | 0800 | ? | ? | A MK 1 | A ND 1 | A ND 1 | A MV 1 | ? | A ND 1 | A MM 1 | A ND 1 | A ND 1 | A MK 1 | A KO 1 | ? | ? | A MK 1 | ✕ MK 1 | A ND 1 | ? | A KO 1 | A MV 1 | A MK 1 | A ND 1 | A ND | ? | A MK | A ND | A JM | A MK | A ND | 0% |
| | | | 2000 | ✔ MF 1 | A AT 1 | ✔ MF 1 | ✔ MO 1 | A AT 1 | ✔ MF 1 | ✔ MF 1 | ✔ PD 1 | ✔ PD 1 | ✔ MF 1 | ✔ PD 1 | ✔ MF 1 | ✔ MO 1 | ? | ✔ PD 1 | ✔ MF 1 | A MF 1 | ✔ PD 1 | A MO 1 | ✔ PD 1 | A ND 1 | A PD 1 | ✔ PD 1 | ✔ ND 1 | A MO | ? | ✔ DF 1 | ✔ RP 1 | ✔ PD 1 | A MF | 67% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 67% | 2000 | ✔ MF 1 | A AT 1 | ✔ MF 1 | ✔ MO 1 | A AT 1 | ✔ MF 1 | ✔ MF 1 | ✔ PD 1 | ✔ PD 1 | ✔ MF 1 | ✔ PD 1 | ✔ MF 1 | ✔ MO 1 | ? | ✔ PD 1 | ✔ MF 1 | A MF 1 | ✔ PD 1 | A MO 1 | ✔ PD 1 | A ND 1 | A PD 1 | ✔ PD 1 | ✔ ND 1 | A MO | ? | ✔ DF 1 | ✔ RP 1 | ✔ PD 1 | A MF | 67% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 67% | 2000 | ✔ MF 1 | A AT 1 | ✔ MF 1 | ✔ MO 1 | A AT 1 | ✔ MF 1 | ✔ MF 1 | ✔ PD 1 | ✔ PD 1 | ✔ MF 1 | ✔ PD 1 | ✔ MF 1 | ✔ MO 1 | ? | ✔ PD 1 | ✔ MF 1 | A MF 1 | ✔ PD 1 | A MO 1 | ✔ PD 1 | A ND 1 | A PD 1 | ✔ PD 1 | ✔ ND 1 | A MO | ? | ✔ DF 1 | ✔ RP 1 | ✔ PD 1 | A MF | 67% |

Case: 23-1618    Document: 00118080310    Page: 204    Date Filed: 12/01/2023    Entry ID: 6607242
Case 1:17-cv-00516-SM    Document 51-2    Filed 10/20/20    Page 17 of 28
CorEMR - Reports :: MAR by Month | v5.5.0                                         Page 1 of 2



**ROBERT ARIAS**

**#16-02920**

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Reports
MAR by Month

# MAR

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✓ | Received |
| 1 | ✗ | Refused |
| 1 | A | Absent |
| 1 | O | Not Given |
| ? | ? | Missing |
| | | Upcoming / Unsaved |
| ~ | ~ | Unscheduled |

| Initials | Name |
|---|---|
| MO | RN O'Haire, Monique |
| PD | RN Dubois, Patricia |
| DF | RN Fermahin, Debra |
| AG | RN Griffith, Adam |
| RW | RN Wiedeman, Rebecca |
| JD | RN-BC Douglas, JillShannon |
| LL | LPN Leitz, Linda |
| MF | Franks, LPN, Melissa |
| AT | RN Ternullo-Pearson, Amy |
| ND | LPN Downing, Nicole |
| MV | LPN Vieira, Marc |
| MM | RN Marshall, Melody |
| MK | RN Keefe, Melissa |
| KO | RN O'Brien, Karen |
| JM | LPN Matile, Jamie |
| RP | LPN Poirier, Rebecca |
| DD | LPN Dow, Dawn |

## March 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS **Scheduled** | PA-C Schwieger, Christopher | 35% | 2000 | ? | A MO 1 | ✓ MO 1 | ✓ PD 1 | ✓ DF 1 | ✓ DF 1 | ✗ MO 1 | ✓ AG 1 | A AG 1 | ✓ RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓ RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW? 1 | | ✓ PD 1 | A MO 1 | A PD 1 | ✓ DF 1 | A PD 1 | ✗ LL 1 | ✓ MF 1 | A MF 1 | ✓ MF 1 | A PD 1 | A PD 1 | 35% |
| IBUPROFEN 800MG TAB800MG BID/PRN **Scheduled** | PA-C Schwieger, Christopher | 18% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ PD 1 | A MO 1 | A PD 1 | ✓ DF 1 | A PD 1 | ✗ LL 1 | ✓ MF 1 | A MF 1 | ✓ MF 1 | A PD 1 | A PD 1 | 36% |
| | | | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ? | A ND 1 | ? | A MV 1 | A MM 1 | A MM 1 | A MK 1 | ? | A ND 1 | A KO 1 | A JD 1 | 0% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID **PRN** | MD Braga, Christopher | 47% | 0800 | ~ | ~ | ~ | A DD 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A KO 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| | | | 2000 | ~ | A MO 1 | ✓ MO 1 | ✓ PD 1 | ✓ DF 1 | ✓ DF 1 | ✓ MO 1 | ✓ AG 1 | A AG 1 | ✓ RW 1 | A AG 1 | ~ | A MO 1 | A MO 1 | ✓ RW 1 | A AG 1 | ~ | A RW 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 53% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush | MD Braga, Christopher | 35% | 2000 | ? | A MO 1 | ✓ MO 1 | ✓ PD 1 | ✓ DF 1 | ✓ DF 1 | ✗ MO 1 | ✓ AG 1 | A AG 1 | ✓ RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓ RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW 1 | ? | ✓ PD 1 | A MO 1 | A PD 1 | ✓ DF 1 | A PD 1 | ✗ LL 1 | ✓ MF 1 | A MF 1 | ✓ MF 1 | A PD 1 | A PD 1 | 35% |

Case 1:17-cv-00516-SM    Document 51-2    Filed 10/20/20    Page 18 of 28
CorEMR - Reports :: MAR by Month | v5.5.0    Page 2 of 2

| Scheduled | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 35% | 2000 | ? | A MO 1 | ✓ MO 1 | ✓ PD 1 | ✓ DF 1 | ✓ DF 1 | ✗ MO 1 | ✓ AG 1 | A AG 1 | ✓ RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓ RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW 1 | ? | ✓ PD 1 | A MO 1 | A PD 1 | ✓ DF 1 | A PD 1 | ✗ LL 1 | ✓ MF 1 | A MF 1 | ✓ MF 1 | A PD 1 | A PD 1 | 35% |

## April 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 80% | 2000 | ✓ MF 1 | A AT 1 | ✓ MF 1 | ✓ MO 1 | ✓ AT 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 80% |
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 33% | 0800 | ? | ? | A MK 1 | A ND 1 | A ND 1 | A MV 1 | ? | A ND 1 | A MM 1 | A ND 1 | A ND 1 | A MK 1 | A KO 1 | ? | ? | A MK 1 | ✗ MK 1 | A ND 1 | ? | A KO 1 | A MV 1 | A MK 1 | A ND 1 | A ND | ? | A MK 1 | A ND 1 | A JM 1 | A MK 1 | A ND 1 | 0% |
| | | | 2000 | ✓ MF 1 | A AT 1 | ✓ MF 1 | ✓ MO 1 | ✓ AT 1 | ✓ MF 1 | ✓ MF 1 | ✓ PD 1 | ✓ PD 1 | ✓ MF 1 | ✓ PD 1 | ✓ MF 1 | ✓ MO 1 | ? | ✓ PD 1 | ✓ MF 1 | A MF 1 | ✓ PD 1 | A MO 1 | ✓ PD 1 | A ND 1 | A PD 1 | ✓ PD 1 | ✓ ND 1 | A MO | ? | ✓ DF 1 | ✓ RP 1 | ✓ PD 1 | A MF | 67% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 67% | 2000 | ✓ MF 1 | A AT 1 | ✓ MF 1 | ✓ MO 1 | ✓ AT 1 | ✓ MF 1 | ✓ MF 1 | ✓ PD 1 | ✓ PD 1 | ✓ MF 1 | ✓ PD 1 | ✓ MF 1 | ✓ MO 1 | ? | ✓ PD 1 | ✓ MF 1 | A MF 1 | ✓ PD 1 | A MO 1 | ✓ PD 1 | A ND 1 | A PD 1 | ✓ PD 1 | ✓ ND 1 | A MO | ? | ✓ DF 1 | ✓ RP 1 | ✓ PD 1 | A MF | 67% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 67% | 2000 | ✓ MF 1 | A AT 1 | ✓ MF 1 | ✓ MO 1 | ✓ AT 1 | ✓ MF 1 | ✓ MF 1 | ✓ PD 1 | ✓ PD 1 | ✓ MF 1 | ✓ PD 1 | ✓ MF 1 | ✓ MO 1 | ? | ✓ PD 1 | ✓ MF 1 | A MF 1 | ✓ PD 1 | A MO 1 | ✓ PD 1 | A ND 1 | A PD 1 | ✓ PD 1 | ✓ ND 1 | A MO | ? | ✓ DF 1 | ✓ RP 1 | ✓ PD 1 | A MF | 67% |

CorEMR - Reports :: MAR by Month | v5.5.0                                                Page 1 of 2



**ROBERT ARIAS**

**#16-02920**

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Reports
MAR by Month

# MAR

| Styling | Symbol | Result |
|---|---|---|
| 1 | ✓ | Received |
| 1 | ✕ | Refused |
| 1 | A | Absent |
| 1 | O | Not Given |
| ? | ? | Missing |
| | | Upcoming / Unsaved |
| ~ | ~ | Unscheduled |

| Initials | Name |
|---|---|
| DF | RN Fermahin, Debra |
| AG | RN Griffith, Adam |
| MM | RN Marshall, Melody |
| MO | RN O'Haire, Monique |
| PD | RN Dubois, Patricia |
| RW | RN Wiedeman, Rebecca |
| KO | RN O'Brien, Karen |
| JD | RN-BC Douglas, JillShannon |
| LL | LPN Leitz, Linda |
| MF | Franks, LPN, Melissa |
| AT | RN Ternullo-Pearson, Amy |
| DD | LPN Dow, Dawn |
| ND | LPN Downing, Nicole |
| MV | LPN Vieira, Marc |
| MK | RN Keefe, Melissa |
| JM | LPN Matile, Jamie |
| RP | LPN Poirier, Rebecca |

## February 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS **Scheduled** | PA-C Schwieger, Christopher | 68% | 2000 | ✓ DF 1 | ✓ AG 1 | ✓ MM 1 | ✓ MO 1 | | ? PD | ✓ PD 1 | ✓ MO 1 | ✓ MO 1 | ✓ MO 1 | ✓ RW 1 | A DF | ✓ PD 1 | ✓ DF 1 | A RW | A AG | ✕ PD 1 | ✓ DF 1 | A DF | ✓ MO 1 | ✓ DF 1 | ✓ AG 1 | ✓ KO 1 | A DF | ✓ PD 1 | A RW | ✓ RW 1 | ✓ PD 1 | A ~ | 68% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID **PRN** | MD Braga, Christopher | 48% | 0800 | A KO 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| | | | 2000 | ✓ DF 1 | ✕ AG 1 | ✓ MM 1 | ✕ MO 1 | ~ | ~ | ✓ PD 1 | ✕ MO 1 | ✕ MO 1 | ✓ MO 1 | ~ | ✕ DF 1 | ✓ PD 1 | | ~ | ✕ AG 1 | ✓ PD 1 | ~ | ✓ DF 1 | ✓ MO 1 | ✕ DF 1 | ✕ AG 1 | A KO 1 | ✓ DF 1 | ~ | ✕ RW 1 | ✓ RW 1 | ~ | ~ | 50% |
| RISPERDAL 1MG TAB1MG CRUSH **Scheduled** | MD Braga, Christopher | 85% | 2000 | ✓ DF 1 | ✓ AG 1 | ✓ MM 1 | ✓ MO 1 | | ? PD | ✓ PD 1 | ✓ MO 1 | ✓ MO 1 | ✓ MO 1 | ✓ RW 1 | A DF | ✓ PD 1 | | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 85% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush **Scheduled** | MD Braga, Christopher | 57% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A RW 1 | ✕ AG 1 | ✓ PD 1 | A DF 1 | ✓ DF 1 | ✓ MO 1 | ✓ DF 1 | ✓ AG 1 | A KO 1 | ✓ DF 1 | A PD 1 | ✓ RW 1 | ✓ RW 1 | A PD 1 | ~ | 57% |
| RISPERDAL 1MG TAB1MG | PA-C Schwieger, Christopher | 0% | 2000 | ? | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |



| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 tab po q HS CRUSH Scheduled | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 68% | 2000 | DF | ✓AG | ✓MM | ✓MO | ? | ✓PD | ✓PD | ✓MO | ✓MO | ✓MO | A RW | ✓DF | ✓PD | A DF | A RW | ✗AG | ✓PD | A DF | ✓DF | ✓MO | ✓DF | ✓AG | A KO | ✓DF | A PD | ✓RW | ✓RW | A PD | ~ | 68% |

## March 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 35% | 2000 | ? | A MO 1 | ✓MO 1 | ✓PD 1 | ✓DF 1 | ✓DF 1 | ✗MO 1 | ✓AG 1 | A AG 1 | ✓RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW 1 | ? | ✓PD 1 | A MO 1 | A PD 1 | ✓DF 1 | A PD 1 | ✗LL 1 | ✓MF 1 | A MF 1 | ✓MF 1 | A PD 1 | A PD 1 | 35% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID PRN | MD Braga, Christopher | 47% | 0800 | ~ | ~ | ~ | A DD 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A KO 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| | | | 2000 | ~ | A MO 1 | ✓MO 1 | ✓PD 1 | ✓DF 1 | ✓DF 1 | ✓MO 1 | ✓AG 1 | A AG 1 | ✓RW 1 | A AG 1 | ~ | A MO 1 | A MO 1 | ✓RW 1 | A AG 1 | ~ | ~ | A RW 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 53% |
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 18% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓PD 1 | A MO 1 | A PD 1 | ✓DF 1 | A PD 1 | ✗LL 1 | ✓MF 1 | A MF 1 | ✓MF 1 | A PD 1 | A PD 1 | 36% |
| | | | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ? | A ND 1 | ? | A MV 1 | A MM 1 | A MM 1 | A MK 1 | ? | A ND 1 | A KO 1 | A JD 1 | | 0% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 35% | 2000 | ? | A MO 1 | ✓MO 1 | ✓PD 1 | ✓DF 1 | ✓DF 1 | ✗MO 1 | ✓AG 1 | A AG 1 | ✓RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW 1 | ? | ✓PD 1 | A MO 1 | A PD 1 | ✓DF 1 | A PD 1 | ✗LL 1 | ✓MF 1 | A MF 1 | ✓MF 1 | A PD 1 | A PD 1 | 35% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 35% | 2000 | ? | A MO 1 | ✓MO 1 | ✓PD 1 | ✓DF 1 | ✓DF 1 | ✗MO 1 | ✓AG 1 | A AG 1 | ✓RW 1 | A AG 1 | A DF 1 | A MO 1 | A MO 1 | ✓RW 1 | A AG 1 | A JD 1 | A PD 1 | A RW 1 | ? | ✓PD 1 | A MO 1 | A PD 1 | ✓DF 1 | A PD 1 | ✗LL 1 | ✓MF 1 | A MF 1 | ✓MF 1 | A PD 1 | A PD 1 | 35% |

## April 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 80% | 2000 | ✓MF 1 | A AT 1 | ✓MF 1 | ✓MO 1 | ✓AT 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 80% |
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 33% | 0800 | ? | ? | A MK 1 | A ND 1 | A ND 1 | A MV 1 | ? | A ND 1 | A MM 1 | A ND 1 | A ND 1 | A MK 1 | A KO 1 | ? | ? | A MK 1 | ✗MK 1 | A ND 1 | ? | A KO 1 | A MV 1 | A MK 1 | A ND 1 | A ND 1 | ? | A MK 1 | A ND 1 | A JM 1 | A MK 1 | A ND 1 | 0% |
| | | | 2000 | ✓MF 1 | A AT 1 | ✓MF 1 | ✓MO 1 | ✓AT 1 | ✓MF 1 | ✓MF 1 | ✓PD 1 | ✓PD 1 | ✓MF 1 | ✓PD 1 | ✓MF 1 | ✓MO 1 | ? | ✓PD 1 | ✓MF 1 | A MF 1 | ✓PD 1 | A MO 1 | ✓PD 1 | A ND 1 | A PD 1 | ✓PD 1 | ✓ND 1 | A MO 1 | ? | ✓DF 1 | ✓RP 1 | ✓PD 1 | A MF 1 | 67% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 67% | 2000 | ✓MF 1 | A AT 1 | ✓MF 1 | ✓MO 1 | ✓AT 1 | ✓MF 1 | ✓MF 1 | ✓PD 1 | ✓PD 1 | ✓MF 1 | ✓PD 1 | ✓MF 1 | A MO 1 | ? | ✓PD 1 | ✓MF 1 | A MF 1 | ✓PD 1 | A MO 1 | ✓PD 1 | A ND 1 | A PD 1 | ✓PD 1 | ✓ND 1 | A MO 1 | ? | ✓DF 1 | ✓RP 1 | ✓PD 1 | A MF 1 | 67% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 67% | 2000 | ✓MF 1 | A AT 1 | ✓MF 1 | ✓MO 1 | ✓AT 1 | ✓MF 1 | ✓MF 1 | ✓PD 1 | ✓PD 1 | ✓MF 1 | ✓PD 1 | ✓MF 1 | ✓MO 1 | ? | ✓PD 1 | ✓MF 1 | A MF 1 | ✓PD 1 | A MO 1 | ✓PD 1 | A ND 1 | A PD 1 | ✓PD 1 | ✓ND 1 | A MO 1 | ? | ✓DF 1 | ✓RP 1 | ✓PD 1 | A MF 1 | 67% |



## ROBERT ARIAS

### #16-02920

LANGUAGE alert, bottom bunk

Sex: Male
DOB: 01/22/1983 (Age 36)
Height: 5ft 6in
Weight: 214 lbs
BMI: 34.5
Agency: HO (15434-049)
Location: HOUSING POD 2 : G : G-31 : L
JMS ID: 16-01254
Allergies:
NKMA

Reports
MAR by Month

# MAR

| Styling | | Symbol | Result |
|---|---|---|---|
| 1 | ✓ | | Received |
| 1 | ✗ | | Refused |
| 1 | A | | Absent |
| 1 | O | | Not Given |
| ? | ? | | Missing |
| | | | Upcoming / Unsaved |
| ~ | ~ | | Unscheduled |

| Initials | Name |
|---|---|
| RP | LPN Poirier, Rebecca |
| DF | RN Fermahin, Debra |
| MO | RN O'Haire, Monique |
| RW | RN Wiedeman, Rebecca |
| PD | RN Dubois, Patricia |
| LL | LPN Leitz, Linda |
| AG | RN Griffith, Adam |
| MM | RN Marshall, Melody |
| KO | RN O'Brien, Karen |
| JD | RN-BC Douglas, JillShannon |
| MF | Franks, LPN, Melissa |
| AT | RN Ternullo-Pearson, Amy |
| MV | LPN Vieira, Marc |
| ND | LPN Downing, Nicole |
| EM | LPN Martin, Eric |
| DD | LPN Dow, Dawn |
| MK | RN Keefe, Melissa |
| JM | LPN Matile, Jamie |

## January 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS **Scheduled** | PA-C Schwieger, Christopher | 74% | 2000 | ✓ RP 1 | ✓ DF 1 | ✓ MO 1 | ✓ RW 1 | ✓ RW 1 | ✓ PD 1 | ✓ LL 1 | ✓ PD 1 | ✓ MO 1 | ✓ AG 1 | ✓ DF 1 | ✓ DF 1 | ✓ DF 1 | ✓ MO 1 | A LL 1 | ✓ LL 1 | ✓ AG 1 | ✓ MO 1 | ✓ MO 1 | A DF 1 | ✓ RW 1 | ✓ ? 1 | ✓ DF 1 | ✓ PD 1 | A RW 1 | ✓ LL 1 | ✗ MO 1 | A PD 1 | A DF 1 | ✓ DF 1 | A AG 1 | 74% |
| GUAIFENESIN SYRUP100/5CC 10 ml PO TID prn, productive cough **PRN** | PA-C Schwieger, Christopher | 90% | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ MV 1 | ✓ ND 1 | ~ | ✓ MV 1 | ~ | 100% |
| | | | 1300 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A MV 1 | ✓ EM 1 | ~ | ✓ MV 1 | ~ | 67% |
| | | | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ LL 1 | ✓ MO 1 | ~ | ✓ DF 1 | ✓ DF 1 | ~ | 100% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID **PRN** | MD Braga, Christopher | 84% | 2000 | ✓ RP 1 | ✓ DF 1 | ✓ MO 1 | ✓ RW 1 | ✓ RW 1 | ✓ PD 1 | ✓ LL 1 | ✓ PD 1 | ✓ MO 1 | ✓ AG 1 | ✓ DF 1 | ✓ DF 1 | ✓ DF 1 | ✓ MO 1 | A LL 1 | ✓ LL 1 | ✓ AG 1 | ✓ MO 1 | ✓ MO 1 | A DF 1 | ✓ RW 1 | ~ | ✓ DF 1 | ✓ PD 1 | ~ | ✓ LL 1 | ✓ MO 1 | ~ | ✓ DF 1 | ✓ DF 1 | A AG 1 | 89% |
| | | | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A KO 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A RP 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓ MV 1 | ~ | ~ | ✓ MV 1 | ~ | | 50% |
| RISPERDAL 1MG TAB1MG | PA-C Schwieger, Christopher | 74% | 2000 | ✓ RP 1 | ✓ DF 1 | ✓ MO 1 | ✓ RW 1 | ✓ RW 1 | ✓ PD 1 | ✓ LL 1 | ✓ PD 1 | ✓ MO 1 | ✓ AG 1 | ✓ DF 1 | ✓ DF 1 | ✓ DF 1 | ✓ MO 1 | A LL 1 | ✓ LL 1 | ✓ AG 1 | ✓ MO 1 | ✓ MO 1 | A DF 1 | ✓ RW 1 | ? | ✓ DF 1 | ✓ PD 1 | A RW 1 | ✓ LL 1 | ✗ MO 1 | A PD 1 | A DF 1 | ✓ DF 1 | A AG 1 | 74% |



| Medication | Clinician | Total % | Time | | | | | | | | | | | | | | | | | | | | | | | | | | | %|
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 tab po q HS CRUSH Scheduled | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 44% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓DF1 ✓PD1 A RW1 ✓LL1 ✗MO1 A PD1 A DF1 ✓DF1 A AG1 | | | | | | | 44% |
| ZOLOFT 50MG TAB50MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 86% | 2000 | ✓RP1 ✓DF1 ✓MO1 ✓RW1 ✓RW1 ✓PD1 ✓LL1 ✓PD1 ✓MO1 ✓AG1 ✓DF1 ✓DF1 ✓DF1 A MO1 ✓LL1 ✓LL1 ✓AG1 ✓MO1 A MO1 ✓DF1 ✓RW1 ? | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 86% |

## February 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 68% | 2000 | ✓DF1 | ✓AG1 | ✓MM1 | ✓MO1 | ? | ✓PD1 | ✓PD1 | ✓MO1 | ✓MO1 | ✓MO1 | ✓RW1 | A DF1 | ✓PD1 | ✓DF1 | A RW1 | A AG1 | ✗PD1 | ✓DF1 | A DF1 | ✓MO1 | ✓DF1 | ✓AG1 | A KO1 | ✓DF1 | A PD1 | ✓RW1 | ✓RW1 | A PD1 | ~ | 68% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID PRN | MD Braga, Christopher | 48% | 0800 | A KO1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | | 0% |
| | | | 2000 | ✓DF1 | ✗AG1 | ✓MM1 | ✗MO1 | | ~ | ✓PD1 | ✗MO1 | ✗MO1 | ✓MO1 | ~ | ✗DF1 | ✓PD1 | ~ | ~ | ✗AG1 | ✓PD1 | ~ | ✓DF1 | ✓MO1 | ✗DF1 | ✗AG1 | A KO1 | ✓DF1 | ~ | ✗RW1 | ✓RW1 | ~ | | 50% |
| RISPERDAL 1MG TAB1MG 1 tab po q HS CRUSH Scheduled | PA-C Schwieger, Christopher | 0% | 2000 | ? | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| RISPERDAL 1MG TAB1MG CRUSH Scheduled | MD Braga, Christopher | 85% | 2000 | ✓DF1 | ✓AG1 | ✓MM1 | ✓MO1 | ? | ✓PD1 | ✓PD1 | ✓MO1 | ✓MO1 | ✓MO1 | A RW1 | ✓DF1 | ✓PD1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 85% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 57% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A RW1 | ✗AG1 | ✓PD1 | A DF1 | ✓DF1 | ✓MO1 | ✓DF1 | ✓AG1 | ✓KO1 | A DF1 | ✓PD1 | A RW1 | ✓RW1 | ✓PD1 | A PD1 | | 57% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 68% | 2000 | ✓DF1 | ✓AG1 | ✓MM1 | ✓MO1 | ? | ✓PD1 | ✓PD1 | ✓MO1 | ✓MO1 | ✓MO1 | A RW1 | ✓DF1 | ✓PD1 | A DF1 | A RW1 | ✗AG1 | ✓PD1 | A DF1 | ✓DF1 | ✓MO1 | ✓DF1 | ✓AG1 | A KO1 | ✓DF1 | A PD1 | ✓RW1 | ✓RW1 | A PD1 | ~ | 68% |

## March 2019



| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 35% | 2000 | ? | A MO1 | ✓MO1 | ✓PD1 | ✓DF1 | ✓DF1 | ✗MO1 | ✓AG1 | A AG1 | ✓RW1 | A AG1 | A DF1 | A MO1 | A MO1 | ✓RW1 | A JD1 | A PD1 | A RW1 | ? | | ✓PD1 | A MO1 | A PD1 | ✓DF1 | A PD1 | ✗LL1 | ✓MF1 | A MF1 | ✓MF1 | A PD1 | A PD1 | 35% |
| IBUPROFEN 800MG TAB800MG 1 TAB [PO] By Mouth BID PRN | MD Braga, Christopher | 47% | 0800 | ~ | ~ | ~ | A DD1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | A KO1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 0% |
| | | | 2000 | ~ | A MO1 | ✓MO1 | ✓PD1 | ✓DF1 | ✓DF1 | ✓MO1 | ✓AG1 | A AG1 | ✓RW1 | A AG1 | ~ | A MO1 | A MO1 | ✓RW1 | A AG1 | ~ | ~ | A RW1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 53% |
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 18% | 2000 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ✓PD1 | A MO1 | A PD1 | ✓DF1 | A PD1 | ✗LL1 | ✓MF1 | A MF1 | ✓MF1 | A PD1 | A PD1 | 36% |
| | | | 0800 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ? | A ND1 | ? | A MV1 | A MM1 | A MM1 | A MK1 | ? | A ND1 | A KO1 | A JD1 | 0% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 35% | 2000 | ? | A MO1 | ✓MO1 | ✓PD1 | ✓DF1 | ✓DF1 | ✗MO1 | ✓AG1 | A AG1 | ✓RW1 | A AG1 | ✓DF1 | A MO1 | A MO1 | ✓RW1 | A AG1 | A JD1 | A PD1 | A RW1 | ? | ✓PD1 | A MO1 | A PD1 | ✓DF1 | A PD1 | ✗LL1 | ✓MF1 | A MF1 | ✓MF1 | A PD1 | A PD1 | 35% |
| | | 35% | 2000 | ? | A | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ | A | ✓ | A | A | A | A | ✓ | A | A | A | A | ? | ✓ | A | A | ✓ | A | ✗ | ✓ | A | ✓ | A | A | 35% |

Case 1:17-cv-00516-SM   Document 51-2   Filed 10/20/20   Page 23 of 28 Page 3 of 3

CorEMR - Reports :: MAR by Month | v5.5.0

| Medication | Clinician | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | | MO1 | MO1 | PD1 | DF1 | DF1 | MO1 | AG1 | AG1 | RW1 | AG1 | DF1 | MO1 | MO1 | RW1 | AG1 | JD1 | PD1 | RW1 | PD1 | MO1 | PD1 | DF1 | PD1 | LL1 | MF1 | MF1 | MF1 | PD1 | PD1 | | | | |

## April 2019

| Medication | Clinician | Total % | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLONIDINE 0.1MG TAB0.1MG 1 TAB [PO] By Mouth QHS Scheduled | PA-C Schwieger, Christopher | 80% | 2000 | ✓ MF1 | A AT1 | ✓ MF1 | ✓ MO1 | ✓ AT1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 80% |
| IBUPROFEN 800MG TAB800MG BID/PRN Scheduled | PA-C Schwieger, Christopher | 33% | 0800 | ? | ? | A MK1 | A ND1 | A ND1 | A MV1 | ? | A ND1 | A MM1 | A ND1 | A ND1 | A MK1 | A KO1 | ? | ? | A MK1 | X MK1 | A ND1 | ? | A KO1 | A MV1 | A MK1 | A ND1 | A ND1 | ? | A MK | A ND | A JM | A MK | A ND | 0% |
| | | | 2000 | ✓ MF1 | A AT1 | ✓ MF1 | ✓ MO1 | ✓ AT1 | ✓ MF1 | ✓ MF1 | ✓ PD1 | ✓ PD1 | ✓ MF1 | A PD1 | ✓ MF1 | ✓ MO1 | ? | ✓ PD1 | ✓ MF1 | A MF1 | ✓ PD1 | A MO1 | ✓ PD1 | A ND1 | A PD1 | ✓ PD1 | ✓ ND1 | A MO | ? | ✓ DF1 | ✓ RP1 | ✓ PD1 | A MF | 67% |
| RISPERDAL 1MG TAB1MG 1 TAB [PO] By Mouth QHS ; Crush Scheduled | MD Braga, Christopher | 67% | 2000 | ✓ MF1 | A AT1 | ✓ MF1 | ✓ MO1 | ✓ AT1 | ✓ MF1 | ✓ MF1 | ✓ PD1 | ✓ PD1 | ✓ MF1 | A PD1 | ✓ MF1 | ✓ MO1 | ? | ✓ PD1 | ✓ MF1 | A MF1 | ✓ PD1 | A MO1 | ✓ PD1 | A ND1 | A PD1 | ✓ PD1 | ✓ ND1 | A MO | ? | ✓ DF1 | ✓ RP1 | ✓ PD1 | A MF | 67% |
| ZOLOFT 50MG TAB50MG 1 tab po q HS Scheduled | PA-C Schwieger, Christopher | 67% | 2000 | ✓ MF1 | A AT1 | ✓ MF1 | ✓ MO1 | ✓ AT1 | ✓ MF1 | ✓ MF1 | ✓ PD1 | ✓ PD1 | ✓ MF1 | A PD1 | ✓ MF1 | ✓ MO1 | ? | ✓ PD1 | ✓ MF1 | A MF1 | ✓ PD1 | A MO1 | ✓ PD1 | A ND1 | A PD1 | ✓ PD1 | ✓ ND1 | A MO | ? | ✓ DF1 | ✓ RP1 | ✓ PD1 | A MF | 67% |

## 🔒 MENTAL HEALTH ASSESSMENT

| | | |
|---|---|---|
| JMS ID: | 16-01254 | Location: HOUSING POD 2 : G : G-31 : L |
| SSN: | - | Ethnicity: - |
| DOB: | 01/22/1983 | Interviewer: LDC CCHP Lilly, Patricia (05/04/2017 1210) |
| Age: | 36 | |
| Agency: | HO | |

### ROBERT ARIAS
### #16-02920

| | | |
|---|---|---|
| Date of Booking | | 09/09/2016 |
| Sentence/Disposition | ☑ Original Charge (note) | conspiracy Immigration. |
| Next Court or Release Date | Date to be determined ∨ | |
| Prior Incarceration (Where/Date) | | none |
| Referral Reason | ☑ Inmate request | |
| CHIEF COMPLAINT | ☑ Inmate quote | I am crying all the time |
| Describe Current MH Sx's and ONSET | crying, depressed affect. | |
| 1.. SAFETY (Suicide Ideation) **Note: Plan, means available, lethality of plan | ☑ Denies SI<br>☑ No Plan<br>☑ Hx of SI (note last SI)<br>☑ I/M contracts for safety<br>☑ I/M agrees to access supports to maintain safety | Last time was one week. |
| 2.. SAFETY (Suicide Attempt-deliberate) **Note: stressors, method, date, reason attempt failed and medical tx recieved after suicide attempt | ☑ Denies Hx of Suicide Attempt | |
| 3.. SAFETY (Self Harm) **Note: date of last self abuse, Type, Severity of Self Abuse, Stressors; evidence of self harm | ☑ Denies Hx of Self Abuse | |
| 4.. SAFETY (Homicidal Ideation-Threat) | ☑ Denies Hx Violence<br>☑ Contracts for safety toward others | |
| 1.. PRESENTATION (Self Care) | ☑ Good | |
| 2.. APPETITE | ☑ Decreased<br>☑ Weight at intake | Weight 182# height 5'6" |
| 3.. SLEEP | ☑ Decreased sleep<br>☑ Nightmares<br>☑ # Hours of sleep/24hr period | Sleeping 4hrs in 24. |
| BEHAVIOR **Note: Describe Corrections information regarding behavior/disciplinary write-ups, reasons for max. time, known aggression or Hx of violence | ☑ No Behavioral problems reported | |
| 1.. SYMPTOMS: AFFECT AND MOOD **Note level of mood alteration -0 to 10+; describe appearance, eye contact | ☑ Affect Appropriate<br>☑ Eye Contact Normal<br>☑ Alert & Oriented x 3 | |
| 2.. Mental Health History/Previous Dx (per inmate) | ☑ No Prior MH Diagnosis | |
| 3.. SYMPTOMS: DEPRESSION | ☑ Depressed Affect<br>☑ Tearfulness<br>☑ Hopelessness<br>☑ Frustration intolerance<br>☑ Agitation/irritability | |

| | | | | |
|---|---|---|---|---|
| 4.. | SYMPTOMS: MOOD DISORDER | ☑ Racing Thoughts | | |
| 5.. | SYMPTOMS: ANXIETY | ☑ Palpitations | Panic attacks are happening daily. | |
| | | ☑ Sweating | | |
| | | ☑ Choking Feeling | | |
| | | ☑ Restless | | |
| | | ☑ Dizziness/Faint | | |
| | | ☑ Numbness/Tingling | | |
| | | ☑ Chills/Hot Flashes | | |
| | | ☑ Chest Pain/Pressure | | |
| | | ☑ Muscle Tension | | |
| | FUNCTIONAL IMPAIRMENT r/t Symptoms Describe reported limitations | ☑ None reported | | |
| | TCP AND PROGRAMMING | ☑ To be determined | | |
| | PSYCHOSOCIAL HISTORY Note: Childhood and Social/Family Hx, School Performance, Work Hx, Financial Resources, (Insurance available), Spirituality/Religion, Interest, Hobbies, Strengths | ☑ Divorced | Family is in the Dominican. Catholic. | |
| | | ☑ Children (custody arrangement) | | |
| | | ☑ No Supports Available | | |
| 1.. | CHILDHOOD and ABUSE HISTORY Note: Age, length of abuse, perpetrator, if abuse was reported | ☑ Denies Hx | | |
| 1.. | CRITICAL INCIDENT and TRAUMA HISTORY | Just this meaning being arrested and facing 10 years. | | |
| 2.. | CRITICAL INCIDENT & PTSD Symptoms (Note onset of symptoms) | ☑ Denies PTSD Sx | | |
| | Substance Abuse: History and Current Use Note: Dosage and Frequency of use, Include route of ingestion | ☑ Etoh Use Disorder | Onset of Marijuana was 14. Daily use. Last use was 9/8/16. Onset of cocaine was 22. no daily use. Weekly. Last use was 9/8/16. Alcohol 14. No Daily use. Last use was 97/16 | |
| | | ☑ Cannabis Use Disorder | | |
| | | ☑ Stimulant Use Disorder (Cocaine) | | |
| 1.. | THOUGHT CONTENT Note: Delusions, Obsessive thoughts, specific AH, VH, CH and fears | ☑ Auditory Hallucinations | people calling his name | |
| | | ☑ Hypervigilence | | |
| | SPEECH | ☑ Normal | | |
| | INTELLIGENCE | ☑ Average IQ | 7th grade. | |
| | JUDGMENT | ☑ Average | | |
| | INSIGHT | ☑ Average | | |
| | HISTORY of HEAD INJURY) **Note: When, How, Treatment | ☑ Denies Head Injury | | |
| | MH Hospitalizations Note: Hospital, Reason, Date, Diagnosis, Length of stay | ☑ No Hx MH Hospitalizations | | |
| | Previous Psychiatric Medication: Note: Effectiveness, Side effects/Adverse effects | None | | |
| | Medical Hx **Note: any pertinent Medical Hx, PCP, Last seen by SCDOC Psychiatrist, medication allergies. | ☑ No PCP | | |
| | MH O.P. Tx **Note: Prescriber/Provider/Placements, List current medications, Pharmacy Information (where and when filled) | ☑ None | | |
| | Family Hx of Mental Illness | ☑ None known | | |
| | Stressors **Note: Include losses in past year, current issues/concerns, conflict with staff members or other I/M's | ☑ Current Stressors | Worrying that they will give him a lot of time. | |
| | ASSESSMENT SUMMARY w/Diagnostic Impression: | S. MHA completed. Inmate was seen at his request. Inmate is an Ice Inmate and has been charged with conspiracy. Inmate was seen on 4/14/17 when another Inmate reported that he thought he was suicidal. At that time Inmate denied this and contracted for his safety. He was instructed to put in a slip he became depressed and started to think about suicide. Today he | | |

CorEMR - ROBERT ARIAS #16-02920 :: MENTAL HEALTH ASSESSMENT, Location 28    Page 3 of 3

| | | acknowledged that he does feel depressed and wants help. He has never had a mental health hospitalization, taken any psychiatric medications or been seen by mental health on an outpatient basis. He states he is hearing people call his name and when he ask they tell him no. He denies any visual hallucinations. He is sleeping about 4 hours in 24 and is having nightmares. His appetite is decreased and he is giving his trays away. He denies feeling suicidal and is able to contract for his safety. He has no history of self-abuse. "I am just worried about my family and children. My lawyer is telling me I am getting 10 years. He is a healthy male who looks his stated age. He reports no family history. His substance abuse history began in the Dominican as a teen. His first use of Marijuana was 14. Daily use. Last use was 9/8/16. Onset of cocaine was 22. No daily use only weekly. Last use was 9/8/16. On set of Alcohol was 14. No Daily use. Last use was 9/7/16<br>O. Inmate had good eye contact. His speech was of normal tone rate and volume. His thoughts were goal directed sequential and on topic. He reports hearing audio hallucination but no visual. He denies any thoughts of suicide self-harm homicide or harm towards others. His mood was described as "I feel guilty because my girl is here and she was not involved." His affect was controlled without lability. His insight and judgment were adequate.<br>A. SX of depression and anxiety with panic attacks.<br>P. Refer to RRC Line for further assessment. |
| INTERVENTION/PLAN | ☑ **Support/Brief Counseling** | |
| HOUSING RECOMMENDATION | ☑ **Current Housing** | |
| REFERRAL (note specific reason | ☑ **Psychiatrist Evaluation** | |
| Assignments given and/or recommended F/U | ☑ **PRN per IM request** | |
| SIGNATURE/CREDENTIALS/DATE | Patricia Lilly, LADC/CCHP | 05/04/2017 00:00 |

.0/11/2018 9:31 AM -> TX Final Report 10-11-18 09:30 Page 1 of 1

## MobilexUSA

## RADIOLOGY REPORT

THIS REPORT IS BASED SOLELY UPON THE RADIOGRAPHIC EXAMINATION.
CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.

CONFIDENTIALITY NOTICE: This facsimile (including any accompanying documents) is intended for the use of MobilexUSA or the use of the named addressee(s) to which it is directed, and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee(s) or person(s) authorized to deliver it to the named addressee(s). If you received this facsimile in error, please report the error by calling the MobilexUSA Privacy Office toll free at 866.686.1717, and providing your name, telephone number and the date. Once you have reported the error, someone from the Privacy Office will contact you within one business day. They may ask you to fax back the information you received so that the company can correct its records and prevent further miscommunication. Please keep the information in a secure place until you are contacted by the Privacy Office and complete the return of the information to that office. Once this is done, please destroy all copies of the mistakenly sent information, without forwarding it. Thank you for your cooperation.

Facility: STRAFFORD COUNTY HOUSE OF CORRECTION - 53005
266 COUNTY FARM ROAD
DOVER, NH 03820-6003

DOS: 10/11/2018
Case: 28147638

Patient: ARIAS, ROBERT
Number:

DOB: 01/22/1984   Age: 34
Room: (ALL RESULTS)

Examination:

XRAY CHEST 1 VIEW

Results: There is no tuberculosis. The lungs are free of active pulmonary disease. The mediastinum shows no adenopathy or mass. The heart is normal and the osseous structures are also normal. There is no active disease.

Conclusion: Normal chest with no evidence of tuberculosis

Electronically signed by ELLIOT WAGNER, M.D. 10/11/2018 9:26:20 AM EDT.

Radiologist:     Date: 10/11/2018     Time: 09:26am ET

*Elliott Wagner*

ELLIOTT WAGNER, MD/LE
RADIOLOGIST
Physician: CHRISTOPHER BRAGA, MD

North East
109 RHODE ISLAND ROAD
LAKEVILLE, MA 02347
800.442.9729

Please call 1-800-442-9729 with any questions regarding this report

PATIENT NAME:          Arias, Robert
DATE OF BIRTH:         01/22/1983
DATE OF VISIT:         10/18/2017

**SUBJECTIVE:** See mental health eval. Inmate referred due to mental health followup from his last visit May 10, 2017. He was seen with a telephonic interpreter. He stopped taking Remeron after about six weeks due to no benefit. Increased his appetite and his weight went up and he describes that he did not feel that his mood was in any way better. He describes an auditory hallucination, but when we clarified, he states that it is just at night as he is falling asleep and he is having trouble with racing thoughts and worries. He states "I hear my wife or others calling me." He does state that the anxiety and the worried thoughts likely are at the root of the symptoms. There are no command hallucinations nor does he have any bizarre hallucination or any predating symptoms of psychosis. He has been here now 13 months. He is a federal inmate. He is pre-sentenced. He has difficulty awakening in the morning due to poor sleep and feels that morning dosing of medications will be problematic. For this reason, he will use bedtime dosing. We reviewed the risks and benefit and the range of treatment options. He is agreeable to trail of Zoloft and clonidine. He does not have any contraindications to their use. No history of low blood pressures or sudden cardiac death in his family.

**MENTAL STATUS EXAM:** Seated, calm, cooperative, polite, very somber looking. Thoughts are goal directed, sequential, and on topic. No psychotic symptoms. No thoughts of suicide, self-harm, homicide, or harm towards others. Mood is described as "just worried and tired." Affect serious, blunt, constricted range. Insight adequate. Judgment adequate.

**IMPRESSION:**
1. Major depressive disorder, most recent episode moderate.
2. History of substance use disorder.

**RECOMMENDATIONS:**
1. Start clonidine 0.1 mg one by mouth at bedtime to target sleep.
2. After three days of clonidine, then start Zoloft 50 mg one at bedtime for anxiety and depression.
3. Inmate will write back to mental health if he desires to increase the clonidine to 0.2 mg to target sleep or in four weeks if he is still experiencing symptoms of anxiety and depression, we can up titrate the Zoloft at that time.

Paul Maguire, M.D.

PM/KUL/SUD

215

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

---

Robert Arias                                      )

                                                     )

     v.                                          )        Case No.  17-cv-516-SM

                                                     )

U.S. Government, et al.                      )

---                                                   )

**PLAINTIFF'S SURREPLY TO REPLY TO OBJECTION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Robert Arias responds to the Reply of the Defendants as follows:

1.      The Defendants wrongfully assert that Mr. Arias' claims of injury during his arrest are not borne out or supported by his medical records, which they have attached as Document 51-2. Specifically, they attempt to use these documents to support an argument that Mr. Arias was not injured in the arrest because the first time that complained of pain was November 2016, some two months after the arrest.

2.      However, the medical records supplied by the Defendants clearly do support Mr. Arias' assertion that he was injured at the time of his arrest. The November medical visit was specifically for knee pain, as stated in a later record from March 6, 2017. That record reads:

> IM submitted as r/t not being able to fully bend his L knee after an injury. IM
> seen in Medical with a Spanish speaking officer. IM stated that he is unable to
> bend his knee. IM was last seen for a knee injury in November 2016.

Document 51-2 at 10.

1

**216**

3. Three days later—and six months before this action was filed—Mr. Arias saw a specialist and linked the knee injury to the arrest at issue. Specifically, on March 9, 2017, Mr. Arias was seen by an orthopedist, Christopher Schwieger, who stated:

> Patient with complaints of chronic left knee pain. Patient is status post ORIF with external fixation for a high tibial fibula fracture. Patient chronically has had loss of motion. Patient having increasing symptoms over the last 6 months. **Patient asserts injury while he was arrested.** Also complains of right hip pain.

Document 51-2 at 13 (emphasis added).

4. Thus, the Defendants' assertion that Mr. Arias' medical records contradict Mr. Arias' statement that Mr. Arias "asked for medical help at the County Jail [and] at that point I did get medical assistance for the pain in my leg" is verifiably false. Document 51 at 5.

5. In addition, in considering the medical records produced to date, the Court should be mindful that Mr. Arias' ability to voice and receive appropriate medical care was hindered by both his inability to speak English and the limited access to medical care in the correctional system. Mr. Arias specifically stated in his affidavit that he was never asked if he needed medical attention when first arrested.

6. Also, the pictures of Mr. Arias taken during the arrest are not conclusive of his injuries as they fail to show his full body and cannot account for internal injuries. Also, as Ms. Jose stated in her affidavit, Mr. Arias' injuries became worse and more visible/swollen with time.

7. Mr. Arias was injured during his arrest. His medical records from Strafford County corroborate his testimony, and create a triable issue of fact from which a reasonable jury could conclude that Mr. Arias was injured during his arrest.

8. With respect to the argument, at Document 51 at 3, that Mr. Arias' affidavit was inconsistent, the Defendants are simply cherry-picking Mr. Arias' affidavit. *See Brown v. Nucor*

2

**217**

Case 1:17-cv-00516-SM   Document 53   Filed 11/13/20   Page 3 of 5

*Corp.*, 785 F.3d 895, 913 at n. 18 (4th Cir. 2015) (rejecting the cherry-picking of affidavits for assertions that contradict the gist of the entire record). The sequence of assertions in Mr. Arias' notarized affidavit, from paragraph 13 to 21, depict a violent arrest, in which Mr. Arias asserts that he experienced pain and fear pressure on his ribs, being stepped on his left leg while on the ground, having his head banged into the ground, and an intense memory of pain in his leg. *See* Document 48-2, generally. What Mr. Arias testified to in his affidavit is that, at the time he signed the affidavit, he had no active recollection of being punched in the chest—but he felt pain there and he remembered being stomped on by the officers. *Id.* This, together with his verified assertion in his Complaint that he recalled being punched, creates a triable issue of fact.

9.      The Defendants attempt to discredit the affidavit of Carmen Jose, Mr. Arias' wife who was present at the time of the arrest by stating, "[I]t is important to note that Ms. Jose was on the opposite side of the car and undergoing her own arrest, no doubt skewing her view of those details." Document 51 at 3-4. Thus, the Defendants ask the Court to make judgments now about the weight and sufficiency of the evidence, and the credibility of the witnesses, provided at the summary judgment stage. That is improper. *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 17-18 (1 st Cir. 2007) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]")).

10.     Furthermore, any contradiction in Mr. Arias and Ms. Jose's affidavits is minor and should be resolved by a trier of fact. It does not provide any basis to grant summary judgment. *See id.*

11.     To the extent that the Defendants argue that this matter should be dismissed as to all Defendants because Plaintiff identified two whose testimony was that they were not present at

3

**218**

the time of his arrest, they are mistaken. Even assuming that the Defendants' affidavits are not contested, four of the six defendants concede that they were at the location of the arrest and indeed participated in the act of arresting Mr. Arias. *See generally* Objection to Motion for Summary Judgment, Document 48-1 at 7-9 (noting, *e.g.,* that Officers Kucharski, Day, Bernard and Herzon admitted that they were present and two admitted to touching Mr. Arias during the arrest; that Defendant Herzon grabbed Plaintiff roughly and cut off his circulation to his arms and legs grabbing him by the neck and head and throwing him to the ground). Whose statement is the truth—Mr. Arias' or that of the arresting officer(s)—is a question of fact to be decided by a jury. *Anderson*, 477 U.S. at 255.

12.     In addition, the law supports a finding that law enforcement officers involved in a violation of a person's rights under § 1983, through acts or omissions, can be found to be the proximate cause of the injury, even if they played a minor role in the incident. *See Guiterrez-Rodrigues v. Cartagena*, 882 F.2d 553, 561 (5th Cir 1989) (officers who only participated in intervention could be deemed proximate cause of plaintiff's injuries); *Bowen v. City of Manchester*, 966 F.2d 113 (1st Cir. 1992). In this case, the two officers who claim to not be present, may well have had duties to Mr. Arias during the arrest that give rise to liability.

13.     In sum, the Defendants' Motion for Summary Judgment does not establish undisputed facts upon which judgment can be granted as a matter of law. The Plaintiff's medical records, his Verified Complaint, and the affidavits of his wife and himself generally and specifically contradict the declarations of the arresting officers supplied in support of the Summary Judgment motion. For these reasons, the Plaintiff requests that the Court deny the Motion for Summary Judgment and schedule this matter for trial.

4

**219**

Case 1:17-cv-00516-SM    Document 53    Filed 11/13/20    Page 5 of 5

Respectfully submitted,

ROBERT ARIAS

Dated:  November 13, 2020

/s/ Jeremy D. Eggleton
Jeremy D. Eggleton, Esq. (BNH #18170)
ORR & RENO, P.A.
45 S. Main Street
P.O. Box 3550
Concord, New Hampshire 03302-3550
Tel.:    603-224-2381
Fax:    603-224-2318
E-Mail: jeggleton@orr-reno.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing surreply was forwarded by ECF to counsel of record.

Dated:  November 13, 2020

/s/ Jeremy D. Eggleton
Jeremy D. Eggleton

2952645_1

Case 1:17-cv-00516-SM   Document 1   Filed 10/19/17   Page 3 of 31

**United States District Court**
**District of New Hampshire**

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

2017 OCT 19 A 10: 55

Robert Arias
_____
Plaintiff

v.

U.S. Goverment
_____
Defendant(s)

Civil Action No. 17·CV·516·SM
(To be provided by Clerk's Office)

**TO BE COMPLETED BY PLAINTIFF**
(Check One Only)
☒ DEMAND FOR JURY TRIAL
☐ NO JURY TRIAL DEMAND

## COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C § 1983

I.    Parties

A.  Please provide the following information for each plaintiff:

1. Name _Arias_____Robert_____
          (Last)          (First)        (Initial)

2. Place of Detention _Strafford County D.O.C_____

3. Institutional Address _266 County Farm Rd_____
_Dover, NH_____

4. Are you incarcerated pursuant to a pretrial detention order or are you a sentenced inmate?

    ☒ Pretrial Detention Order
    ☐ Sentenced Inmate

5. Date pretrial detention order was issued or sentence imposed _9/8/16___

USDCNH-11 (Rev. 5/13)(previous editions obsolete)        Page 3

Case: 23-1618    Document: 00118080310    Page: 222    Date Filed: 12/04/2023    Entry ID: 6607242

Case 1:17-cv-00118080310    Document: 1    Filed 10/19/2023    Page 2 of 31

On Sept 8th 2016 while enroute to the mall with my girlfriend I or rather we entered the entrance to the mall when we were surrounded by DEA agents. These agents then approached the car very quickly opened the passenger door and attempted to pull me out of the vehicle. I was grabbed by several officers in a number of areas of my body Neck/head, arms and legs. But to no avail because I had a seatbelt on. These officers managed to pull me almost out the car and against the restraint of the seatbelt. Before realising that the attempt was useless and placing me back in the car with such force that I banged ~~by~~ my head off of the roof of the car. The force of the blow cause me to scream out in pain inturn setting off the agents in punching and choking me. While one agent cut the seatbelt away from me. Once the seatbelt was off of me, these

222

continued to page 2

Pg 2 of 3

agents mishandled me by snatching me out of the car where they continued to punch and Kick me. Agents were holding me down in several ways all as inhumanely as possible. i) Foot on my head, standing on my ankles and pinning me to the ground like a wrestler. While doing this one agent pull my pants down to my thighs and reach into my underware and grabbed my penis.

All the agents were screaming and yelling orders because there was several commands at one time and because they were all speeking english my second language I didnt quite make out what they were saying. And I was punished for this by way of punches and Kicks. I was badly hurt from these assaults and suffered not only physical abuse but mental as well. After the incident I continued to suffer pain in and around my left leg, and fell into a depression From always being reminded of the brutal attack from the pain I

continue to page 3

endured. My Medical files will bere the burden of proof on my injuries where I cant get corrected surgery at the facility Im at, and am in need of. I'm losing range of motion, my extension is limited and the symptoms are increasing over time. I have chronic hip and Knee pain that I've never experienced before. I had consultation and continuing Coonsling with Doctors, and Pyschologist. I now have anxiety everytime I'm remind from the pain. I have problems sleeping, hearing voices and Migrains consistantly, I'm reminded everyday of how humiliated I was in the public eye. Let me remind the court at of fear I also wet my pants during this incident, and couldnt walk normally I had to be assisted.

Under 14th amendment Due Process emphasizes Fairness between state and individual and equal protection, And no agency shall disregard prohibition of the 14th amendment..

Excessive force was used in the Process of

224

continue pg4

an arrest. In the police report it doesn't state that I resisted arrest in anyway. Under the 14th amendment this ~~act~~ constitutes unreasonable arrest because of the assaults and the public peace disturbance.

As a matter of law Im entitled to a summary judgment because my conduct fell within Purview of state statute by obeying officers while in the capicity of their duties. And still got assaulted For no penological reason. The agents did use excessive Force in effectuating arrest violating my 4th 8th and 14th amendment right to be protected from ~~xxxx~~ assault from law enforcement officers, and the excessive use of force or the deliberate indifference ~~of~~ the deprivation of my rights.

The Factual element in this case should determine whether the force used was excessive and not privileged. A controlling factual element would be like why such force was used. When is the degree of force ever permitted

225

continued to 5

or justified, whether in a group or personal participation. These agents acted is deliberate indifferance to me by using excessive force in assaulting me during arrest. 1983 is defined as any person who under color of any statute, subjects any citizen of the US. to the deprivation of any rights secured by the constitution.

This claim is cognizable and sufficiently supported by factual allegation.

Roberto Arias
Robert Arias

B. Please provide the full name, current title and address known for each defendant:

1. Name _____ Day _____
(Last)                    (First)                    (Initial)

2. Title __TFO DEA NewHampshire M.D.O__

3. Address __U.S. Department of Justice DEA__
Manchester Resident Office 324 River Rd Bedford
NH 03110

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.    Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: Violation of US. Constitution Amendment IV Excessive force

Supporting Facts: Officer Day did use excessive force when effecting the arrest on _____ He knowingly and intentionally assisted in trying to snatch me out of a vehicle while I still had a seatbelt on. When agent realised that I couldnt be removed because of the belt, he as well as others threw me back into the car, cut seat belt and proceeded to throw me to the ground. Where agent then forcably held me down by pinning my legs, by standing on them, and continuosly hitting me.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 4

Allegation 2: Failure to Prevent excessive Force

Supporting *Facts*: Agent did Knowingly and intentionally Participate in assaulting plaintiff and stood by while other agents proceeded to hit, Kick, drag, and humiliate plaintiff in an open (public) enviroment. This agent had the opportunity to prevent his as well as other agents use of excessive force. There is evidence that the agency does not allow this type of behavior. (Policy & procedures)

Allegation 3: Cruel and Unusual Punishment by using excessive force in violation of 8th amendment

Supporting Facts: Agent Forcing plaintiff to be treated in a malicious act intended to harm plaintiff for no legitimate Penological reason. Other than to subject plaintiff to a excessively painful procedure conducted in violation of his own procedures and policies. Agents did cause me to become paralysis immobility on ___ leg

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.    Relief

You must request specific relief in your Complaint.  State briefly exactly what you want the court to do for you (attach additional pages if necessary):

I would like the court to hold the Agent and Agency accountable for these action by reprimand and/or admonishment by instituting policy on procedures or regulating the policies in place. I would like for the court to as a relief to my Pain & suffering grant me three million dollars. This money would compensate the injuries that are unrepairable.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 5

Date: _10-5-17_                    _Robert arios_
                                    Signature of Plaintiff

State of New Hampshire        ]
                              ]    ss
County of _Strafford_         ]

_Robert arias_____, being first duly sworn, upon oath, presents that (s)he has read and subscribed to the foregoing complaint, and states that the information contained therein is true and correct.

Subscribed and sworn before me this _5th_ day of _October_, 20_17_.

_____
ISABEL PADIAL, NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 15, 2021

| **O R** |
| --- |

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

_10-5- XX -17_                    _Robert arias_
        DATE                            SIGNATURE

## JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed.

YES (X)        NO ( )
**(check one only)**

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 6

Case 1:17-cv-00516-SM    Document 1    Filed 10/19/17    Page 16 of 31

Date: _10-5-17_                                    _Robert prior_
                                                   Signature of Plaintiff

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 7

**230**

B. Please provide the full name, current title and address known for each defendant:

1. Name ___Herzon_____Noah_____A._____

               (Last)                       (First)                (Initial)

2. Title __G.S.____New Hampshire____M.D.O_____

3. Address __U.S Department of Justice, Manchester Resident Office 324 River Rd, Bedford NH 03110___

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.    Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: Violation of U.S. Constitution Amendment IV Excessive force

Supporting *Facts*: Agent Herzon did Knowingly and intentionally use excessive force while effecting an arrest on ——— Agent Herzon with the assistance of other agents did grab plaintiff roughly and tried to pull plaintiff from an automobile while he was still belted to the seat. Causing plaintiff to choke and cut circulation of in his arms and legs. This agent also retaliated against plaintiff for expressing concern as to the assault by grabbing plaintiff by the neck and head area and throwing him to the ground.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)              Page 4

Case 1:17-cv-00518-SM   Document 1   Filed 10/19/17   Page 12 of 31

Allegation 2: Violation of U.S. Constitutional Amendment 8th Cruel and unusual punishment.

Supporting *Facts*: Agent Herzon did use cruel and unusual punishment on me when he grabbed me by my neck causing me to choke. Then pulling my pants down in a public area and proceed to reach into my underwear and squeeze my testicals agent also participated in kicking, punching, and dragging me from vehicle prior to arrest. Agent did force me to be treated in a malicious act intended to harm myself and subject myself to be treated in a excessively painful procedure

Allegation 3: Failure to prevent Excessive Force

Supporting Facts: Agent Herzon did participate in assisting other agents in assaulting plaintiff and then stood by while others proceeded to continuously assault plaintiff. This agent had the opportunity to prevent his as well as others use of excessive Force. But didn't.

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.   Relief

You must request specific relief in your Complaint. State briefly exactly what you want the court to do for you (attach additional pages if necessary):

I would like the court to hold the agents and the agency accountable for there action by reprimand and/or admonishment by instituting policy on procedures or regulating the policies in place. I would like for the court to as a relief to my pain and suffering grant me three million dollars. This money would compensate for the life long injuries Ive suffered this far.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 5

Case 1:17-cv-00518-SM  Document 1  Filed 10/19/17  Page 13 of 31

Date: _10-5-17_  _____Robert arias_____
Signature of Plaintiff

State of New Hampshire ]
                      ]  ss
County of _Strafford_ ]

_Robert arias_ , being first duly sworn, upon oath, presents that (s)he has read and subscribed to the foregoing complaint, and states that the information contained therein is true and correct.

Subscribed and sworn before me this _5th_ day of _October_, 20_17_.

_____Isabel Padial_____

ISABEL PADIAL, NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 15, 2021

| **O R** |
| --- |

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

_10-5-17_  _____Robert arias_____
DATE              SIGNATURE

## JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed.

YES (✓)   NO ( )
(check one only)

USDCNH-11 (Rev. 5/13)(previous editions obsolete)          Page 6

Case 1:17-cv-00518-SM    Document 1    Filed 10/15/17    Page 14 of 31

Date: _10-5-17_                    _Robert arios_
                                   Signature of Plaintiff

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 7

B. Please provide the full name, current title and address known for each defendant:

1. Name ___Infante_____Juan_____
           (Last)              (First)              (Initial)

2. Title __T.F.O  N.H. DEA, MDO_____

3. Address __US. Department of Justice. Manchester
Resident Office 324 River Rd Bedford N.H. 03110

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.   Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: Violation of U.S. Constitutional Amendment IV. Excessive Force

Supporting *Facts*: Officer Infante did use excessive force when effecting arrest on Plaintiff. He Knowingly and intentionally pulled punched, Kicked, and dragged plaintiff prior to arrest. This agents behavior was erratic while continuously hitting and screaming Plaintiff.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)          Page 4

Allegation 2: Violation of 8th amendment - Cruel and unusual Punishment

Supporting *Facts*: Agent forcing plaintiff to treatment in a malicious act intened to harm plaintiff. By pulling plaintiff out of car while still seatbelted, by throwing plaintiff to the ground, then proceeding to kick and punch plaintiff while he was already subdued. Pulling down plaintiff pants and grabbing his testicals while in a public enviroment.

Allegation 3: Failure to prevent Excessive Force

Supporting Facts: Agent did participate in the assaulting of plaintiff and then stood by while others did the same all in the capicity of his duty. And for no perological reason. did subject plaintiff to punishment not warrented by any immediate danger

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.    Relief

You must request specific relief in your Complaint.   State briefly exactly what you want the court to do for you (attach additional pages if necessary):

Grant Plaintiff relief in the sum of three million dollars for pain and suffering and injuries encured by the assaults

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 5

Case 1:17-cv-00516-SM    Document 1    Filed 10/19/17    Page 17 of 31

Date: _10-5-17_                                                    ___Robert arios___
                                                                    Signature of Plaintiff


State of New Hampshire          ]
                                ]       ss
County of _Strafford_           ]


_Robert arias_ , being first duly sworn, upon oath, presents that (s)he has
read and subscribed to the foregoing complaint, and states that the information contained therein is true
and correct.


Subscribed and sworn before me this __5th__ day of _October_ , 20_17_.

                                                    ___Isabel Padial___

                                                    ISABEL PADIAL, NOTARY PUBLIC
                                                    MY COMMISSION EXPIRES JUNE 15, 2021

| O R |
|---|

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE
AND CORRECT.

10-5-~~18~~-17                          ___Robert arios___
              DATE                              SIGNATURE


### JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed.

YES (X)      NO ( )
**(check one only)**


USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 6

Case 1:17-cv-00518-SM Document 1 Filed 10/19/17 Page 13 of 31

Date: _10-5-17_       _Robert arias_
                                Signature of Plaintiff

Case 1:17-cv-00516-SM Document 1 Filed 10/19/17 Page 13 of 31

B. Please provide the full name, current title and address known for each defendant:

1. Name _Garcia_
          (Last)         (First)       (Initial)

2. Title _TFO DEA New Hampshire M.O.O_

3. Address _US. Department of Justice DEA Manchester Resident Office 324 River Rd Bedford N.H. 03110_

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.    Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: _Violation of US. Constitution Amendment IV. Excessive Force_

Supporting *Facts*: _Agent Garcia did use excessive Force when effecting arrest on. He Knowingly and intentionally assisted other agents in Kicking, Ponching, dragging and humiliating Plaintiff in Plain view of citizens in a public area. Agent did cause me injury by holding my head down with his Knee For a period of time._

USDCNH-11 (Rev. 5/13)(previous editions obsolete)         Page 4

Allegation 2: Violation of U.S. Constitutional Amendment 8th Cruel and unusual punishment.

Supporting *Facts*: By Agent Forcing Plaintiff to be treated in a malicious act intended to harm plaintiff for no penological reason, other to subject plaintiff to a excessivly painful procedure conducted in violation of agents own policies and procedures.

Allegation 3: Failure to Prevent excessive Force

Supporting Facts: Agent did Knowingly and intentionally participated in assaulting plaintiff and stood by while others proceeded to Kick, punch, drag, and humiliate plaintiff in an public enviroment. This agent had the opportunity to prevent his as well as others Use of excessive Force but chose not to.

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.     Relief

You must request specific relief in your Complaint. State briefly exactly what you want the court to do for you (attach additional pages if necessary):

I would like for the court to hold this agent accountable for his actions or lack of by reprimand and/or admonish by instituting policy or procedure, or regulate the polices in place. I would also like the court to grant me the sum of 3 million dollars for the injuries I've endured that are

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                          Page 5

irrepairable

Date: _10-5-17_                     ___Robert ario___
                                         Signature of Plaintiff

State of New Hampshire          ]
                                ]       ss
County of _Strafford_           ]

___Robert arias___, being first duly sworn, upon oath, presents that (s)he has read and subscribed to the foregoing complaint, and states that the information contained therein is true and correct.

Subscribed and sworn before me this __5th__ day of __October__, 20_17_.

                                    ___Isabel Padial___
                                    ISABEL PADIAL, NOTARY PUBLIC
                                    MY COMMISSION EXPIRES JUNE 15, 2021

**O R**

    I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

_10-5-17_                          ___Robert ario___
    DATE                                  SIGNATURE

## JURY TRIAL DEMAND

    I demand a jury trial for all claims for which a jury trial is allowed.

YES (X)     NO ( )
**(check one only)**

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 6

**241**

Case 1:17-cv-00516-SM Document 1 Filed 10/19/17 Page 22 of 31

Date: _10-5-17_                         _____Robert arios_____
                                            Signature of Plaintiff

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 7

Case 1:17-cv-00518-SM Document 1 Filed 10/19/17 Page 23 of 31

B. Please provide the full name, current title and address known for each defendant:

1. Name __Kurcharski,_____ __Ty__
                  (Last)               (First)        (Initial)

2. Title __TFO   New Hampshire   DEA   MDO__

3. Address __US Department of Justice Manchester Resident Office 324 River Rd Bedford NH03110__

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.    Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: __Violation  of  U.S. Constitutional  Amendment IV  Excessive force__

Supporting *Facts*: __Agent did use excessive force when effecting the arrest on Plaintiff. He knowingly and intentionally assisted in assaulting plaintiff by either Kicking, punching, dragging, or pulling plaitiff from car.__

Allegation 2: <u>Failure to Prevent Excessive Force</u>

Supporting *Facts*: Agent did stand by while agents proceeded to assault plaintiff. This agent had the opportunity to stop or prevent some of the excessive force being used, but chose not to.

Allegation 3: _____

Supporting Facts:

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.  Relief

You must request specific relief in your Complaint. State briefly exactly what you want the court to do for you (attach additional pages if necessary):

I would like the court to grant Plaintiff the sum of three million dollars for relief from the pain and suffering and injuries endured from the assault of DEA agents.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 5

Date: _10-5-17_        _Robert arias_
                                                                 Signature of Plaintiff

State of New Hampshire     ]
                      ]   ss
County of _Strafford_    ]

_Robert arias_ , being first duly sworn, upon oath, presents that (s)he has read and subscribed to the foregoing complaint, and states that the information contained therein is true and correct.

Subscribed and sworn before me this _5th_ day of _October_ , 20_17_..

                                          _Isabel Padial_
                                         ISABEL PADIAL, NOTARY PUBLIC
                                  MY COMMISSION EXPIRES JUNE 15, 2021

| **O R** |
|---|

    I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

_10-5-17_                   _Robert arias_
     DATE                                 SIGNATURE

## JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed.

YES (X)    NO ( )
**(check one only)**

USDCNH-11 (Rev. 5/13)(previous editions obsolete)           Page 6

Case 1:17-cv-00518-SM   Document 16   Filed 10/15/17   Page 26 of 31

Date: _10-5-17_                    _Robert arios_
                                   Signature of Plaintiff

USDCNH-11 (Rev. 5/13)(previous editions obsolete)            Page 7

Case 1:17-cv-00518-SM Document 17 Filed 10/19/17 Page 27 of 31

B. Please provide the full name, current title and address known for each defendant:

1. Name ___Bernard___

  (Last)          (First)          (Initial)

2. Title TFO DEA New Hampshire M.O.O

3. Address U.S. Department of Justice Manchester Resident Office 324 River Rd, Bedford NH 03110

(If the complaint is being made against more than one defendant, please attach additional sheets listing the above information and allegations as follows.)

II.  Statement of Claim

For each claim, please include the following information on attached sheets:

1. State which of your federal constitutional or federal statutory rights have been violated.

2. State which defendant(s) have violated that particular right for each allegation.

3. State, with specificity, the facts and circumstances that gave rise to the violations or deprivations alleged.

4. State the harm or damage that resulted from the alleged violation or deprivation.

Allegation 1: Violation of U.S. Constitution Amendment IV Excessive force

Supporting *Facts*: Agent Benard did use excessive force when effecting the arrest on plaintiff. Agent did knowingly and intentionally assaulted plaintiff when he assisted & others in kicking, punching, grabbing, dragging, and holding plaintiff down while being arrested.

Allegation 2: Failure to prevent Excessive Force

Supporting *Facts*:

Agents did assault plaintiff and then stood by while other agents assaulted plaintiff for no pendological reason. The agents had the opportunity to stop or prevent the excessive force used.

Allegation 3: _____

Supporting Facts:

(If more space is needed to explain any allegation or to list additional facts, attach additional pages)

III.    Relief

You must request specific relief in your Complaint. State briefly exactly what you want the court to do for you (attach additional pages if necessary):

I would like the court to grant relief in the sum of 3 million dollars for the pain and suffering I've endured. And the indefinite injuries I've recieved as a result to the assaults and incident.

USDCNH-11 (Rev. 5/13)(previous editions obsolete)                    Page 5

Date: _10-5-17_                    _Robert arias_
                                          Signature of Plaintiff


State of New Hampshire          ]
                                ]       ss
County of _Strafford_           ]


_Robert Rainery Arias_ , being first duly sworn, upon oath, presents that (s)he has read and subscribed to the foregoing complaint, and states that the information contained therein is true and correct.


Subscribed and sworn before me this ___5th___ day of _October_ , 20_17_.

_Isabel Padial_

ISABEL PADIAL, NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 15, 2021

| O R |
| --- |

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

_10-5-17_                        _Robert arias_
      DATE                            SIGNATURE


## JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed.

YES (X)     NO ( )
(check one only)


USDCNH-11 (Rev. 5/13)(previous editions obsolete)          Page 6

Case 1:17-cv-00518-SM   Document 1   Filed 10/19/17   Page 56 of 31

Date: _10-5-17_

_Robert Arios_
Signature of Plaintiff

Case 1:17-cv-00516-SM Document 1 Filed 10/19/17 Page 31 of 31

**Please print or type**

# The State of New Hampshire
## JUDICIAL BRANCH - SUPERIOR COURT

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

Merrimack _____ County

Case No. _____

2017 OCT 19 A 10 55

In the matter of _____

MOTION __Laurie__

17-CV-516-SM

(Briefly describe purpose of motion)

Your Name __Robert Arias__

A. What orders do you want the Court to make?

1. Plaintiff would like a copy of all defendants files in responce to Laurie act

2. _____

3. _____

B. Why should the Court make these orders? (List each reason separately.)

1. Plaintiff Robert Arias is seeking action in a Civil Suit against DEA Agents Jfor violation

2. of 4th & 8th Amendment of the U.S.C. and Violation of Policies to prevent such excessive Force

3. _____

4. _____

5. _____

C. I certify that a copy of this motion was this day mailed/given to (insert names) (lawyer for other side, if any) (other side, if no lawyer) (guardian ad litem) (OCS, if State is a party) (insert names):

_____

__10-5-17__

Date

__Robert aria__

Signature (Sign in front of Notary Public or Justice of the Peace)

State of New Hampshire

__Strafford__ County

The person signing these affidavits appeared and signed this before me and took oath that the facts stated in these affidavits are true, to the best of his or her knowledge and belief.

__10/5/17__

Date

_____

Notary Public / Justice of the Peace

ISABEL PADIAL, NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 15, 2021

SC-MOTION-WEB03